# EXHIBIT 5

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CHRISTOPHER HATCHER, et al.,

        Plaintiffs,

    v.                        Case No.
                                 3:23-cv325-JAG

DAVID R. HINES, SHERIFF OF THE
COUNTY OF HANOVER, VIRGINIA, et al.,

        Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF GREGORY WAYNE SIX

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

November 13, 2023

Hanover County, Virginia

# ORIGINAL

CHANDLER and HALASZ, INC.
Stenographic Court Reporters
P.O. Box 1975
Mechanicsville, Virginia 23116
(804) 730-1222
Reported by:  Beverly S. Lukowsky
Shorthand Reporter

Deposition of GREGORY WAYNE SIX, was taken by and before Beverly S. Lukowsky, Notary Public in and for the Commonwealth of Virginia at large, pursuant to Rules 30(b)(6) of the Federal Rules of Civil Procedure; commencing at 1:00 p.m., November 13, 2023, at the Hanover County Sheriff's Office, 7522 County Complex Road, Hanover, Virginia 23069.

Appearances:

BUTLER CURWOOD
By:  CRAIG J. CURWOOD, ESQ.
attorney, of counsel for Plaintiffs
craig@butlercurwood.com

THOMPSON McMULLAN, P.C.
By:  WILLIAM D. PRINCE, IV, ESQ., and.
PETER S. ASKIN, ESQ.
attorneys, of counsel for
Defendant David R. Hines, Hanover Sheriff.
wprince@t-mlaw.com.
paskin@t-mlaw.com.

HARMAN CLAYTOR CORRIGAN & WELLMAN P.C.
By:  MELISSA Y. YORK, ESQ.
attorney, of counsel for
Defendant County of Hanover
myork@hccw.com

Also Present

Christopher Hatcher, a Plaintiff

o0o

CHANDLER & HALASZ, INC.

Deposition of GREGORY WAYNE SIX, was taken by and before Beverly S. Lukowsky, Notary Public in and for the Commonwealth of Virginia at large, pursuant to Rules 30(b)(6) of the Federal Rules of Civil Procedure; commencing at 1:00 p.m., November 13, 2023, at the Hanover County Sheriff's Office, 7522 County Complex Road, Hanover, Virginia 23069.

Appearances:

          BUTLER CURWOOD
          By:  CRAIG J. CURWOOD, ESQ.
          attorney, of counsel for Plaintiffs
          craig@butlercurwood.com


          THOMPSON McMULLAN, P.C.
          By:  WILLIAM D. PRINCE, IV, ESQ., and.
          PETER S. ASKIN, ESQ.
          attorneys, of counsel for
          Defendant David R. Hines, Hanover Sheriff.
          wprince@t-mlaw.com.
          paskin@t-mlaw.com.


          HARMAN CLAYTOR CORRIGAN & WELLMAN P.C.
          By:  MELISSA Y. YORK, ESQ.
          attorney, of counsel for
          Defendant County of Hanover
          myork@hccw.com


Also Present

     Christopher Hatcher, a Plaintiff


                    o0o

CHANDLER & HALASZ, INC.

```
                    I N D E X

                  D E P O N E N T

Examination By:                              Page

              GREGORY WAYNE SIX

Direct     - Mr. Curwood                       4




                  E X H I B I T

  1          - Notice of Deposition            6




                      o0o
```

CHANDLER & HALASZ, INC.

those are assignments; right.

But it's any time that you are working, when you are scheduled to work, or when you have an assignment to work.  Those hours are tracked either in our Kronos time and attendance system, or in a extra duty overtime software system.  So that's Letter A.

Letter B, Marking On Duty.  Marking on duty doesn't really mean anything to the sheriff's office.  We mark on the radio, not interchangeable with being on duty.  So when you mark on -- or when an officer, sorry, marks on the radio, they can do it before their shift.  Sometimes people forget and they do it after their shift has started.  But it is merely a means by which the officer lets our dispatch center know that they are on the radio.  It is not used as a means of compensation.  They are two completely separate systems.

