IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

CHRISTOPHER HATCHER
INDIVIDUALLY ON BEHALF OF
HIMSELF, AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,

    Plaintiff,

v.                                Case No. 3:23-cv-00325-MHL

THE COUNTY OF HANOVER, VIRGINIA,

    Defendant.

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.      INTRODUCTION

Christopher Hatcher ("Hatcher") and five opt-in Plaintiffs, all of whom are former deputy sheriffs for the Hanover County Sheriff ("Sheriff") have sued the County of Hanover ("the County"), claiming that they should have been compensated for the time spent commuting to work before the start of their scheduled shifts. These six plaintiffs are part of a collective action pursuant to the Fair Labor Standards Act ("FLSA"), and Hatcher is the class representative for 265 members of a Rule 23 class asserting claims under the Virginia Overtime Wage Act ("VOWA") and Virginia Gap Pay Act ("VGPA").

The County is entitled to judgment as a matter of law for two reasons. First, the County is not a joint employer of the Sheriff's deputies. Sheriff's deputies serve at the pleasure of the Sheriff, who has the sole authority to hire, fire, discipline, and set the terms and conditions of employment. In fact, it is against the law for the County to be a joint employer with the Sheriff.

Second, the time spent commuting to work is not compensable. The record shows that, contrary to the allegations in the Complaint and statements made in support of class and collective

1

certification, the Sheriff does not require his deputies to "mark on" at any given point in time or location. Instead, he requires them to be "marked on" by the start of their shift. The Court's earlier concern that deputies were performing law enforcement activities on the way to the start of their shift for which they were not compensated has proven to be unfounded in light of the evidence gathered during discovery. The deputies are not dispatched to calls for service before being cleared from roll call. They have no duties or obligations during the commute to work and, if they voluntarily undertake law enforcement action, they should address that with their supervisor and be compensated.

The Sheriff's take home vehicle program is a benefit to these deputies, and their use of an employer-provided vehicle does not transform their daily commute into compensable hours worked. In short, Plaintiff's allegations in the Complaint have not panned out. The County is entitled to judgment as a matter of law.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    The Sheriff and the County

1. David R. Hines is the Sheriff of Hanover County and has served in that role since September 2010. (Hines dep. 7:19-22, 8:2-3.) Sheriff Hines is a constitutional officer. Va. Const. art. VII, § 4.

2. The Sheriff's Office is composed of four divisions: administrative, patrol, investigative, and judicial. (Hines dep. 9:9-15.)

3. Sheriff Hines has an arrangement or agreement with the County whereby he uses the County's centralized services for human resources, payroll, budgeting, insurance, and benefits. The arrangement or agreement between Sheriff Hines and the County is similar to the arrangement between the County and the other constitutional officers—Clerk of Court, Commonwealth's

2

Attorney, Treasurer, and Commissioner of the Revenue—as well as the Hanover County School Board, Pamunkey Regional Jail, and Pamunkey Regional Library. (Wright dep. 11:19-12:2, 17:11-23, 24:18-26:22, 45:8-22.)

4.      The County owns the real and personal property that is used by the Sheriff's Office. (Wright dep. 42:20-21.)

5.      The County is the payor for purchases by the Sheriff's Office, but that money comes from the Sheriff's budget. (Wright dep. 36:9-23, 91:6-18.)

6.      Sheriff Hines has the authority to hire and fire Sheriff's deputies. Va. Code § 15.2-1603.

7.      The Sheriff has a take-home vehicle program designed to provide improved law enforcement services to the citizens of Hanover County through increased visibility and officer readiness; and to promote increased vehicle life and conversely reduce the costs associated with maintenance and repair. Use of a take-home vehicle is a benefit, and any officer eligible for an assigned vehicle may decline to accept it subject to Sheriff's approval. (Ex. 4; Six dep. 32:2-35:25.)

8.      Permitted off-duty use of a vehicle includes transportation to and from headquarters for duty, meetings, administrative work, physical training, routine medical exams, payroll distribution, and mailbox checks after extended absences. (Ex. 4.)

9.      The Sheriff's Office has three patrol shifts: (1) Days: 6:00 a.m. to 4:30 p.m.; (2) Evenings: 12:30 p.m. to 11:00 p.m.; and (3) Midnights: 8:30 p.m. to 7:00 a.m. (Six dep. 8:11-18; Ex. 5.)

10.     The County's Public Safety Emergency Communications Department ("Emergency Communications") handles emergency communications for the Sheriff, Ashland Town Police, Hanover County Fire-EMS, and Hanover County Animal Control.  (Ex. 6; Ex. 7.)

11.     Emergency Communications utilizes a Computer-Aided Dispatch system ("CAD") to process incidents and calls for service, determine to whom to dispatch calls for service, and to track unit activity for the agencies for which they are responsible for providing emergency communications services.  (Buchanan dep. 11:15-24.)

12.     Sheriff's deputies are assigned Mobile Data Terminals ("MDTs") that they can use to access CAD.  (Hatcher dep. 15:11-18; Six dep. 17:19-18:1.)

13.     When Sheriff's deputies communicate via radio with Emergency Communications, the communications are logged in CAD.  Communications primarily take place on the Police Dispatch Channel.  (Buchanan dep. 19:7-20:23, 60:18-61:6, 74:15-75:2; Hatcher dep. 19:9-20:1.)

14.     Sheriff's deputies utilize 10 codes when communicating via radio with Emergency Communications and each other.  10-41 is the 10 code for "beginning duty" and 10-42 is the 10 code for "ending duty."  (Buchanan dep. 50:4-17; Six dep. 29:5-7; Hines dep. 23:1-24; Ex. 10.)

15.     Once a Sheriff's deputy marks 10-41, his unit number appears as "available" in CAD, and Emergency Communications can see the deputy's location based on the Automated Vehicle Locator ("AVL") that is housed in the MDT.  Patrol deputies mark 10-41 and 10-42 with Emergency Communications.  (Buchanan dep. 28:2-30:12. 63:20-23; Hines dep. 35:3-14; Six dep. 42:8-43:4.)

16.     Sheriff's deputies are given unit numbers based on their assignments.  Day units are in the 100 series, evening units are in the 200 series, and midnight units are in the 300 series.  (Ex. 5; Buchanan dep. 66:1-15.)

17.     As a general rule, Emergency Communications does not dispatch calls for service to a unit until that unit's shift is cleared from roll call and becomes "primary" pursuant to the schedule provided by the Sheriff's Office.  (Ex. 5; Buchanan dep. 31:16-32:20, 36:16-38:14, 42:1-17, 43:15-44:3, 46:9-24; Six dep. 67:1-69:9, 73:8-74:16, 78:5-80:3.)

18.     Sheriff Hines requires patrol deputies to be "marked on"—that is, marked 10-41—by the beginning of their shift.  The Sheriff does not have a policy as to when, or from where, a deputy must mark 10-41.  The practice as to when, and from where, deputies mark 10-41 varies widely.  (Hines dep. 34:20-37:5, 108:1-22, 147:15-150:24; Six dep. 14:18-16:11, 24:9-25:1, 27:20-29:12, 38:7-18, 44:10-25, 83:17-89:17.)

19.     Sheriff's deputies assigned to administration and investigations do not mark 10-41. (Six dep. 42:8-44:9; Hines dep. 35:3-14.)

