DEFENDANT'S
EXHIBIT
9
1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CHRISTOPHER HATCHER, INDIVIDUALLY
ON BEHALF OF HIMSELF, AND ON
BEHALF OF ALL OTHERS SIMILARLY          CASE NO.
SITUATED,                               3:23-cv-00325-MHL

                    Plaintiff,

vs.

THE COUNTY OF HANOVER, VIRGINIA,

                    Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED DEPOSITION OF CHRISTOPHER HATCHER

February 3, 2025

10:04 a.m.

Richmond, Virginia

HALASZ REPORTING & VIDEO

1011 East Main Street, Suite 100

Richmond, Virginia  23219

(804) 708-0025

REPORTED BY:  LESLIE D. ETHEREDGE, RMR, CCR

wasn't because I was smart.  It was because I went to summer school for a couple years and got ahead, because I didn't like school, and I wanted to get out and work and make money, so I went to summer school, I think it was two years, and took a class so that I would have the necessary credits to graduate early.

Q.    Okay.  All right.  Tell me about your first involvement with the Hanover County Sheriff's Office.

Did you apply, or what was the process? You just made up your mind, I want to be a Hanover County Deputy Sheriff?

MR. CURWOOD:  Object to the form of the question.  You can answer.

A.    Yes, I applied to Hanover -- in 2001, obviously, i was interested in becoming a Deputy there, and I went through the process and was offered the job.

Q.    Okay.  Did you attend an academy?

A.    I did.

Q.    What was the name of that academy?

A.    Rappahannock Regional Criminal Justice Academy in Fredericksburg, Virginia.  January 2002 was the start date.

Q.    Had you worked at all for the Hanover

County Sheriff before January 2002, or was it after that when you started work?  Do you understand my question?

Different places I have been, sometimes they sign up, then they go to the academy, and then they start work.

A.    No, sir.  It was -- The hire date was January 2, 2002, and, if my memory serves me correctly, we began the academy within 2 weeks.

Q.    All right.  So how long were you at the academy?

A.    17 weeks.

Q.    Which puts you in April?

A.    May of 2002, I believe it was May 17, 2002 was the graduation date.

Q.    Okay.  And when you first graduated and you went to work for the Sheriff, where -- was your first assignment?

A.    Well, after we graduated, we -- because we went to a regional academy, Hanover had their own academy at that time; however, because they didn't hire a lot of us, they elected to send us to Rappahannock to complete our training, so to answer your question, immediately upon graduating the academy, we came back to Hanover and we received at

Q.    Okay.  Do you remember what midnight shift was back then?

A.    I do.  They were 9-hour shifts, and it was 10:00 p.m. to 7:00 a.m.

Q.    Okay.  And who was your supervisor in that first midnight shift where you were working?

A.    Give me a second.  Michael J. Anthony.

Q.    Is he a Sergeant?

A.    Yes, sir, Patrol Sergeant, midnight shift.

Q.    Okay.  What were your communication devices available to you at that time, in July 2002?  Did you have an MDT at that time, or was it just a radio, or what did you have?

A.    You are correct, it was just a radio.  We had not been assigned MDTs in 2002.

Q.    And, again, for the record, MDT is what?

A.    Mobile data terminal, laptop.

Q.    What training did you receive in that -- either doing it The Hanover Way or during your field training, or once you started your shift, in terms of marking on and -- I will ask that question first.

What was your understanding or what was the training you received with respect to marking on?

A.    When I was at Rappahannock Regional

shift, some people more, some people less, just based on where they lived.

Q.    And throughout that time, whenever people marked 10-41, they didn't actually start getting paid until they actually got to roll call; correct?

MR. CURWOOD:  Object to the form of the question.  You can answer.

A.    You are correct.

Q.    And when -- During this time, you were patrol, so you were marking on on what channel or what radio?

A.    The police dispatch channel, and as far as what radio, to that part of the question, I personally at that point in my career, I would mark on from the mobile radio instead of the hand held, and that did have a designation, where they would -- dispatch would know if you were mobile radio or portable radio, just as your peers would know too, based on a digital, a numeric printout on the radio that would ID you.

Q.    Okay.  So the channel was the police dispatch channel.

A.    You are correct.

Q.    And everybody on patrol was expected to mark on on the police dispatch channel; correct?

A.      Yes, sir.

Q.      When you say from mobile instead of hand held, this is me, I'm not a police officer, when you say mobile is your car radio; correct?

A.      Yes, sir.

Q.      And your hand held is actually -- was on your shoulder?

A.      You are correct.

Q.      Okay.  So what you are saying is your habit was to mark on on your car radio on the police dispatch channel?

A.      At that point in my career, yes, sir.

Q.      Okay.  Throughout the time you were in patrol, did that remain the case, that you did that same thing, would mark from your mobile on the police dispatch channel?

