DEFENDANT'S EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CHRISTOPHER HATCHER, INDIVIDUALLY
ON BEHALF OF HIMSELF, AND ON
BEHALF OF ALL OTHERS SIMILARLY          CASE NO.
SITUATED,                               3:23-cv-00325-MHL

                  Plaintiff,

vs.

THE COUNTY OF HANOVER, VIRGINIA,

                  Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF JONATHAN McGILL

February 3, 2025

1:25 p.m.

Richmond, Virginia

HALASZ REPORTING & VIDEO

1011 East Main Street, Suite 100

Richmond, Virginia  23219

(804) 708-0025

REPORTED BY:  LESLIE D. ETHEREDGE, RMR, CCR

remember how far -- I made it to the interview process, but, after that, I think that was it.

Q. So thinking about when you applied in 2018, tell me about that application process.

A. I applied, I can't remember if it was online or paper, applied and just went through the process.

Q. And what is that process?

A. One or two oral interviews, a written test, I believe. That's pretty much it.

Q. So after the written test, do they notify you whether you have qualified for employment?

A. I think they notify you, you go to the next step, I believe, after the written test, and I think that may have been the first interview, I think, oral interview, I think.

Q. Okay. So maybe an application, a test, and then interviews?

A. Yes.

Q. Okay. And you were successful in that application process.

A. Yes.

Q. When did you start with Hanover?

A. I think beginning of November 2018.

Q. And did you have to go to the academy?

A.      Sergeant Sutton.

Q.      So we thought you may have finished field training in perhaps September of 2019, and then you said you were on day shift for 3 to 6 months, so that's taking us into maybe the first part of 2020; does that sound right?

A.      Possibly.  I don't remember the exact time I was on day shift, but it was a brief amount of time, then I went to evening shift after day shift.

Q.      How long were you on evening shift?

A.      Maybe a year.  I don't -- I don't recall the specific time frame.

Q.      Did you have the same supervisor the whole time?

A.      I think Sergeant Sutton went out on medical leave at some point, I can't recall if there was a different Sergeant.  It was either Sergeant Sutton or Sergeant Vaughan.

Q.      Vaughan?

A.      Vaughan.

Q.      And then when did you move back to day shift?

A.      Sometime in, I want to say 2022, I don't know if it was the spring or summer.  It was at some point in 2022.

20

Q.    Did you stay on day shift until you left the Sheriff's Office?

A.    Yes.

Q.    Were you on -- still on the first platoon?

A.    Yes.

Q.    Who was your supervisor?

A.    I don't recall.

Q.    Do you recall who your supervisor was when you resigned?

A.    It would have been -- well, I don't know who the Sergeant was, but it was Lieutenant Papenfuse.  I cannot recall who the Sergeant was.

Q.    Is it Tim Papenfuse?

A.    Yes, ma'am.

MR. CORRIGAN:  How do you spell that?

A.    P-A-P-E-N-F-U-S-E.  One of the Sergeants may have been Miller, Sergeant Miller, but I don't know, he was recently promoted, so I don't know what the time frame was when he would have been my supervisor.

Q.    When you moved to evening shift, did you get a different unit number?

A.    Yes.

Q.    What was that unit number?

32

and to have the GPS active was to be signed into the CAD on the computer, Mobile Data Terminal.

Q.    So to have the GPS active, the computer not only has to be on, but you have to be signed in to CAD?

A.    As far as I'm aware, yes.

Q.    That's your understanding?

A.    Yes.

Q.    Once you were out of the academy, did you receive any further training about when to mark 10-41?

A.    Just mark 10-41 before the shift started.

Q.    Was there any direction as to when before your shift started you needed to mark 10-41?

A.    There was no time specifically given, no.

Q.    What was your practice as far as marking 10-41?

A.    It varied, depending on the schedule, if we had roll call assigned or not.

Q.    Tell me about how it varied.

A.    So usually, I would -- if we didn't have roll call, I would mark 10-41 by radio before leaving the house, and then, if I was leaving the house before I marked on by radio, I would power up the MDT.  As long as there were any computer updates or

34

Q.    So if there was no roll call, you would be leaving your house and mark 10-41 and then go about your patrol responsibilities?

A.    Yes.

Q.    Okay.  What would you do if there was roll call?

A.    I would usually mark on by computer.

Q.    When would you do that?

A.    As I'm leaving the driveway.

Q.    How long would it take you to drive from your home to headquarters?

A.    10 to 15 minutes.

Q.    When would you mark 10-42?

A.    When I arrived home usually.

Q.    Would you do that via radio or via computer?

A.    It depends.

Q.    Would it depend on certain circumstances or just how you felt that day?

A.    Just how I felt that day.

Q.    When would you arrive home?

A.    Usually, at the time my shift ended or shortly thereafter.

Q.    It is my understanding that there is overlap between day shift, evening shift, midnight

36

A.    Yes.

Q.    Okay.

A.    I think evening shift was 12:30 to 11.

Q.    12:30?

A.    Yeah, 12:30 to 11, I think.

Q.    But it sounds like, for the most part, you would return home by the end of your scheduled shift?

A.    Yes.

Q.    And you would mark 10-42 when you got home?

A.    Yes, or close to home.

Q.    When you would mark 10-41 on your way to roll call, for example, what would you be doing during your commute?

MR. CURWOOD:  I object to the form of the question.  You can answer.

