DEFENDANT'S
EXHIBIT
13
1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

*****************************************************

CHRISTOPHER HATCHER, INDIVIDUALLY

ON BEHALF OF HIMSELF, AND ON BEHALF

OF ALL OTHERS SIMILARLY SITUATED,

                    Plaintiff,

vs.                                    CASE NO.

THE COUNTY OF HANOVER, VIRGINIA,      3:23-cv-00325-MHL

                    Defendant.

*****************************************************


            DEPOSITION OF TIMOTHY SUTTON

                 February 10, 2025

                    9:58 a.m.

                 Richmond, Virginia



             HALASZ REPORTING & VIDEO

         1011 East Main Street, Suite 100

            Richmond, Virginia 23219

                 (804) 708-0025


    STENOGRAPHICALLY REPORTED BY:  ROSE MARIE TATE, RPR

A    Yes.  For a couple months.

Q    All right.  When did you start with Hanover County Sheriff's Office?

A    1993.  It was July of 1993 if I'm not mistaken.

Q    Was that your first experience in law enforcement?

A    No, ma'am.

Q    Where did you work prior to that?

A    Chesterfield County Police Department.

Q    How long were you with Chesterfield?

A    From 1989 to '93.  Four years.

Q    What was your position with Chesterfield?

A    Midnight shift patrol officer.

Q    Where did you work prior to Chesterfield County Police Department?

A    I was in college.  Did a semester at VCU working on MBA, but I was working summers at Kings Dominion security during college.

Q    Okay.  Where did you go to high school?

A    Lee-Davis High School.

Q    And did you graduate with a diploma?

A    Yes.

Q    What year was that?

A    1984.

were in street crimes?

A    No.

Q    Okay.  And from street crimes where did you go?

A    In fall of 1999 I got promoted to sergeant and placed on evening shift.

Q    How does the promotional -- or how did the promotional process work?

A    In general or for me?

Q    For you.

A    I had -- one of my sergeants on evening shift left.  I was called to meet with the sheriff the next morning at 8:00 a.m., at which point I was told I was being promoted as of tomorrow, the next day.

Q    I understand that's probably not typically how it works.

A    Does not.

Q    Was that Sheriff Cook?

A    That was Sheriff Cook, yes.

Q    And sergeant on evening shift, that's back in patrol?

A    Yes, ma'am.

Q    How many deputies would you supervise as a sergeant on the evening shift?

A    In the beginning?  I don't recall.  When I

left, I had particular deputies that I was responsible for as far as evaluation purposes.  However, as far as supervising the work being done daily, probably between 15 -- 14 and 15.

Q     Would there be more deputies you supervised daily than for whom you were responsible for completing the evaluations?

A     Yes.

Q     Looking at your file, it looks like you remained a sergeant in patrol until your retirement.

A     Yes, ma'am.

Q     Did you ever apply for any further promotions within the department?

A     I was not interested.

Q     Okay.  How long did you stay on evenings?

A     Until the end of March, 2022.

Q     From the fall of 1999 --

A     Well, actually 2001 I was placed on midnights for nine months and then was brought back to evening shift and stayed there until March of 2022.

Q     And what happened in March of '22?

A     I was placed on day shift.

Q     Did you request to be moved to day shift?

A     No, ma'am.

Q     Did you remain on day shift through your

retirement?

A    Yes, ma'am.

Q    Remind me, when did you retire?

A    January 8, 2023.

Q    What caused you to retire?

A    I was ready to go.

Q    Any particular reason?

A    No, ma'am.

Q    30 years is a long time?

A    33 years is a long time.

Q    Did you prefer evenings over days?

A    Yes, ma'am.

Q    Why is that?

A    I'm not a morning person.

Q    I'm with you.  That's the reason we are starting at 10:00 and not 9:00.

A    Thank you.

Q    All right.  So you were a sergeant on evening shift patrol for quite a bit of time.

A    Yes, ma'am.

Q    Would the deputies assigned to your shift fluctuate?

A    As in?

MR. ANTELL:  Object to form.

Q    Would they change?  Did you always have the

A    Yes.

Q    How long would it take you to commute from your neighborhood to headquarters?

A    Probably about 25 minutes.

Q    Was that the same when you resided in King William, that you would mark on from --

A    I would mark 10-41 when I came in to Hanover County.

Q    Okay.  So when you lived in King William, you did not mark 10-41 at your residence?

A    Right.

Q    Where would you cross the county line?

A    On Route 30.  You go from King William into Caroline, then Hanover.

Q    How long would it take you to get from the county line to headquarters?

A    Probably about 15 or 20 minutes.

Q    How long was your drive total?

A    Probably about 20 or 25 minutes.  Maybe 30. To get to headquarters, yes.

Q    From King William to headquarters?

A    Yes.

Q    Okay.  All right.  When you said you would mark 10-41 via your radio, would that be your portable or mobile --

A    If I was in the vehicle, it would be the mobile.

Q    Okay.  When you were driving from home to headquarters, would you have the police radio on?

A    Yes, ma'am.

Q    And what channel would it be --

A    Dispatch channel.

Q    Do you recall -- the period at issue in this case is May 2020 to May 2023.  So I want to focus on that time period.  I understand you left in January.

A    Right.

Q    So May 2020, until your retirement.  During that time period were you ever dispatched to a call for service on your way to headquarters?

A    No.

Q    During that time period, May 2020 to your retirement, did you ever stop for an incident on your way to headquarters?

A    I do not recall.

Q    As a sergeant would you ever have court duties?

A    Very rarely.

Q    Would you mark 10-41 to go to court?

A    Yes.

Q    Okay.  I have spoken with at least one other

shift that was --

A    Right.

Q    -- pertinent.  What happens after roll call?

A    Usually give them a couple minutes, the deputies a couple minutes to get to their vehicles, and Sergeant -- I would go on the radio and advise communications, ECC, emergency communications, that evening shift was 10-8, available for service.

Q    All right.  So you have roll call, give the deputies a few minutes to get to their cars, you get on the radio and say evening shift is 10-8?

A    Yes.

Q    And what message did that relay to dispatch?

A    That they were in service and could start receiving calls.

Q    Would deputies receive calls prior to being marked 10-8?

MR. ANTELL:  Object to the form of the question.

Go ahead and answer.  I'm sorry.

A    They would not typically receive calls for service.  They may get calls from the dispatchers for messages that had been left for them.

Q    So prior to being marked 10-8 after roll call, deputies would not be dispatched to calls for

50

service?

A    Correct.

MR. ANTELL:  Object to the form of the question.

Q    I don't want to hear about anything you have discussed with your lawyers, but have you spoken with any of the other members of the class about the lawsuit?

A    No, ma'am.

Q    Okay.  Did you work with Steve DiLoreto?

A    He was a sergeant on another shift.  I did not work with him.

Q    Have you had any communications with him about the lawsuit?

A    No, ma'am.

Q    Did you work with Matt Dodge?

A    Yes.  He worked for me, yes.

Q    Matt Dodge worked for you?  Have you had any communications with him about the lawsuit?

A    No, ma'am.

Q    How long did Mr. Dodge work for you?

A    Probably five-plus years.

Q    How would you describe Mr. Dodge?

A    Very dependable, honest.

Q    Have you spoken with him since you retired?