DEFENDANT'S EXHIBIT 19


IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

_____

CHRISTOPHER HATCHER,
INDIVIDUALLY ON BEHALF OF
HIMSELF, AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,

                    Plaintiffs,

v.                          Civil Action No.: 3:21-cv-325

THE COUNTY OF HANOVER, VIRGINIA,

                    Defendant.
_____

DEPOSITION OF LOWELL W. LANTZ

February 27, 2025

Richmond, Virginia

HALASZ REPORTING & VIDEO

1011 E. Main Street, Suite 100
Richmond, Virginia 23219
www.HalaszReporting.com (804)708-0025
Reported by:  Lori McCoin Jones, RPR, CCR

9

Q.    Did you receive any training with the Henrico County Sheriff's Office about marking 10-41?

A.    We were not all assigned radios.

Q.    Okay.

A.    Because it wasn't a patrol job, job function. We were -- we responded to a location, facility security, weren't assigned vehicles at that point.  Unless you went to a specialized division like civil process, for example, you were given a car and radio because you were out patrolling.

Q.    Okay.  You were in the jail facility for -- to perform your duties?

A.    Correct.

Q.    Okay.  Why did you leave the Henrico County Sheriff's Office?

A.    I got an excellent opportunity with Hanover and I wanted to serve the community in the -- further.

Q.    All right.  I think you said you started with Hanover in maybe July of 1999.

A.    I believe that's correct, yes.

Q.    And did you go through an academy with the Hanover County Sheriff's Office?

A.    I did.

Q.    Where did you go to the academy?

A.    At -- well, ironically, that's a little bit of

Q.    Okay.  Where did you -- where were you assigned in January of 2016?

A.    Atlee High School.

Q.    Okay.  And did you receive a different assignment within the sheriff's office at that time?

A.    I transferred January of 2016 to being the warrant officer for Hanover County.

Q.    Okay.  How long were you the warrant officer?

A.    Four years and two months, from January of 2016 to February of 2020.

Q.    And what -- where were you assigned -- where did you get reassigned to in February of 2020?

A.    I was promoted to the rank of sergeant and assigned to day shift.

Q.    Okay.

A.    And I stayed there to August of 2022.

Q.    Okay.  And where were you reassigned in August of 2022?

A.    Well, I retired May 1 of '23, so I transferred back from day shift as a sergeant to a sergeant in youth services division where I ended my career.

Q.    All right.  So let's talk about the youth services division, your stint there from September 2004 to January 2016.  What did that position entail?

A.    It was a school resources officer position,

throughout the course of the day.

Q.    But you would start your day at the county complex, it sounds like?

A.    Correct.

Q.    How long would it take you to travel from your home to the county complex?

A.    Probably 15, no more than 15 minutes.

Q.    Who was your direct supervisor when you were the warrant officer?

A.    There was a few of them.  I think at first it was -- I was assigned to the -- a captain which probably was at the time Kenny Epling was one.  Then as promotions occur and things got reorg'ed a little bit, James Sizemore was another supervisor of mine.  And at one point, it became I was assigned to the special operations sergeant. So I guess I started out with a captain, then a lieutenant, and then a sergeant as my supervisor.

Q.    Who was the special operations sergeant to whom you were assigned?

A.    I believe it may have been Barrett Laine at one point which is now a captain.  He was acting as that special operations sergeant position, but I want to say when I got promoted, they actually created that special operations title.

Q.    Okay.

A.    I was not.

Q.    What would happen after rollcall concluded?

A.    Rollcall concluded, the sergeant, at the time, myself, I would key up on my radio, tell dispatch day shift is 10-8 which means in service, rollcall is essentially over is what that told them.

Q.    And what is the significance of letting dispatch know that day shift was 10-8?

A.    That they can be the primary -- assigned as primary units for calls for service.

Q.    During the time period February 2020 to August 2022 when you were a sergeant in uniform patrol, were you ever dispatched to a call for service prior to the start of your shift, so prior to five-thirty a.m.?

A.    I can't say that it happened on day shift, but I know it's happened in my career that I was out there, shifts were short, they knew I was there because, you know, I'm marked 10-41.  I might not have been assigned as a primary beat unit, but they didn't have a unit to send, so, therefore, they called to dispatch you to that call, and instead of going to rollcall, I went to the call.

Q.    And you say you know that that happened at some point during your career?

A.    Yeah, because I recall it happening to me.  I can't honestly tell you the date and time or what year it

44

Q.    105 being the deputy, the patrol deputy?

A.    And the unit in the back being the backing deputy and the 102 would have been my sergeant number.

Q.    Okay.  So you -- as a sergeant, you would handle rollcall, everyone would get their beat assignment information for the day.  What would the rest of your shift look like?