Off-duty, Letter C, I think would be the exact opposite of on-duty.  You're outside the window of your prescheduled work times, whether it be your normal shift, court overtime, a special assignment that you have, or some type of supplemental employment.

And then, again, Letter D, Marking

that process work?

A    Called on the radio --

Q    All right.

A    -- by their unit number.

Q    And in order for -- to give the example, you said, of a deputy who doesn't have a take-home car who might not hear it -- hear a call because they don't have a radio on, is there a requirement that, if you have a take-home car, that you have the radio on?

A    Is there a requirement; no.

Q    Okay.  So what if -- how are, how are deputies with take-home vehicles called for service if there's -- if their radio is not on?

A    Well -- and how you asked the question, I would say that they're not called if the radio is not on.

Q    Okay.  What are the requirements for deputies who are given take-home vehicles with respect to marking on?

A    We require people to mark on the radio for the shift that they are coming to work.  When that happens, like how soon before they mark on the radio or how soon after their shift that they mark off the radio, we do not have any specific requirements or

CHANDLER & HALASZ, INC.

policy that requires that.  It's generally officer preference.

Q    So what is the policy, then, for marking on for the shift?

A    There isn't one.

Q    Okay.  So that -- there's no re- -- well, what is the policy for marking on for the shift?

A    We have no policy --

Q    Okay.

A    -- for marking on the shift as it relates to marking on the radio, which I presume is the context you're asking me.

Q    Yeah, no.  If you -- I don't want you presuming anything.  If you need clarification, absolutely ask me.

A    Well, we were talking about the radio, that's why I asked.

Q    Okay.

A    So marking on the radio, we, we don't have a policy that you have to mark on the radio for your -- before your shift.  It is a practice that officers mark on the radio prior to their shift.  But whether that -- the time period with which that is done varies amongst everyone.

Q    All right.  So, so then what is the

CHANDLER & HALASZ, INC.

practice?  Tell me, if there's no policy, tell me what the practice is at the sheriff's office.

MR. PRINCE:  Objection to form.

You can answer.

A    I think it depends on the individual officer.  Some officers may mark on at, say, 5:30 for a 6 o'clock roll call.  Some officers may mark on at 5:59 when they're walking down the back steps of the sheriff's office going to roll call.  Some officers may forget all together and not mark on and have to do it after roll call.

BY MR. CURWOOD:

Q    So let me talk about policy -- or excuse me, Topic Number 3B.  You know, you layed it out earlier about marking on, and maybe that's what we ought to follow up on because you were using the term marking on the radio.

Is there any other type of terminology that's used at the sheriff's office relating to marking on that's separate and apart from the radio?  Is there any other way to mark on?

A    I think mark on is way too general a term for me to answer.  Mark -- again, mark on means several things.  You could mark on the radio.  You could be within the time period that you're

scheduled to work and go into Kronos and enter your end punch of when your shift started that morning, that could be considered marking on.

Q    And then --

A    Just the --

Q    Go ahead, I don't mean to interrupt you.

A    Just the term marking on doesn't mean anything to us.

Q    All right.  As far as the several things it could mean, it could mean marking on radio, marking on some specific way on Kronos that you just described.  What other of the several ways could marking on mean besides those two?

MR. PRINCE:  Objection to form.

You can answer.

BY MR. CURWOOD:

Q    You can answer.

A    I don't know.

Q    Can you mark on a PC or computer?

A    You can log onto the computer, yes.

Q    All right.  Well, what do you mean by logging onto the computer?

A    So when you log into your computer, you enter your credentials.  You can pull up mobile CAD and mark yourself in CAD as being on the radio, so

to speak.

Q    Any other way you can mark on in addition to that?

A    You can mark on by telephone.  You -- although we don't really allow it, you could mark on via MDT message.  I think those are generally it.

Q    What is MDT message?

A    MDT is basically your computer.  It's a mobile data terminal.  And when you're logged in to mobile CAD, you have the ability to send messages back and forth between other officers, or to the person working the computer at dispatch, and you have the ability to send them a message.