20.     A deputy is off-duty until the start of his shift and has no duties or obligations while driving to the start of his shift.  (Hines dep. 163:8-12, 165:14-166:1; Six dep. 80:24-81:20.)

**B.     The Plaintiffs**

21.     Hatcher was employed as a deputy sheriff from January 2002 to May 31, 2022. From October 2014 until his resignation, Hatcher was assigned to the Street Crimes Unit.  (Hatcher dep. 11:10-12:9, 24:14-18, 50:19-51:2.)

22.     Street Crimes is an undercover investigative unit with an objective to locate fugitives who are elusive and difficult to apprehend.  Street Crimes investigators conduct a lot of surveillance.  (Hatcher dep. 51:3-13.)

23.     While assigned to Street Crimes, Hatcher did not mark 10-41 on the Police Dispatch Channel.  He sometimes stated "90 back" on SCU1, a channel for the Street Crimes Unit that is not monitored by Emergency Communications.  When he would say "90 back"—indicating that

he was back in his unmarked vehicle—he would not receive a response from his coworkers. (Hatcher dep. 68:3-71:25.)

24. Jonathan McGill ("McGill") was employed as a deputy sheriff from November 2018 to October 2022. He was a patrol deputy. (McGill dep. 9:23-24, 19:21-20:3, 46:3-9, 55:15-56:7.)

25. McGill's commute from his residence to headquarters took 10-15 minutes. (McGill dep. 34:10-12.) For the time period relevant to this litigation,[1] McGill worked 269 shifts. For 150 of those shifts, he "marked on" 5 minutes or less before the shift began. McGill did not "mark on" at all for 28 shifts, and "marked on" **after** the start of his shift 6 times. Thus, for 68% of the 269 shifts relevant to this action, McGill "marked on," if at all, no more than 5 minutes before his shift began. (Ex. 12.)

26. Timothy Sutton ("Sutton") was employed as a deputy sheriff from July 1993 to January 8, 2023. From 1999 until his resignation, Sutton was a patrol sergeant. (Sutton dep. 8:2-5, 12:3-6, 13:15-14:4.)

27. Sutton's commute from the County line to headquarters took 15-20 minutes. (Sutton dep. 33:2-22.) For the time period relevant to this litigation, Sutton worked 197 shifts. For 69 of those shifts, Sutton "marked on" 10 minutes or less before the start of his shift. Sutton did not "mark on" at all for 39 shifts, "marked on" **after** the start of his shift 39 times, and "marked on" at the start of his shift 7 times. Thus, for 78% of the 197 shifts relevant to this action, Sutton "marked on," if at all, no more than 10 minutes before his shift began. And for more than half of

---

[1] The relevant time period is the period of May 15, 2021 to May 15, 2023, which is the two-year lookback window for the FLSA and the VGPA. Sovereign immunity was waived for the VOWA for the period July 1, 2021 to June 30, 2022, so that is the relevant time period for that claim.

those shifts, Sutton did not "mark on" at all or "marked on" at the start of his shift or after his shift began.  (Ex. 14.)

28.    B. Waverly Carroll ("Carroll") was employed as a deputy sheriff from October 2007 to July 2022.  Carroll was a patrol deputy from 2007 until 2021, and from 2021 until his resignation, he was assigned to the Safe Streets Unit.  (Carroll dep. 10:5-7, 14:25-4, 17:7-17.)

29.    Safe Streets is an interdiction unit that is part of the Special Operations Division. Deputies in this unit were assigned to a high crime region to interdict and look for wanted subjects, drugs, guns, etc. that would make the area safer.  (Carroll dep. 15:5-25.)  Safe Streets was a proactive unit with a high emphasis on conducting traffic stops.  (Payne dep. 39:17-21.)  Deputies assigned to Safe Streets wore a Sheriff's uniform and drove a marked patrol vehicle.  (Carroll dep. 16:1-5.)  Safe Streets deputies are not dispatched to calls for service.  (Payne dep. 58:8-13; Ex. 5.)

30.    Carroll's commute from the County line to headquarters took 25 minutes.  (Carroll dep. 20:15-21:6, 24:1-9.)  For the time period relevant to this litigation, Carroll worked 214 shifts. For 98 of those shifts, Carroll "marked on" 10 minutes or less before the start of his shift.  Carroll did not "mark on" at all for 28 shifts, "marked on" **after** the start of his shift 20 times, and "marked on" at the start of his shift 3 times.  Thus, for almost 70% of the 214 shifts relevant to this action, Carroll "marked on," if at all, no more than 10 minutes before his shift began.  And for almost a third of those shifts, Carroll did not "mark on" at all or "marked on" at the start of his shift or after his shift began.  (Ex. 17.)

31.    C. Ryan Payne was employed as a deputy sheriff from January 2015 to December 16, 2021.  From 2016 until his resignation, Payne was assigned to the Safe Streets Unit.  (Payne dep. 27:19-28:7.)

32.     Payne's commute from his residence to headquarters took 15-20 minutes.  (Payne dep. 25:3-17.)  For the time period relevant to this litigation, Payne worked 147 shifts.  For 39 of those shifts, Payne "marked on" 10 minutes or less before the start of his shift.  Payne did not "mark on" at all for 32 shifts, "marked on" **after** the start of his shift 30 times, and "marked on" at the start of his shift 7 times.  Thus, for 73% of the 147 shifts relevant to this action, Payne "marked on," if at all, no more than 10 minutes before his shift began.  And for more than half of those shifts, Payne did not "mark on" at all or "marked on" at the start of his shift or after his shift began.  (Ex. 18.)

33.     Lowell Lantz was employed as a deputy sheriff from July 1999 to May 1, 2023. From February 2020 to August 2022, Lantz was a Patrol Sergeant, and from August 2022 until his resignation, he was a Sergeant in the Youth Services Division.  (Lantz dep. 9:18-20, 18:11-19.)

34.     The Youth Services Division provides School Resource Officers and D.A.R.E. Officers to serve in Hanover County Public Schools.  (Lantz dep. 44:20-46:25.)

35.     Lantz's commute from the County line to headquarters took 15 minutes.  (Lantz dep. 30:5-7.)  For the time period relevant to this litigation, Lantz worked 340 shifts.  For 62 of those shifts, he "marked on" 10 minutes or less before the start of his shift.  Lantz did not "mark on" at all for 93 shifts, "marked on" **after** the start of his shift 39 times, and "marked on" at the start of his shift 3 times.  Thus, for 58% of the 340 shifts relevant to this action, Lantz "marked on," if at all, no more than 10 minutes before the start of his shift.  And for nearly 40% of all shifts relevant to this action, Lantz did not "mark on" at all or "marked on" at the start of his shift or after his shift began.  (Ex. 20.)