A.      That's correct, I would.

Q.      All right.  We talked about you're on midnight shifts, starting in July 2002.  What was the -- what other shifts did you work or did you remain on that, or how did your career move?

A.      I believe I was on midnight shift for 14 months, and then I went to evening shift, where I remained until I left the agency.

Q.      And what was evening shift?

24

I stayed in General Investigations until September 16th of 2010, when I was promoted by Stuart Cook to Patrol Sergeant, and for time line purposes -- I'm sorry. It was September 15th, and then September 16th was the day that Stuart Cook retired, and I was assigned to midnight shift patrol as a Sergeant, I remained there between a year and 2 years.

Then I was transferred to evening shift, as a Patrol Sergeant, where I remained for about a year, and then I was transferred to training as the Training Sergeant a/k/a the Assistant Director of the Criminal Justice Academy in Hanover County.

And then October of 2014, I voluntarily took a demotion and went to Street Crimes on my request, where I remained from 2014 until I achieved 20 years of service, and I voluntarily resigned from the agency effective June 1, 2022.

Q.    Okay. Very helpful.

So let me go back. You mentioned that in April of 2006, you left, then you returned in October 2006.

Why did you leave in April 2006?

A.    I would say the best answer I can give you is there were other opportunities that were more

50

is because he didn't know what to do, but he did realize what he did was wrong.

Q.    And, in your mind, him admitting that he lied and he didn't know what to do, that means he can't be a Deputy?

A.    100 percent.

Q.    But that is not what happened?

A.    No, sir.

Q.    All right.  So the self-preservation aspect of this was that you felt like, in Administration, you were constantly interacting with the leadership; and that, if it continued like that, it wouldn't be good for your long-term future?

A.    That's accurate.

Q.    All right.  When you were demoted, what did you go to?

A.    I was never demoted.  I asked to be demoted.

Q.    Okay.  Well, after you asked to be demoted, you were, in fact, demoted; correct?

A.    Yes, but that was a voluntary demotion that I asked for, it was not a punitive demotion.  I just want to make that clear for the record.

Q.    Okay.

A.    To answer your question, I was -- after

51

demotion, I went to Street Crimes and remained from '14 to '22, when I resigned.

Q.    And what is Street Crimes?

A.    Street Crimes' objective is an undercover unit that -- primarily, the objective, if I'm going off memory correctly, it specifically states that the objective of the unit is to locate fugitives who are elusive and are difficult to apprehend.

That is one of the primary functions of it, and there is some language in there too that would be specific to a lifestyle study of a potential suspect, so it's a lot of -- in layman's terms, a lot of surveillance.

Q.    Is it under Investigations?

A.    It is.

Q.    Now, you previously said you didn't like the investigations.  Did you like Street Crimes?

A.    I liked it a lot better than General Investigations, and it's two entirely different pieces.

I mean you're -- quite honestly too, I didn't like General Investigations because I had to wear a suit and tie, and you had -- you were in the field in Street Crimes, so you didn't -- we didn't even go to the office often at all, so it was

68

Rusty Hale, who was promoted from Lieutenant to Captain during that time frame.

Q.    Okay.  Got it.  All right.  In terms of marking on during this time, and, again, let's talk about the relevant, potentially relevant times of this lawsuit, from May 15th of 2020 until you left on May 31 of 2022 -- I will say this again, just to make sure we're on the same page, you did not mark on to the police dispatch channel?

A.    As a general practice, and I say general practice, I can never remember a time that I ever would have marked 10-41 on duty or in any way, shape, or form indicative that I was in my car or available did I ever during the time I was on Street Crimes mark on duty on police dispatch.

Q.    Okay.  But your interrogatory answers and the allegations in the lawsuit are that you marked on to SCU1?

A.    Yes, sir.

Q.    And what is SCU1?

A.    Street Crimes Unit 1.  There were two channels, and the basis of that was in case we did what you had a vision of and had them separated, on east or west, so there was two Street Crimes Unit channels, but we primarily used SCU1, and that always

69

was the one that I would mark back on.

Q.    Okay.  So when you say you marked on SCU1, what would happen?  How would you mark on SCU1?

A.    So the way I was trained, when I came over, and what I continued on until the time I left is that when you mark back --

Q.    Go ahead.

A.    When you mark back, so, for example, my unit number the entire time I was in Street Crimes was 90, I would key up, traditionally on my hand held, because I would also monitor the dispatch, police dispatch frequency that you had referenced earlier, so I could hear what's going on in the county, so I would mark back on the SCU1, and I would say 90, which is my unit number, back.

That's how I was trained, and that's the practice of all Street Crimes personnel.  When they got back in the car and they were on duty would say 90 back.