A.    On the way to roll call, if I marked on by radio, usually I was updating my computer or logging onto my computer and traveling to headquarters.

Q.    Are you -- would you be listening to the radio?

A.    Yes.

Q.    Do you ever recall a circumstance in

37

which you were dispatched to a call for service while en route to headquarters for roll call?

A.    I wouldn't say -- well, I mean yes.

Q.    Okay.  Tell me about that.

A.    I ran across -- well, when we ran across a accident -- a accident occurred on the route that I take to headquarters, and I stopped for the accident.

Q.    So my question is did -- was that call dispatched to you, or did you notify someone that the accident had occurred and you were stopping?

A.    I notified them that I was stopping.

Q.    Were you paid for that time that you spent with that accident?

A.    No.

Q.    Did you put that time on your time sheet?

A.    No.

Q.    Did you talk to a supervisor about being compensated for that time?

A.    No.

Q.    Why not?

A.    Because I wouldn't have been compensated for it.

Q.    How do you know you would not have been compensated for it?

A.    Because usually -- what the policy says

38

and usually by just routine practice, unless it's an over extended amount of time, we're not going to get paid overtime for it.

Q.    Would there be occasion where you would stop on your way to work and then be allowed to leave early, to make up for that time?

A.    Possibly, if I requested it.

Q.    So you recall at least one circumstance in which you observed an accident on your way to headquarters for roll call.

Was there ever a time in which dispatch dispatched a call to you while you were on your way to roll call?

A.    I can't recall.

Q.    How often would there be roll call?

A.    It depends.  Sometimes every day, sometimes a couple days a week.  In COVID, it was usually maybe once a week, if that.

Q.    Who decides if there's roll call?

A.    Either the Sergeant, Lieutenant, or Captain.

Q.    Someone in the chain of command decides?

A.    Yes.

Q.    How do you know if there is going to be roll call?

46

know -- I don't recall anybody specific I heard it from, just rumors.

Q.    When did you leave the Hanover County Sheriff's Office?

A.    Sometime in October of 2022.

Q.    And why did you leave the Hanover County Sheriff's Office?

A.    I got moved to evening shift, and that conflicted with my family schedule.

Q.    Where did you go from the Sheriff's Office?

A.    I'm self-employed.

Q.    What are you doing?

A.    Heating and air conditioning.

Q.    Do you have a company?

A.    I'm just self-employed, yes.

Q.    Does your company -- Do you have a name for your company?

A.    Yes.

Q.    What is that?

A.    Aries Mechanical.

Q.    Aries?

A.    Mechanical.

Q.    How do you spell that?

A.    A-R-I-E-S.

54

performing law enforcement duties, yes.

Q.    And what law enforcement duties are you performing?

A.    I was marked on duty, and I'm travelling in a marked patrol vehicle, headed to roll call.

Q.    So are you permitted to drive your marked patrol vehicle when you are not on duty?

A.    In the SOPs, I believe so, yes.

Q.    Should you be paid for that time, when you are driving a marked patrol car?

A.    If you are doing something that the Sheriff's Office require you to do, I believe so.

Q.    Okay.  And it's your position that the Sheriff's Office is requiring you to mark 10-41 on your way to work?

A.    It is my position that the Sheriff's Office requires you to mark 10-41 before the beginning of your shift.

Q.    Turn to page 14 of Exhibit 1.  Look at February 4, 2022.  It looks like you have a shift start time of 6:00 a.m., you marked 10-41 at 5:19 a.m., which is 41 minutes before your shift started.

Why would you mark on 41 minutes before your shift started?

55

A.    I do not recall.

Q.    Any idea what might have happened on February 4, 2022?

A.    If I was marked on, it was -- that early, either I was at headquarters doing work or it was because of roll call.

Q.    And, again, you said it takes you 10 to 15 minutes to travel from your home to headquarters?

MR. CURWOOD:  I object to the form of that question.  You can answer.

A.    Usually, yes.

(10/04/2022 Memorandum from D/S J.D. McGill to Col. D.R. Hines was marked as McGill Exhibit 2.)

Q.    Mr. McGill, you have been given a document marked Exhibit 2.  What is this document?

A.    A memo for my resignation.

Q.    It looks like it's dated October 4, 2022?

A.    Yes.

Q.    Who did you give your resignation to?

A.    Lieutenant Papenfuse.

Q.    Do you know who these handwritten statements and signatures are from on this document?

A.    I've not seen it before, these handwritten statements, so I would have to look at it

to identify them.

Q.    But you handed this to Lieutenant Papenfuse?

A.    Yes, but all of this handwritten stuff is extra.

Q.    Is extra.

A.    Yes.

Q.    Have you spoken with the other plaintiffs in this lawsuit about the lawsuit?

A.    Just Hatcher and Chris Payne, Ryan Payne.

Q.    What have you and Hatcher discussed about the lawsuit?

MR. CURWOOD:  Object to the form of the question, and to the extent that any discussions were with Chris Hatcher and me, those are privileged.

Q.    So I don't want to hear about any conversations you had with Mr. Curwood and Mr. Hatcher, but any conversations that you and Mr. Hatcher had with one other.

A.    What was the context of it?

Q.    What conversations have you had with Mr. Hatcher about the lawsuit?

A.    About status of the lawsuit and compensation on the lawsuit.