A.    So all other duties assigned, basically.  So you would go on calls, the more prevalent calls, with the officers.  Anything that would require any type of investigation, breaking-and-enterings, crimes against the person, you might go out there and just be their backing officer on larcenies from Wal-Mart, whatever the case may be, any specialized assignments from your lieutenant to captains.  If there was community meetings at apartment complexes, you would attend those.  Anything that I could do to take the extras off my officers, I did because it allowed them to be free and clear and take calls for service, keep them on the street.

Q.    Okay.  So then in August of 2022, you go back to the youth services division; is that right?

A.    I believe that's a good timeline, yes.

Q.    Okay.  What caused you to go back to youth services?

A.    Well, when you get promoted, you are -- we all

45

work at the leisure of the sheriff, so we all work at that directive.  Just like if you were a deputy assigned to shift, you were eligible to be reassigned to a different shift based upon staffing or development in your career, exposure, different day, evening, midnights.  As sergeants, they move their people around different divisions to get -- develop their resume, different aspects within development as a supervisor.  So it was time to move to a different unit.  Thankfully it was a unit in which I was very familiar with which is probably why I got picked for that unit because I worked so long in the unit.

Q.    So as a sergeant in the youth services division, what were your responsibility?

A.    My responsibilities was school safety, student safety, supervising the school resource officers that were assigned under me, helping out with the phase trainings that we had each year with our -- with the officers, liaison between the sheriff's office and school administration and the Hanover County School Board, basically.

Q.    Were you assigned to a particular school or as a supervisor, did you kind of oversee the SROs who were in the schools?

A.    That unit was set up where it had a lieutenant

46

in charge of it which they managed -- that lieutenant managed the two sergeants that were assigned and the whole collective unit together. We had an east sergeant and a west sergeant. I was assigned as the western sergeant which is all of schools that were located within the western part of the county. And then there was an eastern sergeant that was -- had the eastern schools. So I was monitoring and I would go around to the schools that were in the western part of the county and I would have the D.A.R.E. officers and the school resource officers for those schools.

Q. Did only middle schools and high schools have SROs or do they have them in elementary schools as well?

A. The elementary schools, we had D.A.R.E. officers in those. There was an officer assigned to every middle and high school in Hanover County. We didn't have enough at all times for the elementary schools. The D.A.R.E. officers would float from one school to another teaching D.A.R.E. classes, and when they weren't teaching, they were going back and forth.

I'm not sure if they have them all staffed now. I know that was one of the sheriff's goals is to have an officer in every school building. I know they've added some D.A.R.E. officers since I retired. I just don't know what the staffing looks like.

63

Q.    Do you recall working with your attorneys to provide information to answer these questions?

A.    Yes.

Q.    Okay.  I want to turn your attention to page 8 which is the -- has the answer to interrogatory number 7 on it.  So interrogatory number 7 starts on page 7 and the answer continues over to page 8.  And almost halfway down the page, you'll see your name, Lowell Lantz.

A.    Uh-huh.

Q.    And the question asked identify each instance when you marked on duty prior to your scheduled work shift, and for each instance, identify any law enforcement action you took.

And your answer is every day I was scheduled to work.  Marking on duty is a law enforcement action which informs dispatch I'm within the jurisdiction in my patrol car and that I'm present and patrolling while on the way. I marked on duty by either radio or computer.

Did I read that correctly?

A.    That's what's there, yes.

Q.    And you told me today that you would mark 10-41 in your driveway in King William County; is that correct?

A.    Uh-huh.

Q.    And so it would not be accurate to say that marking on duty informed dispatch that you're within the

64

jurisdiction; is that correct?

MR. ANTELL:  Object to the form.

A.     Well, obviously it would -- King William is not within the jurisdiction of Hanover, but I am in my patrol car and I'm present.  I would say that the perception of any citizen, no matter what county you're in, when they see a police officer in uniform displaying a badge of authority in a marked unit, marked patrol car, that their expectation is they walk up to that officer that they're going to get some level of service.

Q.     I understand that.  And my only question is if you were marking 10-41 in your driveway in King William, you were not in the jurisdiction of Hanover County?

A.     That would be correct.

MS. YORK:  All right.  And just one final exhibit.

MR. ANTELL:  Thanks.

(Lantz Exhibit 3 marked.)

BY MS. YORK:

Q.     All right.  Mr. Lantz, I've handed you what's been marked as Exhibit 3.  Do you recognize this document?

A.     Yes.

Q.     And what is it?

A.     It's a memorandum notifying the command staff and the sheriff of my intention to retire.