Q    Okay.  So when you say mark -- you can mark on the radio is one option, does that -- what I picture like a CB-type radio, you press a button and you announce yourself and other people hear you, is that, is that what the radio is?

A    Yes.

Q    All right.  So there's radio; there's Kronos; there's computer; there's mobile CAD; there's MDT message; and there's telephone.  Is that --

A    Uh-huh.

Q    -- all those things?  And just because

it's a deposition you have to say yes.

A    Yes.

Q    Is there any others that you can think of?

A    None that I can think of right now.

Q    And is there -- does the sheriff's department, when it trains its deputies on how to go about marking on, is there a specific or a preferred method that deputies are trained?

A    We teach them that they can mark on the radio with their portable radio, their mobile radio. We also teach them that, if you have a problem with your mobile or portable radio, you can, you can walk into communications and mark on verbally in person. You can mark on the radio via phone.  Everything that we just discussed on the list about what it may mean to mark on, they're taught all of that.

Q    In addition to verbally in person, I guess that was a new one that we just talked --

A    Well, it's --

Q    -- about, which is fine.

And that means -- what? -- verbally in person to, to whom?

A    To one of the dispatchers in the dispatch center.

Q    All right.  So marking on, does marking on

relate to notifying dispatch the way the terms --

MR. PRINCE:  Just to clarify, you're talking about marking on through the radio?

THE DEPONENT:  Marking on through the radio is notifying dispatch that you're on the radio.

BY MR. CURWOOD:

Q    So, no, I'm not clarifying that that's what I was asking.

A    Okay.

Q    Because we were talking about ways to mark on.  And you've said there's a radio, but there's also other ways.  So there's in person; there's Kronos; there's a computer.  So is there any other way of marking on in addition to any of the others that you've identified?

MR. PRINCE:  Objection to form.  Calls for speculation.

You may answer.

A    As I understood it, we were talking about marking on the radio.  And then you asked what other ways could, could you mark on besides the radio.

BY MR. CURWOOD:

Q    So let me take back --

A    That's what I understand.

CHANDLER & HALASZ, INC.

Q    Okay.

A    So if I mix that up, please, please direct me back to where I need to be.

Q    Let's -- let me ask this.  You're using, you're using a term marking on the radio.  Is that term, marking on the radio, a term that means something at the sheriff's department?

A    Yes.

Q    Okay.  What does it mean?

A    It means you are on the radio.  The dispatch knows that you're on the radio.

Q    And does the term marking on mean anything at the sheriff's department?

A    No, I think that's too general.

Q    Okay.  And you don't hear deputies or sheriffs or officers use that term marking on without the words the radio?

A    Sure.  I think --

Q    Okay.

A    -- they may use it.

Q    Okay.  And what's your understanding when they use that term of what they're talking about?  Are they talking about what you're saying marking on the radio means?

A    You're -- I'm going to have to make an

Q    Okay.  What's the sheriff's reason for having deputies mark on with dispatch?

A    Same.

Q    Okay.

A    You mark on with dispatch so that you you'll know that you know -- or that, I'm sorry, they know that you're coming or going to a particular shift for an assignment.

Q    Okay.  And to the extent that the sheriff wants deputies to know -- or dispatch to know where the deputies are, what, what, if any, requirement or policy does the sheriff have with its deputies as to when to mark on with dispatch?

MR. PRINCE:  Objection to form.

You can answer.

A    We don't have a specific policy that says when.  We just have a practice that you do it before your scheduled shift or your scheduled time of work.

BY MR. CURWOOD:

Q    And how does the sheriff make known to its deputies what the practice is?

A    That's done during field training.  I mean, it's -- I'm not trying to be condescending when I say this, but it's common sense, right, that if your shift starts at 6, you need to be on the

A    Probably more so during field training.

Q    All right.  And is field training when, when the time that the sheriff informs its newer officers what the practice is with regard to informing dispatch for -- about marking on?