8

### III.     ARGUMENT

**A.     Standard of Review**

Summary judgment is to be entered when the moving party shows that there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56.  The summary judgment inquiry scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence that could carry the burden of proof of his claim at trial.  *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).  The non-moving party cannot create a genuine issue of material fact through mere speculation or the building of one inference on another.  *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).  Only reasonable inferences need to be considered by the court.  *Sylvia Development Co. v. Calvert County, Md.*, 48 F.3d 810, 818 (4th Cir. 1995).  The Supreme Court has made it clear that trial judges "shall . . . grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to summary judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

**B.     The County is not an employer of the Sheriff's deputies under the FLSA or the VOWA.**

There is no question that the Sheriff's deputies are employees of Sheriff Hines.  Plaintiffs argue that the County is liable under the FLSA and the VOWA as a joint employer.  **This argument fails because it is a legal impossibility for the County to be a joint employer of the Sheriff's deputies under Virginia law and, even it if it were not, the facts do not support the conclusion that the County is a joint employer.**

The FLSA defines "employee" as "any individual employed by an employer."  *Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 133 (4th Cir. 2017) (citing 29 U.S.C. § 203(e)(1)).  The FLSA defines "employ" as "to suffer or permit to work," and "employer" as "any person acting directly

9

or indirectly in the interest of an employer in relation to an employee." *Id.* (citing 29 U.S.C. § 203(d), (g)).[2]

The FLSA recognizes a joint employment relationship when:

1. **Two or more persons or entities share, agree to allocate responsibility for, or otherwise codetermine**—formally or informally, directly or indirectly—**the essential terms and conditions of a worker's employment**, and
2. The two entities' combined influence over the essential terms and conditions of the worker's employment render the worker an employee as opposed to an independent contractor.

*Id.* at 129-30 (emphasis added). The "joint employer inquiry must address the 'relationship between *the employer* who uses and benefits from the services of workers and *the party that hires or assigns the workers to that employer*.'" *Id.* at 137 (quoting *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 306 (4th Cir. 2006)) (emphasis in original).

To determine whether employers codetermine the essential terms and conditions of a worker's employment, the Fourth Circuit has articulated a six-factor test.

(1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;
(2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;
(3) The degree of permanency and duration of the relationship between the putative joint employers;
(4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;
(5) Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and

---

[2] The language of the VOWA for the time period at issue in this case—July 1, 2021 to June 30, 2022—used the same definitions as the FLSA and, therefore, the analysis of whether the County is a joint employer is the same under that statute.

> (6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

*Id.* at 141-42.  The list is non-exhaustive, and "[t]o the extent that facts not captured by these factors speak to the fundamental threshold question . . . courts must consider those facts as well." *Salinas*, 848 F.3d at 142.  "[A] majority of factors are not required to support a finding that two or more entities are 'not completely disassociated.'"  *Id.* at 145.  **Indeed "one factor alone" can serve as the basis for such a finding, <u>so long as "the facts supporting that factor demonstrate that the person or entity has a substantial role in determining the essential terms and conditions of a worker's employment</u>."**  *Id.* (emphasis added).

The Department of Labor regulations in effect at the time of the Fourth Circuit's decision in *Salinas*—and upon which the Fourth Circuit relied in crafting its six-factor test—identified three nonexclusive scenarios in which joint employment exists:

1. Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
2. Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
3. Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

*Id.* at 141 (citing 29 C.F.R. § 197.2(b)).  None of these scenarios are applicable to the relationship between the Sheriff and the County.  The six-factor test does not permit a conclusion that the County codetermines the terms and conditions of deputies' employment.  In fact, it is legally impossible for the County to be an employer of the Sheriff's deputies under Virginia law.

11

Under Virginia law, a sheriff "is an independent constitutional officer." *Shannon v. City of Richmond Virginia Sheriff's Off.*, No. 3:22CV460, 2023 WL 2720806, at *6 (E.D. Va. Mar. 30, 2023) (citing *Clark v. Beasley*, No. 3:03cv1074, 2004 WL 3222732, at *4 (E.D. Va. July 8, 2004)); *Roop v. Whitt*, 768 S.E.2d 692, 695 (Va. 2015) (citing Va. Const. art. VII, § 4) ("[C]onstitutional officers, including sheriffs, are creations of the constitution itself . . . Their offices exist, abeyant and unfilled, by virtue of constitutional origination from the moment their county or city is created by the legislature.").

> **There shall be elected by the qualified voters of each county** and city a treasurer, **a sheriff**, an attorney for the Commonwealth, a clerk, who shall be clerk of the court in the office of which deeds are recorded, and a commissioner of the revenue. The duties and compensation of such officers shall be prescribed by general law or special act.

Va. Const. art. VII, § 4 (emphasis added).

> **The voters in every county** and city **shall elect a sheriff** unless otherwise provided by general law or special act. **The sheriff shall exercise all the powers conferred and perform all the duties imposed upon sheriffs by general law.** He shall enforce the law or see that it is enforced in the locality form which he is elected; assist in the judicial process as provided by general law; and be charged with the custody, feeding, and care of all prisoners confined in the county or city jail. **He may perform such other duties**, not inconsistent with his office, **as may be requested of him by the governing body**. The sheriff shall be elected as provided by general law for a term of four years.

Va. Code § 15.2-1609 (emphasis added).

A sheriff's deputy "is the employee of the sheriff, not the local government." *Roop*, 768 S.E.2d at 695; Va. Code §§ 15.2-1603, -1604. The sheriff alone has the power to appoint his deputies, and the local government "does not have a say as to whom the sheriff shall appoint." *Roop*, 768 S.E.2d at 695. The local government does not prescribe the sheriff's duties, have any control over his conduct, and does not have the power to remove him from office. *Id.* (citing *Bd. of Sup'rs of Rockingham County v. Lucas*, 128 S.E. 574, 576 (1925)). *See also Jenkins v.*

12

*Weatherholtz*, 909 F.2d 105, 107 (4th Cir. 1990) ("State law makes clear that sheriff's deputies are at will employees serving at the discretion of their sheriffs.  The Virginia Code makes deputies employees of the sheriff, not employees of the local governing body . . ."); *Williams v. McDonald*, 69 F. Supp. 2d 795, 800 (E.D. Va. 1999) ("Deputies appointed by constitutional officers pursuant of Virginia Code § 15.2-1603 are not employees of the local governing body."); Va. Code. 15.2-1600(B).  "The deputies are considered employees of the constitutional officer, even if a County contributes to the employee's salary."  *Kellum v. Isle of Wight County, Va.*, No. 2:18-cv-543, 2020 WL 3164962, at *7 (E.D. Va. Feb. 13, 2020), *report and recommendation adopted* 2020 WL 1304083 (E.D. Va. Mar. 19, 2020).  Under Virginia law, the County

- Cannot require the Sheriff to "exercise a power or perform a duty which the [Sheriff] is not required to perform under applicable law without consent of [the Sheriff]"; and

- Cannot "diminish [the Sheriff's] powers or duties as provided by applicable state law including the power to organize [his] office[] and to appoint such deputies, assistants and other individuals as are authorized by law upon the terms and conditions specified by [the Sheriff].

Va. Code § 15.2-1600(B).  Additionally, the sheriff sets the salaries of his deputies.  Va. Code § 15.2-1609.2(D) ("The annual salary of each full-time deputy sheriff who is primarily a courtroom security officer, a correctional officer or a law-enforcement officer shall be determined by the sheriff in whose service he is employed . . .").  As such, it is legally impossible for the County to be a joint employer of the Sheriff's deputies.  The County providing certain administrative support functions to the Sheriff does not transform the County into an employer for purposes of the FLSA.

The United States District Court for the Middle District of Georgia reached a similar conclusion in *Krage v. Macon-Bibb County, Ga.*, No. 5:19-CV-321 (MTT), 2021 WL 5814274, at *6 (M.D. Ga. Dec. 7, 2021), *aff'd*, No. 22-10061, 2022 WL 16707109 (11th Cir. Nov. 4, 2022).