The only other time I would use that term is, if I got out halfway through the shift and I got out of the car, I would say 90 out; and, when I got back in the car, I would say 90 back, on the hand held.

Q.    So -- But before your shift, on your way

70

to your shift, when you got into your vehicle, you would key up on your hand held and say 90 back?

A.    Yes, sir, B-A-C-K.

Q.    Okay.  When you said 90 back, was there ever any acknowledgment of 90 back?

A.    That's a great question.  For me personally?  Rarely, if ever, simply because I was an employee that came in first, so, in other words, if I -- when I would say 90 back, and there were times where I wouldn't say 90 back because I knew that my peers weren't back yet, but, as far as a response goes, if I didn't get in the car and start down the road early, like I did and how I was trained, then there was nobody to hear me, so I would be talking to myself.

Q.    So sometimes, because there was no one to hear you, you didn't even say 90 back; correct?

A.    There were times that I would not.

Q.    And other times, you would say 90 back, and it was very rare that there was ever any acknowledgment; is that correct?

A.    That's correct.  There were -- There were occasions where there was one other guy that would come in shortly behind me, because he lived not too -- not too much distance difference than where I

71

was, as far as where I live; but, other than him, no, it was no one on the radio to hear me.

Q.    Who was that?

A.    That would have been Donny Davis, and his unit number is 87.

Q.    And how would he mark on?

A.    87 back.

Q.    When the other guys marked on at any point, did you ever acknowledge them?

A.    Yes, and I would say 10-4.  10-4.

THE COURT REPORTER:  I'm sorry.  You would say what?

THE WITNESS:  I would say 10-4.

THE COURT REPORTER:  10-4?

THE WITNESS:  Uh-huh, to acknowledge.

MR. CORRIGAN:  Except he said it really fast.

THE WITNESS:  Because, if you pulled the tape, that's what it would sound like.

BY MR. CORRIGAN:

Q.    To your knowledge, was anyone from the police dispatch channel monitoring SCU1?

A.    If they were, they wouldn't say anything; and in my 8 years in that unit, I never marked back and received a response from anyone in dispatch.

73

work, and I never addressed it.

Q.    During this time relevant to the lawsuit, May 15 of 2020 until you retired -- resigned on 5/31/22, did you have a take-home car the entire time?

A.    I did.

Q.    And what type of vehicle was it?

A.    Initially, I was assigned a Nissan Max -- a Nissan Altima.

Q.    Was it a marked vehicle?

A.    No, sir, it was unmarked, regular Virginia license plates with lights and siren and police radio.

Q.    Now, when you say you had lights and sirens, were they -- it wasn't a light bar on top of your vehicle; right?

A.    No, sir.  They were grill lights, and then there were some in the taillights and headlights.  They were covert.

Q.    That's the word I was looking for. Covert, not overt; correct?

A.    Yes, sir.

Q.    And the idea was you could drive down the street in your Nissan Altima and no one would know you were law enforcement?

97

A.      That's correct.

Q.      And -- but many days, you would be told by your Sergeant to start going home 30 or 40 minutes before the end of the shift?

A.      Yes, sir, that was standard.  That was typical, unless something was currently active.

Q.      Okay.  During this time frame, May 15, 2020 to May 31, 2022, how many times did you actually respond to a call while you were on the way to work?

A.      I don't recall how many times.  It wasn't that it was frequently, but I don't recall how many times.

Q.      Okay.  Can you ever recall one particular time in that time frame of the 2 years I just described where you responded to a call.  In other words, you've -- you come from home, you've said 90 back, and before you got wherever you were going that day, that you actually took a call.

A.      Well, as far as taking a call, it wouldn't have been a situation where I would have been dispatched to a call, it would have been more so me keying up that I was in the area or something that I observed.

As far as giving you an example during the time frame that you described, I don't recall any

98

specifics or any particular call that resulted in me responding or -- I don't have any recollection of it.

Q.    And, if you ever did, and I am not saying you did, but if you did key up or tell them that you observed something, you would expect to get paid for that time, wouldn't you?

A.    Yes.

Q.    And you would get paid for that time, wouldn't you, if you put in for it?

A.    My opinion is that I would have.  Let me retract that.

My opinion is that if it were during the prescribed time of when I was reporting to the location that we were going to, like I said earlier, we didn't have a roll call, from the time I left my house until the time I got to where I was going, much the same as it was my whole career, I was under the expectation and practice, because it is what I did, that it was not something that, if I put in for, that I would have been paid, so I completely retract the statement of yes or the answer of yes.

Q.    So you don't think you would have been paid, but you also can't remember any specifics in that May 2020 to May 2022 time frame, where you actually responded to a call during that time; isn't