A    It's probably not the first time, but it is covered.

Q    Okay.  And if it's covered before field training, when does the sheriff cover it and how?

A    It will be during the academy.  Each academy is different because we normally have a spring and a fall academy.  The seasons dictate when we do certain things in each academy.

So, like, in a winter academy we do driving later because we don't want to get hit with snow and have to -- that's catastrophic for us having to cancel driving in the middle of an academy.  So same thing with the fall, we would do driving early.

So dependent upon each academy, we give them their portable radios, not mobile radios, portable radios during the academy, and we instruct them on the ten codes that we use on the radio.  It is -- the ten code curriculum is a standard curriculum by which we instruct, because there is --

CHANDLER & HALASZ, INC.

home or using it.

Q    Or responsibility for having it?

A    Correct.

Q    All right.  As far as you know, there's no -- nothing other than the administrative code on that -- or whatever you used -- policy on that that's in writing?

A    Nothing that comes to mind.

Q    All right.  As a general -- if you can categorize it, or say, you know, which officer -- which deputies at the Hanover County Sheriff's Department in general get take-home cars versus which deputies don't?

A    So to have a take-home car where you take it to your residence, you have to live in an adjoining jurisdiction within ten air miles.  As long as you are within an adjoining jurisdiction within ten air miles, you are allotted the benefit of being able to take your patrol vehicle or your sheriff's office vehicle home to your residence.

Q    What about, how do you even get to which deputies have that option, you know --

A    Everyone gets it.

Q    Court bailiffs?

A    Correct.

CHANDLER & HALASZ, INC.

Q    Okay.  How many sworn deputies are there below the rank of lieutenant?  Approximately is fine, it's not a test.

MR. PRINCE:  Objection to form.

You can answer.

A    I don't want to guess on the number.  But there are -- we have 273 sworn law enforcement positions.  Of those, 238 are law enforcement, 35 are court services positions.  We also have an additional, give or take, 20 reserve officers who are not employed, but that take their cars home.  Of those, let's just say for round numbers, 293 people, everyone gets a car that is assigned to them.

Q    If they live in that ten-mile radius?

A    Everyone gets a car assigned to them.

Q    Got it.

A    They can take it home --

Q    Got it.

A    -- if they live within the ten air miles.

Now, the sheriff has the ability to approve you to take your car home outside of ten air miles depending on the, on your assignment.

Q    Okay.

A    But you -- it is -- the take-home car is a benefit; you don't have to accept it.

CHANDLER & HALASZ, INC.

a portable radio on.  But when I am in my car driving to work, the radio is on, and when I go to lunch, the radio is on; when I drive home, the radio is on.  Generally, I eat lunch in my office.  But when I am out between 12 and 12:30, people are marking on at various times.

Q    For the shift that starts at 12:30?

A    Correct.

Q    Are, are the law enforcement at the Hanover County Sheriff's Office expected to have the radio on when they're in the car?

A    I don't think there's an expectation, per se.  The radios are hardwired to be on when you turn the car on.  There may be some UC cars, undercover cars, or plain cars, that don't do that, but if it is, it's very few, and it would be something that someone did as a personal preference.

Q    But the way the cars that are assigned to the deputies are intended is for the radio to be on as soon as the car is turned on?

MR. PRINCE:  Objection to form.

You can answer.

A    Yes.

BY MR. CURWOOD:

Q    Is there a policy -- because I asked

CHANDLER & HALASZ, INC.

before if there was an expectation, but is there a policy at the sheriff's office as to whether the radio if -- for law enforcement officers, if they're in the car to have the radio on?

MR. PRINCE:  Objection to form.

You can answer.

A    I'm not aware of a specific policy that says you have to have the radio on.  I think it's just a general practice that, when we build the car and put it together, that it is wired in such a way that as soon as the car cuts on, the radio cuts on.

And you leave it on unless you're -- like, you get outside the radio footprint, because then it makes a noise at you and no one wants to listen to that, so then you'll cut off.  Or if you're on the cell phone, and the radio is barking, and it's overtaking your conversation.