13

> Simply put, just because Sheriff Davis chose to adopt certain policies and procedures from the County as a matter of convenience, those policies were only applicable to Plaintiffs to the extent that Sheriff Davis chose to adopt and enforce them. In a similar vein, **the County cannot be characterized as Plaintiffs' employer merely because Sheriff Davis chose to have the County provide a variety of administrative support functions to avoid the duplication of resources**. Georgia's Constitutional mandate is clear: the County is expressly prohibited from controlling or directing Sheriff Davis in any manner whatsoever.
>
> \* \* \*
>
> Even if Plaintiffs' employment with the County wasn't a legal impossibility under Georgia law, the *Villarreal* framework favors a finding that the County is not an employer of Plaintiffs within the meaning of the FLSA. It is undisputed that Sheriff Davis had ultimate hiring and firing authority over his deputies and that deputies are subject only to the supervision and control of Sheriff Davis himself. **To the extent that the County issued paychecks to sheriff's deputies, maintained employment records of sheriff's deputies, and undertook other responsibilities that employers commonly perform, these functions are best characterized as administrative functions that Sheriff Davis delegated to the County to avoid the duplication of resources.** Most importantly, there is nothing in the record to suggest Sheriff Davis could not perform these functions himself if he so chose or that in the performance of these functions the County exercised any actual control over the deputies.

*Id.* at \*6-7 (citing *Pellitteri v. Prine*, 776 F.3d 777, 780 (11th Cir. 2015)) (emphasis added). *See also Cunningham v. Fulton County, Ga.*, 785 F. App'x 798 (11th Cir. 2019) (FLSA claims against the county were properly dismissed because the county was not an employer of the sheriff's deputies); *Winters v. Bd. of County Comm'rs of Muskogee County, Okla.*, 633 F. App'x 684, 690 (10th Cir. 2015) (holding that the board of commissioners for a county was not the employer of sheriff's deputies for purposes of the FLSA); *Brickley v. County of Smyth, Va.*, 944 F. Supp. 1310 (W.D. Va. 1996) (holding that the county was not an employer of sheriff's deputies for purposes of the FLSA).

Unlike a subcontractor/general contractor or staffing agency/company relationship, the County is not using the Sheriff's employees. Instead, the County administers some aspects of the deputies' employment with the Sheriff by Code or by agreement. The nature of this relationship has been recognized in other employment contexts.

14

For example, in *Leuenberger v. Spicer*, No. 5:15-cv-00036, 2016 WL 355090, at *13 (W.D. Va. Jan. 28, 2016), the United States District Court for the Western District of Virginia concluded that "the joint employer doctrine is ill suited to the facts of this case because it does not involve the situation where one entity is using an employee of another entity. Rather, it involves an employee who works only for one entity but who has some aspects of her employment managed by another entity." That case involved an assistant commonwealth's attorney who asserted claims of gender discrimination against the commonwealth's attorney and the county. *Id.* at *1. The court concluded that the commonwealth's attorney was responsible for hiring, supervising, giving assignments, setting pay, disciplining, and firing, while the county was responsible only for supplementing salary, managing benefits, disbursing pay, maintaining employment records, and providing space. *Id.* at *13. "With the exceptions of the salary supplement and space, these are all factors indicative of a payroll administrator. They do not suggest that the County had any control over [the plaintiff's] work. Accordingly, the court concludes that the joint employer doctrine does not apply here." *Id.*

Similarly, in *Kellum*, the Court cited *Leuenberger* and concluded that the county was not a joint employer with the commissioner of the revenue for purposes of an ADA claim. *Kellum*, 2020 WL 3164962, at *7-10.

Judge Novak reached the same conclusion in *Butler v. Spotsylvania County Government*, No. 3:19-cv-950, 2020 WL 2572801, at *5-8 (E.D. Va. May 21, 2020). That case involved a claim under the ADA and Title VII against the commissioner of the revenue and the county. The Court noted that the county was precluded *by law* from attempting to control the plaintiff's employment. *Id.* at *7 (citing Va. Code § 15.2-1600(B)). While the county in *Butler* provided human resources

15

services, that was insufficient to overcome the lack of authority to supervise or control the plaintiff's work. *Id.*

While the factors to be analyzed under Title VII and the ADA differ slightly from the *Salinas* factors, the goal of the tests remains the same, to determine whether the putative joint employers "share or codetermine those matters governing the essential terms and conditions of employment." *Id.* at *5 (citing *Butler v. Drive Auto. Indus.*, 793 F.3d 404, 408 (4th Cir. 2015)).

Like the counties in *Leuenberger*, *Kellum*, and *Butler*, here the County provides only administrative services and serves as a payroll administrator for Sheriff Hines. The relationship between Sheriff Hines and the County is identical to that of the county and sheriff in *Krage*, and the same conclusion is warranted.

Even if the Court were to examine the *Salinas* factors, the record demonstrates that the County is not a joint employer.

While three of the six factors—permanency and duration of the relationship, location of the work performed, and typical employer functions—weigh in favor of finding a joint employment relationship—the most important factors, *i.e.*, those demonstrating control over the terms and conditions of employment, weigh very strongly against a joint employer relationship. The County, by statute, lacks the power to hire, fire, modify the terms and conditions of employment, direct, control, or supervise deputies. Va. Code § 15.2-1600(B). The County also lacks the ability to control the Sheriff, who is an independent constitutional officer. Va. Const. art. VII, § 4; Va. Code § 15.2-1609. The centralized services that the County provides to the Sheriff—as well as the other constitutional officers, Hanover County School Board, Pamunkey Regional Jail, and Pamunkey Regional Library—do not render it a joint employer under the FLSA. *See, e.g. Dianda v. PDEI, Inc.*, 377 F. App'x 676 (9th Cir. 2010) (being identified as the employer

on the plaintiff's paystub and W-2 did not make company a joint employer under the FLSA; "the parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship" and use of own account to pay wages and maintaining payroll records was part of service provided as a payroll company); *Clyde v. My Buddy the Plumber Heating & Air, LLC*, No. 2:19-cv-756, 2021 WL 778532 (D. Utah Mar. 1, 2021) (granting summary judgment on joint employer issue because being listed as the employer on a tax documents did not make company a joint employer under the FLSA instead of a payroll processor); *Spears v. Choctaw County Comm'n*, No. 07-0275, 2009 WL 2365188 (S.D. Ala. July 30, 2009) (granting summary judgment in favor of the county because no court has "decided that an entity that was completely uninvolved in the day-to-day activities of a plaintiff in an FLSA case was an 'employer' based only on its involvement in setting salary classifications and handling benefits and payroll").

The County processes payroll, administers benefits, and assists with human resources needs that the Sheriff has.  Additionally, the County supplements the salary of deputies as authorized by statute, Va. Code § 15.2-1605.1, and provides the vehicles and equipment that deputies use in the course of employment, Va. Code § 15.2-1613.  The record demonstrates that the County cannot have and does not have "a substantial role in determining the essential terms and conditions of [Plaintiffs'] employment."  *Salinas*, 848 F.3d at 145.  The County is entitled to judgment as a matter of law as to Counts I and IV.