I mean, no- -- there's no policy that says you can't turn it off.  There's no policy that says you can't turn it on.

Q    Okay.  So there's no policy with respect to being in the car where the radio needs to be on or off?

A    No.

Q    Okay.  What's your practice with your

CHANDLER & HALASZ, INC.

Q    What investigative units do mark on?

A    I'm not aware of any units, any investigative units that mark on as a means by which indicating that they're about to start their shift.

Q    Do investigative have their own channel on the radio?

A    Yes.

Q    Okay.  And so do they mark on that -- their specific channel?

A    I don't know that answer.

Q    All right.  And the different -- there are different channels, but all -- dispatch has access to all the different channels; right?

A    Yes.

Q    What channel would street crime mark on?

A    I don't know.

Q    Courts, you said, generally don't but some do.  Can you break that down for me?  Is there a specific assignment within courts where --

A    Well --

Q    -- deputies do mark on?

A    If I'm a court's guy and I'm assigned to the courthouse, I may not mark on.  But if I'm a court's guy doing transports, or in the field serving civil process, I may mark on.

CHANDLER & HALASZ, INC.

Essentially, dispatch would have no need to know that I am reporting for duty if I'm driving here just to walk in the courthouse and stand in a courtroom all day.  Dispatch doesn't keep track of who's assigned to what court, et cetera.

But if you're out serving papers in the field, those officers talk on the radio.  If you're out making transports, those officers would talk on the radio.  They would need to be marked on.

Q    So patrol has an obligation to inform dispatch that they're on duty?

A    Yes.

Q    Okay.  So patrol is -- there's no, as I understand it, policy -- or, for patrol, is there a policy that they have to mark on?

A    I'm not aware that there's a specific policy that they have to mark on, but you have to have a means by which dispatch knows you're a unit that can be assigned calls for service.  They don't assign investigators calls for service.  They don't assign the administrative captain a call for service.  They don't assign court services a call for service.  Those are done through patrol, and that's why there's a need that -- so dispatch knows who is available for calls when the shift begins.

BY MR. CURWOOD:

Q    That's all right.  What is the sheriff's policies with respect to what time that a deputy is compensated for?

A    The sheriff's policy on what time the deputy is compensated for?

Q    Yeah.  What are -- what time is compensable versus not compensable for a sheriff's deputy?

A    So you're compensated for the regular shift that you work.  You're compensated for court time.  You're compensated for any time that you take a law enforcement action outside of your regularly scheduled shift.  You're compensated for any type of grant overtime or overtime assignment that is paid through the County.

But I think the general answer is any time that you are working a preset time, regardless of the shift, for the sheriff's office in a law enforcement function, you're compensated for.

Q    What are, what are the, what are the means or method that the -- the time for the deputy shift is captured?  And let me ask it differently.

Is the deputy shift for which they're paid Kronos?  Is it some other system?

CHANDLER & HALASZ, INC.

A    It's Kronos.

Q    Okay.  And does the, does the deputy's pay for their shift, is it, is it predetermined by what their -- are they paid based on the shift that they're scheduled for, or do they actually have to enter -- or clock in or clock out each day or each shift in Kronos or in some other shift system?

MR. PRINCE:  Objection to form.

You can answer.

A    So the way that we are compensated in Kronos is that you have preloaded schedules.  As long as your end punch and your out punch match your preloaded schedule, you are paid 124th of your yearly salary each pay period.

Then you get into exceptions.  So any exception from the regular schedule you are compensated either at time and a half, compensatory time, which is accrued at time and a half, or you can adjust hours worked if you're within the same Garcia cycle and the same pay cycle.  And those hours are done time for time.

BY MR. CURWOOD:

Q    What is the sheriff's Garcia cycle?

A    It's a 28-day cycle by which the schedule has a starting point and an end point.  There are

A    Meaning, so if I -- if it's day one of the Garcia cycle, and I haven't worked and I'm off and I have court, we pay them overtime.  Whereby the 171 standard, I'm not required to pay them overtime.