C.    **The County is not Plaintiff's employer under the VGPA.**

Plaintiffs claim that the County is their employer for the purposes of the VGPA.  The VGPA defines employer as "any political subdivision of the Commonwealth, including any county, city, town, authority, or special district that employs fire protection employees except any

17

locality with five or fewer paid firefighters that is exempt from overtime rules by 29 U.S.C. § 207

(k)." Va. Code § 9.1-700.[3] The VGPA defines law-enforcement employee as,

> any person who is responsible for the prevention and detection of crime and the enforcement of the penal, traffic or highway laws of the Commonwealth, other than an employee who is exempt from the overtime provisions of the Fair Labor Standards Act, and who is a full-time employee of either (i) a police department or (ii) a sheriff's office that is part of or administered by the Commonwealth or any political subdivision thereof.

*Id.* The definition of "law enforcement employee" tracks the language of "law enforcement officer" from sections 9.1-101 and 18.2-57(G). *Compare* Va. Code § 9.1-700 *with* Va. Code § 9.1-101 *with* Va. Code § 18.2-57(G). Furthermore, the VGPA provides for a cause of action by a "law enforcement employee" against his employer if "the employer employs 100 or more law-enforcement employees." Va. Code § 9.1-704.

In *Guinyard v. Commonwealth*, No. 1185-06-1, 2007 WL 2174788, at \*2 (Va. Ct. App. July 31, 2007), the Court of Appeals of Virginia analyzed what it means to be "part of or administered by the Commonwealth or any political subdivision thereof" for purposes of section 18.2-57. The Court noted that "administer" means "to attend, manage, to manage the affairs of, or to direct or superintend the execution, use or conduct of." *Id.* (citing *Websters Third New International Dictionary* 27 (1981)). "By choosing the verb 'administer' . . . the legislature intended to include, unless specifically mentioned categorically or otherwise 'a part of' the Commonwealth, only those police departments whose day-to-day operations and affairs are managed by 'the Commonwealth or any political subdivision thereof.'" *Id.*

---

[3] The VGPA originally applied only to fire protection employees and, when it was amended in 2005 to apply to law enforcement employees, the General Assembly did not alter the definition of employer.

As explained *supra,* the County does not, and cannot, manage the day-to-day operations of the Sheriff's deputies. Therefore, the Sheriff's deputies are not law enforcement employees of the County. **The County does not employ any law enforcement employees, certainly not 100 or more.** Therefore, there is no cause of action under the VGPA against the County, and the County is entitled to judgment as a matter of law as to Count III.

**D.      The time spent driving to work is not compensable under the FLSA.**

The FLSA "requires employers to compensate employees for all hours worked." *Truslow v. Spotsylvania Cnty. Sheriff,* 783 F. Supp. 274, 277 (E.D. Va. 1992), *aff'd* 993 F.2d 1539 (4th Cir. 1993). Pursuant to the Portal-to-Portal Act of 1947, however, certain work-related activities are not compensable and do not constitute "hours worked" for purposes of the FLSA. *Id.* Specifically, the Portal-to-Portal Act provides that an employer need not compensate employees for time spent either (1) "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform"; or (2) engaged in "activities that are 'preliminary to or postliminary to' the 'principal activity or activities' which an employee is engaged to perform . . . ." *Id.* at 277, 277 n.5 (citing 29 U.S.C. § 254 (a)-(b)). The statute expressly addresses the situation in which an employee commutes in an employer's vehicle, providing that "[f]or purposes of this subsection, activities performed by an employee which are incidental to the use of [an employer's] vehicle for commuting shall not be considered part of the employee's principal activities." 29 U.S.C § 254(a). Relatedly, the Department of Labor has specifically instructed that:

> A police officer, who has completed his or her tour of duty and who is given a patrol car to drive home and use on personal business, is not working during the travel time *even where the radio must be left on so that the officer can respond to emergency calls.* Of course, the time spent in responding to such calls is compensable.

19

29 C.F.R. § 553.221(f) (emphasis added).

There is little to no case law directly on point within the Fourth Circuit; however, the Eastern District of Virginia's decision in *Truslow* is instructive. In that case, the question before the court was whether a deputy sheriff assigned to a canine unit was entitled to compensation for off-duty care of his police dogs and related activities under the FLSA. The court held that the deputy's off-duty dog care activities (e.g., attendance at dog training sessions, unscheduled emergency canine calls, and canine demonstrations) were compensable under the FLSA, because they were "plainly an integral and indispensable part of his principal activities as deputy sheriff in the canine units." Notably, however, the court quickly disposed of the deputy's claim for compensation for time spent *commuting* with the dogs to such otherwise compensable activities:

> The Portal-to-Portal Act of 1947 also exempts employers from liability for time employees spend "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform." 29 U.S.C. § 254(a)(1). Accordingly, the Court holds as a matter of law that defendants were not required to compensate [the plaintiff] for the time he and the dogs spent commuting to or from work, training sessions, and canine demonstrations.

*Truslow*, 783 F. Supp at 277 n.5. In other words, even though the plaintiff was still responsible for tending to the dogs' "health, care, cleanliness, and well-being" during his commute—the time was not compensable. Just like the commute time in *Truslow*, the commute time at issue here falls squarely within the exemption set forth in 29 U.S.C. § 254(a).

Courts that have more directly faced the question at bar—whether the FLSA requires employers to compensate sheriff's deputies for time spent commuting to and from work in employer issued vehicles—have answered with a resounding "no." The Eleventh Circuit, for example, has held that "[t]he time that the deputies spent commuting in marked patrol vehicles is excluded from compensable work time by the Portal–to–Portal Act." *Llorca v. Sheriff, Collier*

*Cnty.*, 893 F.3d 1319, 1326-28 (11th Cir. 2018).  This remains true, the court held, even when the deputies are required to "monitor their radios" and "monitor the roads for traffic violations" during their commute.  *Id.* (reasoning that 29 C.F.R. § 553.221(f) precludes compensability based on the former, and that the latter is not compensable because it was neither integral nor indispensable to the deputies' performance of their principal activities).  In *Llorca*,

> The deputies also commuted to and from work in marked patrol vehicles.  The sheriffs required the deputies to **have their radios on during the commute, listen to calls** in the district through which they were driving, **and respond to major calls and emergencies**.  Additionally, the sheriffs required deputies who commuted in marked patrol vehicles to **observe the roads for traffic violations** and **engage in general traffic law enforcement** during their commutes.

*Llorca*, 893 F.3d at 1322 (emphasis added).  The Eleventh Circuit concluded that these activities were **incidental to the use of the employer's vehicle**.

> It would undermine law enforcement if marked patrol cars, driven by uniformed officers, routinely passed by accidents, disabled vehicles, flagrant safety violations, or even routine traffic violations.  It is a matter of common experience that traffic violations multiply if there is an appearance among the public that traffic enforcement is lax.  Thus, it would be highly inappropriate for uniformed officers to drive to and from work in marked patrol vehicles without observing the roads for traffic violations and other incidents.  We believe that this means that **such activities are incidental to the very use of the marked patrol vehicle**.  Thus, we conclude that such activities easily fall within the meaning of the statutory phrase: "For purposes of this subsection, . . . activities performed by an employee which are incidental to the use of [an employer's] vehicle for commuting shall not be considered part of the employee's principal activities."

*Llorca*, 893 F.3d at 1327 (quoting 29 U.S.C. § 254(a)).