Q    So the sheriff pays overtime automatically for court time?

A    We pay automatically overtime or compensatory time for any time worked outside of your normal schedule.  And the time for time adjustment if you're within the Garcia cycle and the same pay period.

So an example would be, if I'm on the way to work and I come upon a disabled vehicle and it's 5:30 in the morning and my shift doesn't start until 6, but I take a law enforcement action, at 5:30, I start.

So in my Kronos I could enter, and should enter, 5:30.  The supervisor has the ability to say, Look, I know you had that 30 minutes that you marked out with the disabled vehicle, instead of paying you overtime, would you want to get off 30 minutes early?  And that's a negotiated agreement between the employee and the supervisor.  And if the employee agrees to it, they can go home 30 minutes early, and it's adjusted and it's gone.

they will drop their car off at the shop, say, the day, or their last day working, whenever it is. And presuming that they have an appointment, it will just stay at the garage. The fleet personnel will come out, service it, put it back in the lot. And then they can pick it up when it's ready.

Q    So -- and fleet personnel, that means someone at the sheriff's office or the County is repairing or doing -- taking the preventive maintenance on that vehicle?

A    Somebody with the County, yes.

Q    Okay.

A    When you say maintaining the vehicle, so one of the things that you can do with your car is take it to, say -- well, we used to use Car Pool. Let's use that for an example.

You could take your car off-duty to Car Pool to get it maintained, or, you know, generally people did it while they were working, because no one wants to go to Car Pool on your day off in your police car.

Q    Is there any other -- I guess, other than getting maintenance or repairs or washing, is there any other permissible off-duty driving of the take-home vehicle?

A    You can use it to go to the gym.  You can use it to go pick up laundry.  You can use it to go get a haircut.  You can use it to -- you can go to a sheriff's office sponsored athletic event.  You could take it to a -- any -- let's just say any sheriff's office sponsored event.

Gym, haircut, laundry, sheriff's office sponsored event.  That's all that comes to mind right now in an off-duty capacity.

Q    And so is the related policy that you can't use the sheriff-issued vehicle for personal reasons other than any of those specific examples?

A    That's our policy, yes.

Q    And is the patrol car policy that sets out exceptions, or whatever, is that set forth in any of the written policies that you identified earlier, like the -- you know, is there a, is there a written policy setting this out with respect to the take-home cars?

A    Yes.  But the reason I'm giving you this look is you said patrol car.  It could be any car, right, any sheriff's office car.  I just wanted to make sure that you weren't looking at something specific to patrol.

Q    And that's fair.  And with respect to the

CHANDLER & HALASZ, INC.

Okay.  And which, which policy in writing addresses that?  Is that one of the --

A    The take-home car, take-home vehicle policy.

Q    Got it.  We talked about policies for -- or lack thereof for marking on.  Is there a policy for marking off with dispatch?

A    No.  Same thing, same thing would apply.

Q    All right.  And the same thing except we're marking off.  So is there -- what, what ways is it the same and what ways is it different when we're talking about marking off?

A    So we don't have a specific time period by which you need to mark off.  However, the practice by which people mark off is much different than marking on.  When you mark off, it is literally a race to get on the radio, because everyone wants dispatch to know that they're off the radio and not taking calls.

So while you were salt and peppered between, say, 5 a.m. and 6 a.m. for a day shift start, where people mark on at different times, at 4:30 on the dot, it's one right after the other, 10-42, 10-42, 10-42.

Q    Any other ways that the marking off is the

same or different than marking on?

A    If you mean by, like, how they can do it, exact same thing applies.  You can do it in person; you can call by phone; you do it by radio; you can do it by computer, all of those things.

Q    Is there -- again, the -- is there a written policy with respect to when you're supposed to mark off?

A    No.

Q    Okay.  With respect to the race to mark off at the end of a shift, are folks on patrol, are they generally at home at -- you know, if they have a take-home car, are they generally at home at the time that they're marking off?