Other state and federal courts have held similarly.  *See Chagoya v. City of Chicago*, 992 F.3d 607, 622 (7th Cir. 2021) (dismissing FLSA claims by police officers for "time spent by the operators in their CPD vehicles driving to and from their duty station for their regular work shifts"); *Espinoza v. Cnty. of Fresno*, No. 1:07-cv-01145, 2011 WL 3359632, at *6 (E.D. Cal. Aug. 3, 2011) (granting summary judgment to county for FLSA claims by deputies, holding that "the possibility

21

of having to perform compensable activities during their commutes does not transform Plaintiffs' entire commutes into compensable work"); *Adams v. United States*, 471 F.3d 1321, 1323 (Fed. Cir. 2006) (dismissing FLSA claims by police officers for commute time in government-owned vehicles even if required to "monitor their vehicles' communication equipment" during such commute); *Aiken v. City of Memphis*, 190 F.3d 753, 755 (6th Cir. 1999) (dismissing FLSA claims brought by canine officers for time spent commuting in government-owned vehicles with canines in them, noting that "monitoring a police radio does not convert commute time into compensable work"); *Hellmers v. Town of Vestal*, 969 F. Supp. 837, 843 (N.D.N.Y. 1997) (finding canine officer's commute time non-compensable under the FLSA, even though he drove to work "in a marked police car in his official uniform," was required to "sign on with the police department at all times," and was required to "be ready and able to respond as a police officer from the moment he leaves his home."); *Kennedy v. State*, 688 N.W.2d 473 (Iowa 2004) (holding that peace officers were not entitled to compensation for their commute time, even though they drove state-owned vehicles that contained police equipment and even though officers claimed they were "watching for law violators, assisting the public, removing debris from the highway, and remaining in contact with other law enforcement officers"). No federal court that has addressed this issue has concluded that the time spent commuting in a law enforcement vehicle is compensable.[4]

Despite this case law, this Court originally denied the County's Motion to Dismiss on the grounds that "Hatcher allege[d] that deputies not only monitored their radios during that period, but also responded to calls and assignments. Deputies primarily respond to calls, emergencies, and assignments and they cannot 'dispense' with that duty, regardless of whether their shifts have

---

[4] *Karr v. City of Beaumont*, 950 F. Supp. 1317, 1322-23 (E.D. Tex. 1997), is an outlier in that it concluded that the time spent caring for and transporting police canines was compensable.

begun." (ECF Doc. 54, at 8.) This Court made that decision by accepting as true the allegations in the Complaint. (*Id.* at 6 n.6.) Discovery has made clear that: (1) there is no requirement, policy, or uniform practice as to when deputies "mark on"; and (2) deputies were not dispatched to calls for service until they were marked clear from roll call. There is no factual support for the allegations in the Complaint. The deputies are seeking to be paid for commute time that is not compensable.

Sheriff Hines repeatedly and unequivocally testified that he expects deputies to be marked on before the start of their shift. (Hines dep. 34:20-37:5, 108:1-22, 147:15-150:34.) There is no expectation for deputies to be listening to or responding to the radio before the start of their shift. (Hines dep. 108:1-109:3.) Nor is there any requirement, policy, or uniform practice as to when deputies "mark on." (Hines dep. 147:15-150:20; Six dep. 15:19-16:11, 24:9-25:12, 27:20-28:13, 29:5-12, 38:7-18.)

Hatcher previously filed a declaration in this case. (ECF Doc. 45-1.) In that declaration, he stated:

> 9.   I was provided with a County of Hanover Sheriff's Office marked vehicle while I was employed as a deputy.
> 10.  It was Defendants' policy to instruct patrol and investigations deputies with take-home vehicles to mark "on duty" (also known as "1041") on the day they were working from the point in time that they left their driveway, if they resided in Hanover County, which I did.
>                                     * * *
> 15.  The Hanover County Sheriff's Office required that deputies be both in an on-duty status and monitoring and/or responding to the police dispatch radio during this time prior to the start of their scheduled shift.
>                                     * * *
> 18.  Marking "on duty" from our laptop or handheld or mobile radio was an activity that we were required to do to communicate with Hanover County's dispatch system.

**These statements are directly contradicted by Hatcher's deposition testimony.**

Q:    During this time relevant to the lawsuit, May 15 of 2020 until you retired—resigned on 5/31/22, did you have a take-home car the entire time?

A:    I did.

Q:    What type of vehicle was it?

A:    Initially, I was assigned a Nissan Max—a Nissan Altima.

Q:    Was it a marked vehicle?

A:    No, sir, it was unmarked, regular Virginia license plates with lights and siren and police radio.

Q:    Now, when you say it had lights and sirens, were they—it wasn't a light bar on top of your vehicle, right?

A:    No sir. They were grill lights, and then there were some in the taillights and headlights. They were covert.

(Hatcher dep. 73:10-19.)

Q:    In terms of marking on during this time, and again, let's talk about the relevant, potentially relevant times of this lawsuit, from May 15th of 2020 until you left on May 31, 2022—I will say this again, just to make sure we're on the same page, you did not mark on to the police dispatch channel?

A:    As a general practice, and I say general practice, **I can never remember a time that I ever would have marked 10-41 on duty or in any way, shape or form indicative that I was in my car or available did I ever** during the time I was on Street Crimes **mark on duty on police dispatch**.

(Hatcher dep. 68:3-15 (emphasis added).)

Q:    But before your shift, on your way to your shift, when you got into your vehicle, you would key up on your hand held and say 90 back?

A:    Yes, sir, B-A-C-K.

Q:    Okay. When you said 90 back, was there ever any acknowledgment of 90 back?

A:    That's a great question. For me personally? Rarely, if ever, simply because I was an employee that came in first, so, in other words, if I—when I would say 90 back, and there were times where I wouldn't say 90 back because I knew that my peers weren't back yet, but, as far as a response goes, if I didn't get in the car and start down the road early, like I did and how I was trained, then there was nobody to hear me, so I would be talking to myself.

Q:    So sometimes, because there was no one else to hear you, you didn't even say 90 back; correct?

A:    There were times that I would not.

Q:    And other times, you would say 90 back, and it was very rare that there was ever any acknowledge; is that correct?

A:    That's correct. There were—There were occasions when there was one other guy that would come in shortly behind me, because he lived not too—not too much distance difference than where I was, as far as where I live; but, other than him, no, it was no one on the radio to hear me.

24

(Hatcher dep. 69:25-71:2.)

> Q:    To your knowledge, was anyone from the police dispatch channel monitoring SCU1?
> A:    **If they were, they wouldn't say anything; and in my 8 years on that unit, I never marked back and received a response from anyone in dispatch.**

(Hatcher 71:21-25 (emphasis added).)    Hatcher did not "mark on" with Emergency Communications because he was not required to do so and, in fact, Sheriff Hines does not want his investigators to be on the radio.  (Six dep. 42:9-43:4; Hines dep. 33:3-14.)

McGill previously filed a declaration in this action.  (ECF Doc. 45-2.)  In that declaration, he stated:

> 14.    I was instructed to mark "on duty" from the moment that I pulled out of my driveway on each day that I worked.
>                               * * *
> 26.    I was regularly marked "on duty" for approximately fifteen (15) minutes to twenty (20) minutes prior to my shift beginning.