MR. PRINCE:  Objection to form.

You can answer.

A    I don't know that I could answer that.  I think some may be at home; some may not be at home. That would -- I'd be, I'd be guessing.

BY MR. CURWOOD:

Q    Is there a -- well, is there a practice -- you know, again, there's no policy -- but is there a practice of patrol officers to, you know, start making their way home so that they're home by the end of their shift when they're marking off?

CHANDLER & HALASZ, INC.

that you can't leave your beat?

A    The exact written policy?

Q    Where is it found?

A    I'd have to search.  I think it's maybe in the patrol policy, but I'd have to search.

Q    That's fine.

A    I'm confident it's in there.

Q    In patrol operations somewhere?

A    Yeah, that's 4011, Patrol Operations.

MR. CURWOOD:  Okay.  All right.  Let's take another five-minute break.

(Recess from 2:49 p.m. to 3:02 p.m.)

BY MR. CURWOOD:

Q    If a deputy is not marked on with the dispatch, are they available to be called for service by dispatch?

A    If a deputy is not marked on with dispatch, are they available?  I would say no, they're not available if they're not marked on with them.

Q    And dispatch --

A    Right.

Q    -- dispatch wouldn't try to dispatch an officer who is not marked on; right?

A    No, not generally.

CHANDLER & HALASZ, INC.

Q    Okay.  If the -- when an officer is marked on with dispatch, are they available to be called by dispatch to respond to something?

A    They are available, but if it is outside of the normal times of their shift, it would be incredibly rare that they would be called.

Q    And is that a written policy?

A    No.  It would be a practice.

Q    Okay.  And on what basis would you say that's a practice?

A    So the dispatch center knows the shifts that we work.  They know the day shift comes out at 6 a.m.  Until the day shift supervisor marks his or her shift clear, or 10-8, available for calls, the dispatch center knows not to call any day shift unit to take a call for service.

That extends the exact same way for day shift and evening shift overlap, and evening shift and midnight shift overlap.  The only caveat to that is that there are two points in time between the day/evening carryover, and the evening/midnight carryover by which, even though the midnight unit or the preceding unit is available, that the pre -- that the units on shift before them still takes primary.

CHANDLER & HALASZ, INC.

So here would be an example. And I'm not sure of the exact time. But let's say day shift comes out -- because, by policy, the first 30 minutes of every shift is supposed to be a roll call. Roll call is paid time.

So at 6 a.m., day shift roll call would start. On or about 6:30, it gen- -- it never takes that long. But around that time, the day shift supervisor would mark his shift -- I'm sorry, not day shift, evening shift.

The evening shift supervisor would mark his shift clear. That would be right around 1 o'clock. Well, day shift still has three and a half hours left to work. So there's a particular time -- and I'm not sure, I think -- I want to say it's like 2:30 or 3, that day shift is still primary. Meaning day shift, even though evenings is out, is the ones that they call for the call. Does that make sense?

So you may have a day and an evening unit assigned to the same beat during the same time, but they're calling the day shift person even though evenings is 10-8 and available for calls.

Q    And you're saying this is what dispatch does. What's your basis for knowing that this is what dispatch does?

CHANDLER & HALASZ, INC.

A    Well, one, I used to work there.  Two, I have been involved in conversations along the way where we have discussed shift overlap.  And I know that dispatch is not going to assign a call to a deputy that's on a shift that is currently on duty without first having been cleared by their supervisor --

Q    And the --

A    -- by the patrol supervisor.

Q    And does dispatch work for the Hanover County Sheriff or for --

A    They do not.

Q    Dispatch works for the County of Hanover?

A    Correct.

Q    All right.  For the GPS tied to the computer, does the computer simply have to be turned on in order for dispatch to have the access to the GPS, or does there need to be some other step taken?

A    I'm not a hundred percent positive.  I want to say that just turning the computer on does not turn on the AVL.  You have to log into your mobile, your mobile CAD, your mobile field reporting for it to work.