(*Id.*)  **McGill's deposition testimony and the data contradicts his previously sworn declaration.**

> Q:    Once you were out of the academy, did you receive any further training about when to mark 10-41?
> A:    Just mark 10-41 before the shift started.
> Q:    Was there any direction as to when before your shift started you needed to mark 10-41?
> A:    There was no time specifically given, no.

(McGill dep. 32:9-17.)

> Q:    And it's your position that the Sheriff's Office is requiring you to mark 10-41 on your way to work?
> A:    **It is my position that the Sheriff's Office requires you to mark 10-41 before the beginning of your shift.**

(McGill dep. 54:13-18 (emphasis added).)  The CAD and payroll data indicate that, although the commute from his residence to headquarters was 10-15 minutes, (McGill dep. 34:10-12), nearly

25

68% of the time, McGill was "marking on," if at all, 5 minutes or less before the start of his shift, (Ex. 12).

In answer to Interrogatories when asked what law enforcement action they took when they "marked on duty" before their scheduled shift, each Plaintiff stated in rote fashion, "Every day I was scheduled to work.  Marking on duty is a law enforcement action, which informs dispatch I'm within the jurisdiction, in my patrol car, and that I am present and patrolling while on the way." (Ex. 21 at No. 7.)  Although he made this statement in answer to Interrogatories, Lantz did not live within the County, and when he marked 10-41 from his residence, he was not informing dispatch that he was "within the jurisdiction."  (Lantz dep. 63:21-64:14.)  Additionally, when asked what law enforcement duties he was performing after marking 10-41 and commuting to the start of his shift, McGill stated, "I was marked on duty, and I'm traveling in a marked patrol vehicle, headed to roll call."  (McGill dep. 54:2-5.)  Deputies also "mark on" when reporting to voluntary off-duty assignments for which they are paid by the contractor who uses the deputies' services.  (Carroll dep. 47:22-48:4, 49:13-22, 50:10-22.)  This is further proof that "marking on" is not a law enforcement action with any significance.  (Carroll dep. 47:12-51:5; Hines dep. 38:23-39:22.)

The evidence in the record demonstrates, contrary to the allegations in the Complaint, deputies were not "called to the scene of a crime or accident."  (ECF Doc. 1, at ¶ 49.)  **They were not dispatched to calls for service until they were marked clear from roll call.**  (Six dep. 67:1-69:9; Buchanan dep. 31:16-32:20, 36:16-38:14, 42:1-17, 43:15-44:3, 46:9-24; Sutton dep. 49:3-50:2; Lantz dep. 39:2-10.)  They may have stopped to address something on the way to the start of their shift or very rarely asked if they could handle something, but they were not affirmatively assigned a call for service before the start of their shifts.  (McGill dep. 36:25-38:14; Sutton dep. 34:12-19; 49:3-50:2.)

26

Q:    During this time frame, May 15, 2020 to May 31, 2022, how many times did you actually respond to a call while you were on the way to work?

A:    I don't recall how many times. It wasn't that it was frequently, but I don't recall how many times.

Q:    Okay. Can you ever recall one particular time in that time frame of the 2 years I just described where you responded to a call. In other words, you've—you come from home, you've said 90 back, and before you got wherever you were going that day, you actually took a call.

A:    Well, as far as taking a call, **it wouldn't have been a situation where I would have been dispatched to a call**, it would have been more so me keying up that I was in the area or something that I observed.
As far as giving you an example during the time frame that you described, I don't recall any specifics or any particular call that resulted in me responding—or I don't have any recollection of it.

(Hatcher dep. 97:13-98:2 (emphasis added).)

"Marking on" is not a law enforcement action or a principal activity. To the contrary, it is preliminary to the principal activity for patrol deputies and, thus, falls squarely within the exclusion of the Portal-to-Portal Act and within the facts of *Llorca*. The time spent commuting to work in a Sheriff-provided vehicle is not compensable under the FLSA, and the County is entitled to judgment as a matter of law as to Count I.

**E.**    **The time spent driving to work is not compensable under the VGPA.**

Because the VGPA is designed to solve a problem unaddressed by the FLSA, it must work in harmony with the FLSA and, thus, define compensable work in the same manner. *See Bailey v. Loudoun County Sheriff's Off.*, 762 S.E.2d 763, 768 (Va. 2014).

> [T]he [VGPA] is designed to solve a problem unaddressed by the FLSA. The FLSA establishes a fixed number of pre-overtime hours that may be paid at a normal rate for any given work period. However, an employer may establish a lower number of hours of work per work period that constitute the basis of the employee's salary or the employee's hourly compensation—that is, those hours which constitute the employee's regularly scheduled work hours. *See* Code § 9.1–700. This is "the gap:" the difference between an employee's regularly scheduled work hours and the federal pre-overtime hours limit.
>           \* \* \*
> Thus, Code § 9.1–701(A) requires an employer of law-enforcement employees to pay such employees, in the form of either overtime compensation or leave, at a rate

27

of at least one and one-half times their normal pay rate, for all hours of work that occur within a work period and that accrue within the gap.

*Id.* "Hours worked" under the VGPA means "all hours that an employee works or is in a paid status during his regularly scheduled work hours shall be counted as hours of work." *Id.* (citing Va. Code § 9.1–703). The VGPA does not more specifically define what constitutes compensable "work," however, and nothing suggests that the VGPA carries a broader definition of "work" than the FLSA.

Magistrate Judge Leonard recognized this in *Emmons v. City of Chesapeake*, No. 2:18CV402, 2019 WL 8888192, at *1 (E.D. Va. June 18, 2019), *aff'd,* 982 F.3d 245 (4th Cir. 2020) (quoting Va. Code § 9.1-701(A)), holding that "a determination of whether Plaintiffs may prevail under the Virginia Gap Pay Act necessarily requires Plaintiffs first prevail on their FLSA claim." Given the commute time at issue is clearly non-compensable work under the FLSA, it is similarly non-compensable under the VGPA, and the County is entitled to judgment as a matter of law on Count III.

F.    **The time spent driving to work is not compensable under the VOWA.**

In Count IV, Plaintiffs allege that they "were entitled to receive an overtime premium for all hours that they worked beyond 171 hours in a twenty-eight (28) day cycle as set forth by 20 [sic] U.S.C. § 207(k), and incorporated by Va. Code § 40.1-29.2(C)." (ECF No. 1, at ¶ 112.) Between July 1, 2021 and June 30, 2022, Virginia Code section 40.1-29.2(C) provided:

> For fire protection or law-enforcement employees of any public sector employer for whom **29 U.S.C. § 207(k)** applies, such employer shall pay an overtime premium as set forth in this section for (i) all hours worked in excess of the threshold set forth in **20 [sic] U.S.C. § 207(k)**[5] and (ii) any additional hours such employee worked or received as paid leave as set forth in **subsection A of § 9.1-701.**

---

[5] The statute refers to 20 U.S.C. § 207(k), which does not exist. It should read 29 U.S.C. § 207(k).

Va. Code § 40.1-29.2 (eff. July 1, 2021 to June 30, 2022) (emphasis added).  29 U.S.C. § 207(k) governs overtime calculations for employees of a public agency engaged in fire protection or law enforcement activities.  Virginia Code section 9.1-701(A) governs other hours worked or received as paid leave.  Notably, that section provides: "Employers shall pay fire protection or law-enforcement employees overtime compensation or leave, **as under the Fair Labor Standards Act, 29 U.S.C. § 207(o)** . . . ."  *Id.* (emphasis added).  29 U.S.C. § 207 is the "Maximum hours" section within the FLSA, and subsection (o) governs what constitutes "compensatory time" for employees of a public agency, such as "a political subdivision of a State," and the rate at which such time must be provided.