Because there is an icon in there that you can turn the AVL off.  Now, we tell people that

that's what these guys do too.

Q   Okay.  Well, okay.  And so, so is there places or stops or permission given when they're driving -- leaving their home and they're on their -- in uniform on the way to their shift that's not permitted when they're off-duty?

A   Ask me that again.

Q   Well, I'm just following up on your distinction that we were talking earlier about permissible use when they're off-duty.

A   Okay.

Q   And I didn't hear, you know, stopping for coffee when they're off-duty; right?

A   Which would --

Q   So go ahead.

A   Which would mean you're trying to tie that that they're on duty when they -- on the way to work, and therefore stopping to get coffee is now something they're permitted to do while on duty.

So we look at this completely separate. Like, being on the radio has nothing to do with compensable time.  Kronos and dispatch are completely separate.  They have nothing to do with each other.

Q   Okay.

CHANDLER & HALASZ, INC.

days, showing my age here.  Before we all had cell phones, if someone was at a firehouse using the phone, and they were already handling a phone -- a call for service by telephone, they may say, Hey, I'll handle that.  I'm already here on the phone. Rather than having that officer have to drive to the same firehouse to make a phone call.

But, generally speaking, the deputy would not decline a call for service.

Q    And just to clarify, is there any written policies or guidance that says dispatch -- that comes from your office, that says dispatch cannot make a call for service to a deputy before the start of their shift?

A    I don't think we have any written policy on that.

Q    Is there any written policy that's --

A    Now --

Q    Go ahead.

A    It -- I think it can be inferred that we have a policy that says that, after roll call, a supervisor will mark the shift clear and available for calls.

So, I think, in that policy you can infer that until that supervisor marks the shift clear,

they can't assign calls to deputies.

Q   Okay.  But that's an inference, that's not a stated policy?

A   Correct.

Q   All right.  And what is the policy that says a supervisor clears?

A   It's in the patrol.

Q   Patrol operations?

A   4011, page 6 at the bottom.

Q   And is that the same for after the end of the shift as it is before the start of the shift?

A   You mean by which deputies no longer take calls?

Q   Yeah, where -- well, let me reask that.

So with respect to -- well, again, there was no policy.  So let me ask this.

After the end of a shift, if the deputy has not marked off yet, are they still available for a call for service --

A   No.

Q   -- from dispatch?

And is that per written policy, or per the practice that you were talking about earlier?

A   Practice.

Q   Okay.

supervisor specific.

Q    Not any kind of official policy or practice here?

A    I don't think that's --

Q    Okay.

A    -- an official policy or practice.  It's probably more supervisor specific.

MR. CURWOOD:  Give me one more second here.

That's all the questions I have.

Do you have any for the record?

MR. PRINCE:  No.  He will read.

MR. CURWOOD:  Very good.

(The deposition was concluded at 3:59 p.m.)

And further this deponent saith not.

CHANDLER & HALASZ, INC.

I, the undersigned, GREGORY WAYNE SIX, do hereby certify that I have read my foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below):

Page/Line      From            To              Reason

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

CHANDLER & HALASZ, INC.

_____          _____

Date                    Signature

COMMONWEALTH OF VIRGINIA, to wit:

    Subscribed and sworn before me this _____

 day of _____, 2023.

    My commission expires:  _____

       Registration Number: _____

Notary Public

COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

I, Beverly Lukowsky Notary Public in and for the Commonwealth of Virginia at large, and whose commission expires May 31, 2026, do certify that the aforementioned appeared before me, was sworn by me, and was thereupon examined by counsel; and that the foregoing is a true, correct, and full transcript of the testimony adduced.

I further certify that I am neither related to nor associated with any counsel or party to this proceeding, nor otherwise interested in the event thereof.

Given under my hand and notarial seal at Richmond, Virginia, this 27th day of November, 2023.

_____
Beverly S. Lukowsky - Notary Public
Commonwealth of Virginia at Large

CHANDLER & HALASZ, INC.