As the above statutory framework demonstrates, the previous version of the VOWA effectively adopts the provisions of the FLSA while maintaining its own internal procedure and remedies.  *See Meharg v. York Operations, LLC*, No. 4:22-CV-51, 2022 WL 16636943, at *4 (E.D. Va. Nov. 2, 2022) ("[T]the current version of VOWA incorporates the procedural and remedial aspects of FLSA and does not alter the substantive right to bring a claim for unpaid overtime in state court.").  Accordingly, with respect to what constitutes "hours worked" (a matter surely not "procedural" or "remedial" in nature), both the prior version and the current version of VOWA incorporate the FLSA's definition.  To hold otherwise would create disharmony between the VOWA and the FLSA where it should not, and does not, exist.  Because commute time is excluded under the Portal-to-Portal Act, it cannot count as "hours worked" under the VOWA.  Put simply, the County is entitled to judgment as a matter of law as to Count IV for the same reasons for which it is entitled under Count I.  Commute time is not compensable.

**G.**     **The FLSA claims of DiLoreto, Dodge, and Richardson should be dismissed with prejudice.**

Steven DiLoreto ("DiLoreto"), Matthew Dodge ("Dodge"), and Jacob Richardson ("Richardson") opted in to the FLSA collective action.  (ECF Doc. 40, 41, 81.)  On January 20, 29, and February 4, 2025, they withdrew their consent to participate in the collective action.  As such, they did not appear for their noticed depositions.[6]

"Although the FLSA provides a mechanism to join the collective action, it does not explicitly 'provide a method whereby an opt-in plaintiff may unilaterally withdraw once they have joined the litigation.'" *Duke v. Harvest Hosps., Inc.*, No. 2:20-CV-00865-CCW, 2021 WL 4245089, at *2 (W.D. Pa. Sept. 17, 2021) (quoting *Mancuso v. Fla. Metro. Univ., Inc.*, No. 09-61984-CIV, 2010 WL 11549395 at *1 (S.D. Fla. Sept. 17, 2010)).  Courts have recognized, however, that "simply withdrawing the consent forms of opt-in plaintiffs does not automatically dismiss their claims."  *Reyes v. Texas EZPawn, L.P.*, No. V-03-128, 2006 WL 3513936 at *1 (S.D. Tex. Dec. 6, 2006).  Generally, courts apply the standards for voluntary dismissal pursuant to Rule 41(a) of the Federal Rules of Civil Procedure. *Yang v. Taste of N. China, Ltd.*, No. CV 19-09392 (KM) (MAH), 2023 WL 120460, at *3–4 (D.N.J. Jan. 6, 2023).

No request for a Rule 41(a)(1) dismissal has been made.  As such, the Court should dismiss the FLSA claims of DiLoreto, Dodge, and Richardson with prejudice.[7]

### IV.     CONCLUSION

For all of the foregoing reasons, Hanover County, by counsel, requests that the Court grant its Motion for Summary Judgment and enter judgment in its favor as a matter of law.

---

[6] Additionally, DiLoreto did not answer written discovery.

[7] Additionally, DiLoreto and Dodge would be foreclosed from pursuing additional litigation based on the statute of limitations.  Their employment with the Sheriff ended in July and September 2022 respectively.

**THE COUNTY OF HANOVER,
VIRGINIA**

By Counsel

/s/_____
David P. Corrigan (VSB No. 26341)
Melissa Y. York (VSB No. 77493)
Counsel for The County of Hanover, Virginia
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
myork@hccw.com

# C E R T I F I C A T E

I hereby certify that on the 13th day of March, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

> Craig Juraj Curwood, VSB No. 43975
> Zev H. Antell, VSB No. 74634
> Samantha R. Galina, VSB No. 96981
> Butler Curwood, PLC
> 140 Virginia Street, Suite 302
> Richmond, VA 23219
> 804-648-4848 - Phone
> 804-237-0413 - Fax
> craig@butlercurwood.com
> zev@butlercurwood.com
> samantha@butlercurwood.com

/s/_____
David P. Corrigan (VSB No. 26341)
Melissa Y. York (VSB No. 77493)
Counsel for The County of Hanover, Virginia
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
myork@hccw.com

31

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

CHRISTOPHER HATCHER
INDIVIDUALLY ON BEHALF OF
HIMSELF, AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,

    Plaintiff,

v.                       Case No. 3:23-cv-00325-MHL

THE COUNTY OF HANOVER, VIRGINIA,

    Defendant.

**INDEX OF EXHIBITS**
**TO DEFENDANT'S BRIEF IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

| Exhibit | Description | Deposition Pg. Nos./ Bates No. | Deposition Exhibit No. |
|---|---|---|---|
| 1 | Deposition of Sheriff David R. Hines | 7-9, 23, 33-39, 108-109, 147-150, 163, 165-166 | |
| 2 | Deposition of Shelly Wright | 11-12, 17, 24-26, 36, 42, 45, 91 | |
| 3 | Deposition of Gregory Six | 8, 14-18, 24-25, 27-29, 32-35, 38, 42-44, 67-69, 73-74, 78-81, 83-89 | |
| 4 | Take Home Vehicle Policy | HCSO-000407-HCSO-000412 | Hines 3 |
| 5 | Hanover Public Safety Emergency Communications General Order 4.3.1 | COUNTY_007072-COUNTY_007078 | Buchanan 6 |
| 6 | Communications Agreement | | Hines 2 |
| 7 | Hanover Public Safety Emergency Communications General Order 1.0 | COUNTY_006776-COUNTY_006778 | |
| 8 | Deposition of Cheryl Buchanan | 11, 19-20, 28-32, 36-38, 42-44, 46, 50, 60-61, 63, 66, 74-75 | |

1

| Exhibit | Description | Deposition Pg. Nos./ Bates No. | Deposition Exhibit No. |
|---|---|---|---|
| 9 | Deposition of Christopher Hatcher | 11-12, 15, 19-20, 24, 50-51, 68-71, 73, 97-98 | |
| 10 | Hanover Public Safety Emergency Communications General Order 4.3 | | Buchanan 3 |
| 11 | Deposition of Jonathan McGill | 9, 19-20, 32, 34, 36-38, 46, 54-56 | |
| 12 | McGill Shift and Mark on Comparison | | |
| 13 | Deposition of Timothy Sutton | 8, 12-14, 33-34, 49-50 | |
| 14 | Sutton Shift and Mark on Comparison | | |
| 15 | Deposition of B. Waverly Carroll | 10, 14-17, 20-21, 24, 47-51 | |
| 16 | Deposition of C. Ryan Payne | 25, 27-28, 39, 58 | |
| 17 | Carroll Shift and Mark on Comparison | | |
| 18 | Payne Shift and Mark on Comparison | | |
| 19 | Deposition of Lowell Lantz | 9, 18, 30, 39, 44-46, 63-64 | |
| 20 | Lantz Shift and Mark on Comparison | | |
| 21 | Interrogatory Answers | | |

2