IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**CHRISTOPHER HATCHER,** *on behalf of*
*himself and all similarly situated persons, et al.,*

      **Plaintiffs,**

    **v.**                             **Civil Action No. 3:23cv325**

**COUNTY OF HANOVER,**

      **Defendant.**

## MEMORANDUM OPINION

This matter comes before the court on two motions: Defendant the County of Hanover, Virginia's ("the County" or "Defendant") Motion for Summary Judgment, (ECF No. 99), and Plaintiffs' Motion for Partial Summary Judgment, (ECF No. 103) (collectively, the "Cross Motions").[1] The County and Plaintiffs have responded to the Cross Motions, (ECF Nos. 115, 117), and each has replied, (ECF Nos. 120, 121).

These matters are ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process.

For the reasons articulated below, the Court will grant in part and deny in part Plaintiffs' Motion for Partial Summary Judgment, (ECF No. 103), and deny Defendant's Motion for Summary Judgment, (ECF No. 99).

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

## I. Factual and Procedural Background

### A.     Factual Background[2]

#### 1.     Relationship Between the Sheriff and the County

David R. Hines is the Sheriff of Hanover County and a constitutional officer under the

Virginia Constitution. (ECF No. 100-1 ("Hines Depo."), at 7:18–22; *see also* ECF No. 117 ¶ 1.)

Sheriff Hines has been the Sheriff since September 2010. (Hines Depo., at 8:2–3.) The Sheriff's

Office employs approximately 287 deputies. (ECF No. 104-3.) The Sheriff's Office is divided

into four divisions: the administrative, patrol, investigative, and judicial divisions. (Hines

Depo., at 9:9–12.)

An unwritten arrangement exists between Hanover County ("the County") and the Sheriff

whereby the Sheriff's Office utilizes the County's centralized services, including human

resources, payroll, and other financial arrangements. (ECF No. 100-2 ("Wright Depo."), at

11:9–12:2.) Upon being hired, the Sheriff's deputies complete new hire paperwork provided to

them by the County's Human Resources Department and attend a County Human Resources

orientation, during which they are informed about the County's policies, procedures, and

benefits. (ECF No. 115 ¶ 65; ECF No. 104-22, at 23:2–16; 45:3–18.) The County handles

payroll for the Sheriff, including signing the deputies' paychecks and processing all W-2s for the

deputies. (ECF No. 104-19 ("Amanda Six Depo"), at 13:13–25; 57:21–58:7.) The money used

to pay the Sheriff's personnel flows through the County before it is distributed to personnel.

---

[2] In recounting the factual history, the Court sets forth the undisputed facts as articulated
in the parties' briefing on both motions for summary judgment and the record submitted to the
Court. In ruling on each motion, the Court will view the undisputed facts and all reasonable
inferences therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 255 (1986). At this stage, however, the Court merely sets forth the
undisputed facts.

(ECF No. 104-10 ("Hines Depo. 2"), at 20:4–7.)  Further, the Sheriff's deputies are eligible for coverage under numerous County insurance plans, including health, dental, vision, and life insurance.  (ECF No. 104-6, at 3.)

The Sheriff and County jointly created a Public Safety Pay Plan (the "Plan") that went into effect on April 16, 2021.  (ECF No. 104-22, at 21–23; *see also* ECF No. 115 ¶ 78.)  The Plan states that "[e]ffective April 16, 2021, a new pay plan will be used by the Hanover County Sheriff's Office . . . for sworn public safety employees only" and "will be used for both recruitment and retention purposes."  (ECF No. 104-22, at 21.)  It further states that "[o]n April 16, 2021, current employees will be placed on the chart based on position/career level and creditable years of service."  (ECF No. 104-22, at 21.)  The Plan "considered the employee's 'target salary'" and stated that "[e]mployees whose current salary is below the target salary will receive a pay increase . . . to bring them to their target salary."  (ECF No. 104-22, at 21.)  Further, the County's Human Resources Department "manage[s] and maintain[s]" the Plan, and "is responsible for interpretation of the guidelines and policies regarding th[e] pay plan, in addition to providing future edits or updates."  (ECF No. 104-22, at 23.)

The County sets the Sheriff's budget.  (Hines Depo. 2, at 17:20–22.)  When the Sheriff's Office receives an invoice, the County is the ultimate payor.  (Wright Depo., at 36:9–23.)  The County owns the building from which the Sheriff's deputies work.  (Hines Depo. 2, at 78:24–79:4.)  The personal property used by the deputies, including computers and police vehicles, are owned by the County.  (Wright Depo., at 42:20–24.)

The Sheriff "controls the day-to-day operations" of the deputies and "devises standard operating procedures for [the Sheriff's] Office."  (ECF No. 104 ¶ 75; ECF No. 115 ¶ 75.)

3

Further, the Sheriff is responsible for hiring and firing deputies. (Amanda Six Depo, at 13:9–10.)

### 2.    The Sheriff's Take Home Vehicle Policy

The patrol division of the Sheriff's Office has three shifts:  day shift, evening shift, and night shift. (ECF No. 100-5, at 2; *see also* ECF No. 115 ¶ 3.) Unless a supervisor cancels, deputies must attend roll call at the Sheriff's Office's headquarters for the first thirty minutes of their scheduled shift. (ECF No. 104-5 ("Gregory Six Depo. 2"), at 15:2–5; Hines Depo. 2, at 44:5–19; *see also* ECF No. 115 ¶ 37.)

Deputies who live in Hanover County or "live in an adjoining jurisdiction within ten air miles" of the Hanover County boundary line receive "the benefit of being able to take [their] patrol vehicle . . . to [their] residence" pursuant to the Sheriff's Take Home Vehicle Policy (the "Policy"). (Gregory Six Depo. 2, at 33:14–20; ECF No. 100-4.) "Any officer eligible for an assigned vehicle may decline to accept it subject to the Sheriff's approval. (ECF No. 100-4, at 1; *see also* Gregory Six Depo. 2, at 34:24–25.) Under the Policy, off-duty use of take-home vehicles is limited to certain enumerated activities, including "[v]ehicle maintenance and cleaning." (ECF No. 100-4, at 2.) "[A]ll take-home police vehicles are owned by the County and titled to the Hanover County Government." (ECF No. 104-6, at 5.) Any "[c]osmetic changes, mechanical and/or electrical alterations to vehicles, and . . . addition and/or removal of equipment" authorized by the Sheriff "shall be made at a county maintenance facility or by a county contracted agency only." (ECF No. 100-4, at 5.)

### 3.    "Marking On"

The Hanover County Public Safety Emergency Communications Center ("Dispatch") is a Department of the County that is "responsible for taking and dispatching . . . law enforcement

4

related calls for service." (ECF No. 104-12, at 1.) Pursuant to a Communications Agreement between the Sheriff's Office and Dispatch, the Sheriff's Office "is dependent upon [dispatch] to not only receive and dispatch calls for service, but also to maintain effective radio communications to members of the Sheriff's Office[.]" (ECF No. 100-6, at 1.) Dispatch uses a Computer-Aided Dispatch software system ("CAD") "to process calls for service, incidents, and identify who to dispatch to calls for service[.]" (ECF No. 100-8 ("Buchanan Depo."), at 11:15–24.) The CAD software system is "owned by the County." (Gregory Six Depo. 2, at 9:16–17.)

"Marking on" is a term used to refer to the act of a deputy communicating to Dispatch that they are on the radio. (Gregory Six Depo. 2, at 3:14–16; *see also* Hines Depo., at 23:2–8.) Deputies may "mark on" using a variety of methods, including via radio or through the mobile data terminal in their vehicle by stating "10-41." (Gregory Six Depo., at 29:5–10; ECF No. 104-11 ¶ 5.) Per a Dispatch policy titled "Law Enforcement Operations Introduction and Terminology", deputies use ten codes adopted by the Sheriff's Office when communicating with Dispatch. (ECF No. 100-10, at 1–3.) According to this policy, the code "10-41" means "beginning duty." (ECF No. 100-10, at 3; Buchanan Depo., at 50:12–14; *see also* ECF No. 117 ¶ 14.) The Sheriff does not maintain any records regarding when deputies mark on or off with Dispatch. (Gregory Six Depo. 2, at 98:6–10; *see also* ECF No. 104 ¶ 34.)

When a deputy marks on by stating "10-41", he or she, identified by a unit number, appears as "available" in the CAD software system. Dispatch can view the deputy's location using their vehicle's mobile data terminal. (Buchanan Depo., at 28:21–24; 29:10–25; *see also* ECF No. 117 ¶ 15.) When Dispatch receives a call for service, the CAD system automatically generates a recommendation of whom to dispatch "based on zone and beat assignment and/or

5

[automated vehicle location]", but Dispatch may override CAD's suggestion. (ECF No. 104-8 ("Buchanan Depo. 2"), at 33:8–15; *see also* ECF No. 115 ¶ 33.)

The County compensates deputies based on their scheduled shifts, not based on when they "mark on". (Gregory Six Depo. 2, at 3:8–18; *see also* ECF No. 115 ¶ 40.) The Sheriff's Office uses a software called Kronos to track deputy pay and timekeeping, and "to track hours worked, request time off, correct timecards, view accrual balances, [and] view pay history and W2 forms." (ECF No. 104-18, at 4; *see also* ECF No. 115 ¶ 50.)

### 4. The Plaintiffs

#### a. Christopher Hatcher

Christopher Hatcher was hired as a Hanover County Deputy Sheriff on January 2, 2002. (ECF No. 100-9 ("Hatcher Depo."), at 11:15–12:9; *see also* ECF No. 117 ¶ 21.) Deputy Hatcher was part of the Street Crimes unit[3] from October 2014 until he resigned from the Sheriff's Office in 2022. (Hatcher Depo., at 24:14–17; ECF No. 117 ¶ 21.)

While on the Street Crimes unit, Deputy Hatcher testified that he could "never remember a time that I ever would have marked 10-41 on duty . . . on [the] police dispatch [channel]." (Hatcher Depo., at 68:10–15; *see also* ECF No. 117 ¶ 23.) Instead, during that time, he communicated on different channel called Street Crimes Unit 1 by saying "90 back."[4] (Hatcher Depo., at 68:16–69:19; *see also* ECF No. 117 ¶ 23.) The Street Crimes Unit 1 (SCU1)

---

[3] Street Crimes is "an undercover unit" under the investigative division of the Sheriff's Office whose objective "is to locate fugitives who are elusive and [] difficult to apprehend." (Hatcher Depo., at 51:4–15; *see also* ECF No. 117 ¶ 22.)

[4] Deputy Hatcher testified that his "unit number the entire time [he] was in Street Crimes was 90." (Hatcher Depo., at 69:8–10.) He would state "90 back" to indicate that he was back in his police vehicle. (ECF No. 117 ¶ 23.)

channel was not monitored by Dispatch. (Buchanan Depo., at 61:13–23; *see also* ECF No. 117 ¶ 23.)

### b.    Jonathan McGill

Jonathan McGill started with the Sheriff's Office in November 2018 and worked there until October 2022. (ECF No. 100-11 ("McGill Depo."), at 9:23–24; 46:3–5; *see also* ECF No. 117 ¶ 24.) Deputy McGill was a part of the patrol division of the Sheriff's Office. (*See* McGill Depo., at 54:2–5; *see also* ECF No. 177 ¶ 24.) Regarding his commute, he testified that it would take him between 10 and 15 minutes to drive from his home to headquarters. (McGill Depo., at 34:10–12; *see also* ECF No. 117 ¶ 25.)

### c.    Timothy Sutton

Timothy Sutton started with the Sheriff's Office in July of 1993. (ECF No. 100-13 ("Sutton Depo."), at 8:2–5; *see also* ECF No. 117 ¶ 26.) In 1999, he was promoted to sergeant on the evening shift in the patrol division of the Sheriff's Office. (Sutton Depo., at 12:5–22; *see also* ECF No. 117 ¶ 26.) Sergeant Sutton remained a sergeant in the patrol division until January 8, 2023, when he left the Sheriff's Office. (Sutton Depo., at 13:9–11; 14:3–4; *see also* ECF No. 117 ¶ 26.) Regarding his commute, Sergeant Sutton testified that it would take him between 15 and 20 minutes to get from the Hanover County line to headquarters. (Sutton Depo., at 33:15–17; *see also* ECF No. 117 ¶ 27.)

### d.    Benjamin Waverly Carroll

Benjamin Waverly Carroll was a deputy with the Sheriff's Office from October 2007 until July 2022. (ECF No. 100-15 ("Carroll Depo."), at 10:5–7; 17:9–10; *see also* ECF No. 117 ¶ 28.) Sometime in 2021, Deputy Carroll was assigned to Safe Streets, "a traffic interdiction unit" within "the Special Operations division", which is under the patrol division of the Sheriff's

7

Office. (Carroll Depo., at 15:1–25; *see also* ECF No. 117 ¶ 29.) Regarding his commute,

Deputy Carroll testified that it took him approximately 25 minutes to travel from the Hanover

County line to headquarters. (Carroll Depo., at 21:3–6; *see also* ECF No. 117 ¶ 30.)

### e.    Christopher Ryan Payne

Christopher Ryan Payne was a deputy with the Sheriff's Office from 2015 until

December 2021. (ECF No. 100-16 ("Payne Depo."), at 25:21; 27:16–25; *see also* ECF No. 117

¶ 31.) From 2016 until December 2021, he was on the Safe Streets Unit. (Payne Depo., at

25:21; 27:16–25; *see also* ECF No. 117 ¶ 31.) Regarding his commute, Deputy Payne testified

that it took him between 15 and 20 minutes to travel from his home to headquarters. (Payne

Depo., at 25:3–17; *see also* ECF No. 117 ¶ 32.)

### f.    Lowell W. Lantz

Lowell W. Lantz started with the Hanover Sheriff's Office in 1999. (ECF No. 100-19

("Lantz Depo."), at 9:18–20; *see also* ECF No. 117 ¶ 34.) In February 2020, he was "promoted

to the rank of sergeant and assigned to day shift", a position in which he remained until August

2022. (Lantz Depo., at 18:11–16; *see also* ECF No. 117 ¶ 33.) From August 2022 until May

2023, Sergeant Lantz was a sergeant in the youth services division. (Lantz Depo., at 18:17–21.)

Regarding his commute, he testified it would take him "no more than 15 minutes" to travel from

his home to headquarters. (Lantz Depo., at 30:5–7; *see also* ECF No. 117 ¶ 35.)

### B.    Procedural Background

On May 15, 2023, Christopher Hatcher, individually and on behalf of all others similarly

situated, filed a Class and Collective Action Complaint against the County and Hanover County

8

Sheriff David R. Hines (the "Sheriff"). (ECF No. 1.) The Complaint alleged four causes of action against both Defendants:

**Count I:**    Fair Labor Standards Act ("FLSA") Claim

**Count II:**   Virginia Wage Payment Act ("VWPA") Claim

**Count III:**  Virginia Gap Pay Act ("VGPA") Claim

**Count IV:**   Virginia Overtime Wage Act 2021 ("VOWA (2021)") Claim[5]

(ECF No. 1, at 15–21.)

On July 17, 2023, the Sheriff filed a Motion to Dismiss pursuant to Federal Rule 12(b)(1), (ECF No. 15), and the County filed a Motion to Dismiss pursuant to Federal Rule 12(b)(6), (ECF No. 20). On July 31, 2023, the parties filed a consent Motion to Dismiss Plaintiffs' claims under the VWPA in Count II, (ECF No. 22), which the Court granted on August 21, 2023, (ECF No. 31). On March 18, 2024, the Court granted the Sheriff's 12(b)(1)

---

[5] As this Court earlier noted, *see Hatcher v. Hines*, No. 3:23cv325 (JAG), 2024 WL 1158365, at *6 (E.D. Va. Mar. 18, 2024), although the legislature amended the VOWA in 2022, Plaintiffs bring their VOWA claim under the 2021 version of the VOWA. (ECF No. 54, at 11; *see* ECF No. 1 ¶ 32.) Plaintiffs' claims under the VOWA are thus limited to "the time period between July 1, 2021, and June 30, 2022", (ECF No. 54, at 11; *see* ECF No. 1 ¶¶ 32, 61, 118), when VOWA (2021) was in effect.

Motion, terminating him as a defendant.  (ECF No. 15.)  The Court denied the County's Rule

12(b)(6) Motion (ECF No. 20).  (ECF No. 55.)

Following the Court's decisions on the Motions to Dismiss, three counts remain, each

only as to the County:

**Count I:**      Fair Labor Standards Act ("FLSA") Claim

**Count III:**    Virginia Gap Pay Act ("VGPA") Claim

**Count IV:**    Virginia Overtime Wage Act 2021 ("VOWA (2021)") Claim

These three Counts are now before the Court on summary judgment.

On March 29, 2024, the County filed an Answer.  (ECF No. 56.)  On December 18, 2023,

Plaintiffs filed a Motion for Class Certification Pursuant to Federal Rule 23 and FLSA

Conditional Certification, (ECF No. 44), which the Court granted after holding a hearing, (ECF

No. 67).  The Court conditionally certified the collective action for Count I pursuant to 29 U.S.C.

§ 216(b) and certified Plaintiffs' proposed class action for Counts III and IV pursuant to Federal

Rule of Civil Procedure 23.  (ECF No. 67, at 1.)  The Court determined that the classes of

employees for both the class action and the collection action will comprise:

> All current and former Hanover County Sheriff's Deputies employed by [the]
> Defendant[] at the rank of Lieutenant or below in patrol, investigations, or similar
> unit, who were issued take-home patrol cars and were required to "mark-on duty"
> prior to the start of their scheduled shift(s), during any time within the liability
> period since May 15, 2020.[6]

(ECF No. 67, at 1.)

On October 22, 2024, the Court entered an Initial Pretrial Order, scheduling trial to

commence on May 12, 2025.  (ECF No. 87, at 1.)  On February 18, 2025, Plaintiffs filed a

---

[6] The parties dispute the relevant liability period for the FLSA and VGPA claims.  The
County states that the relevant time period is "May 15, 2021 to May 15, 2023, which is the two-
year lookback window for the FLSA and the VGPA."  (ECF No. 115, at 23 n.5.)  Plaintiffs argue

Motion for Leave to File First Amended Complaint to Add a Second Class Representative, which the County opposed. (ECF Nos. 93, 97.)

On March 13, 2025, the County filed a Motion for Summary Judgment, (ECF No. 99), and a Motion to Decertify, (ECF No. 101). The same day, Plaintiffs filed a Motion for Partial Summary Judgment. (ECF No. 103.) Plaintiffs seek summary judgment only with respect to the "the County's baseline liability." (ECF No. 104, at 2 n.2.) Plaintiffs do not move for summary judgment "as to liquidated damages, willfulness, or matters of damages." (ECF No. 104, at 2 n.2.) The County and the Plaintiffs have responded to the Cross Motions for Summary Judgment, (ECF Nos. 115, 117), and each has replied, (ECF Nos. 120, 121.)

For the reasons articulated below, the Court will grant in part and deny in part Plaintiffs' Motion for Partial Summary Judgment, (ECF No. 103), and deny in its entirety Defendant's Motion for Summary Judgment, (ECF No. 99). Specifically, the Court finds that, as a matter of law, on this expanded record, the County is Plaintiffs' joint employer under the FLSA and the VOWA, and Plaintiffs' employer under the VGPA. The Court therefore grants Plaintiffs' Motion for Partial Summary Judgment on this issue and denies Defendant's Motion for Summary Judgment on the same issue.

However, disputes of material fact exist that preclude summary judgment with respect to whether Plaintiffs were required to "mark on" prior to the beginning of their scheduled shift and

---

that this is "incorrect" and that they have "alleged a willful violation of the FLSA[,] meaning that the lookback period goes until May 15, 2020." (ECF No. 121, at 17 n.2.) Plaintiffs also dispute the County's contention that the claims period ended on May 15, 2023 (the day the case was filed) as "no record suggests" that the County "addressed the violating practice on that date." (ECF No. 121, at 17 n.2.)

Any dispute with respect to the liability period for Plaintiff's FLSA and VGPA claims is not material to the Court's decision on summary judgment, and the Court need not address it here.

whether such time was compensable. The Court will deny both parties' Motions for Summary

Judgment as to the "mark on" issue. As a result, Plaintiffs' claims against the County in Counts I

(FLSA), III (VGPA), and IV (VOWA) will proceed, but only as to whether Plaintiffs' time

"marked on" prior to the beginning of their shift is compensable under the FLSA, the VGPA, or

the VOWA.

## II. Standard of Review:  Summary Judgment

Summary judgment under Federal Rule of Civil Procedure 56[7] is appropriate only when

the Court, viewing the record as a whole and in the light most favorable to the nonmoving party,

determines that there exists no genuine issue of material fact and that the moving party is entitled

to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). Once a party has properly filed

evidence supporting the motion for summary judgment, the nonmoving party may not rest upon

mere allegations in the pleadings, but instead must set forth specific facts illustrating genuine

issues for trial. *Celotex Corp.*, 477 U.S. at 322–24. These facts must be presented in the form of

---

[7] Rule 56(a) provides:

(a) MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT. A
party may move for summary judgment, identifying each claim or defense — or
the part of each claim or defense — on which summary judgment is sought. The
court shall grant summary judgment if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter
of law. The court should state on the record the reasons for granting or denying
the motion.

Fed. R. Civ. P. 56(a).

stipulations, exhibits, and sworn affidavits or declarations. Fed. R. Civ. P. 56(c).[8] Moreover, the facts offered by a sworn declaration must also be in the form of admissible evidence, meaning the statements in the sworn declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of [its] evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). However, "'there is a preliminary question for the judge, not whether

---

[8] Rule 56(c) states, in pertinent part:

(c) PROCEDURES.

> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

>> (A) citing to particular parts of materials in the record, including depositions, documents, . . . affidavits or declarations, stipulations (including those made for purposes of the motion only), . . . or other materials; or

>> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the *onus* of proof is imposed.'" *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). Thus, "the nonmoving party must rely on more than conclusory allegations, 'mere speculation,' the 'building of one inference upon another,' the 'mere existence of a scintilla of evidence,' or the appearance of 'some metaphysical doubt.'" *Lamar v. Ebert*, No. 2:12cv706 (HCM), 2018 WL 11463829, at *3 (E.D. Va. Mar. 20, 2018) (quoting *Anderson*, 477 U.S. at 252; *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002); *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 330 F. Supp. 2d 688, 671 (E.D. Va. 2004)).

At this stage, the Court is tasked with assessing whether a plaintiff "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). "Because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [a court] must determine whether the evidence in [a] case presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal quotation marks and brackets omitted). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Ultimately, the court must adhere to the affirmative obligation to bar factually

14

unsupportable claims from proceeding to trial. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex Corp.*, 477 U.S. at 323–24). When the court is faced with cross-motions for summary judgment, as in the instant case, "the court must review each motion separately on its own merits." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

### III. Analysis

Before the Court are the parties' competing motions for summary judgment. Both parties move for summary judgment on the same two issues: whether, under the FLSA, the VOWA, or the VGPA (1) the County is an employer, or joint employer, of the Plaintiffs, and (2) the time Plaintiffs "marked on" before the start of their shifts is compensable. (ECF No. 104, at 1; ECF No. 100, at 1.)

For the reasons discussed below, the Court concludes that no genuine dispute of material fact exists regarding whether the County is a joint employer of the Plaintiffs under the FLSA and VOWA, or whether the County is an employer of the Plaintiffs under the VGPA. However, disputes of material fact exist that preclude summary judgment with respect to whether Plaintiffs' time "marked on" before the start of their shifts is compensable.

### A.    The FLSA (Count I)

#### 1.    Legal Standard:  Joint Employer Under the FLSA

The Fair Labor Standards Act requires employers to pay employees time-and-a-half wages for hours worked over forty hours per week. 29 U.S.C. §§ 207(a)(1), (k). "To state a FLSA cause of action, a plaintiff must allege an employment relationship." *Aguirre v. Joe Theismann's Restaurant*, No. 1:19cv556 (AJT), 2019 WL 12267459, at *3 (E.D. Va. July 23, 2019) (citing *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1277 n.68 (11th Cir. 2008)). The FLSA defines "employee" as "any individual employed by an employer", including "any

individual employed by a State" or "political subdivision of a State." 29 U.S.C. § 203(e). Under the FLSA, an "'[e]mployer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(d). The statute defines "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g).

Courts have interpreted these definitions to "encompass a broader swath of workers than would constitute employees at common law." *Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 137 (4th Cir. 2017); *see also Aguirre*, 2019 WL 12267459, at *3 (quoting *Jackson v. Mayor & City Council of Baltimore City*, 2009 WL 2060073, at *3 (D. Md. July 14, 2009) ("[T]he definition of 'employer' under the FLSA is not limited by the common law concept of 'employer' and should be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes.") (some internal quotation marks omitted)). For FLSA purposes, "an individual may be the employee of more than one employer at a given time." *Jackson*, 2009 WL 2060073, at *3 (citing *Schultz v. Capital Int'l Sec. Inc.*, 466 F.3d 298, 305 (4th Cir. 2006); *see also Salinas*, 848 F.3d at 133 (recognizing that "[a]lthough the FLSA does not expressly reference 'joint employment,' the Department of Labor's first set of regulations implementing the statute—which remain in force—recognize that '[a] single individual may stand in the relation of an employee to two or more employers at the same time under the [FLSA]'").

The United States Court of Appeals for the Fourth Circuit has imposed a two-part test to analyze whether an entity qualifies as a joint employer under the FLSA. *Salinas*, 848 F.3d at 139–40. The Court must: (1) "determine whether [the] two entities should be treated as joint employers" and (2) "analyze whether the worker constitutes an employee or independent

contractor of the combined entity, if they are joint employers, or each entity, if they are separate employers." *Id.* at 140.

The first part of the test assesses whether a joint-employer relationship exists. It looks to "whether two or more entities . . . are not completely disassociated with respect to a worker such that the persons or entities share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of the worker's employment." *Id.* at 141 (internal quotation marks omitted). The Court should consider several factors in reviewing that relationship, including:

(1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;

(2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;

(3) The degree of permanency and duration of the relationship between the putative joint employers;

(4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;

(5) Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and

(6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

*Id.* at 141–42. The "six factors do not constitute an exhaustive list," and quality, not quantity, matters most in weighing them. *Id.* at 142. "[O]ne factor alone" can establish a joint-employment relationship. *Id.*

If the entities are "not completely disassociated," the Court proceeds to step two to assess whether the worker is an employee. *Id.* at 143. To do so, the Court reviews whether the "worker is economically dependent on . . . his [or her] putative joint employers." *Id.* at 150. Six factors guide that analysis:

> (1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his [or her] managerial skill; (3) the worker's investment in equipment or material, or his [or her] employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business.

*Id.* at 160 (quoting *Schultz*, 466 F.3d at 304–05).

### 2.    The County is Plaintiffs' Joint Employer Under the FLSA

This Court previously found that "the facts as pled by [Plaintiffs] demonstrate a joint-employer relationship between Sheriff Hines and the County." (ECF No. 54, at 10.); *Hatcher v. Hines*, No. 3:23cv325 (JAG), 2024 WL 1158365, at *6 (E.D. Va. Mar. 18, 2024.) Now, based on the evidence adduced by the Parties, and viewing the record as a whole, the Court determines that no genuine issue of material fact exists regarding whether the County is the Plaintiffs' joint employer under the FLSA.

### i.    *Salinas* Step 1: A Joint Employer Relationship Exists Between Sheriff Hines and the County

The Fourth Circuit has imposed a two-part test to analyze whether an entity qualifies as a joint employer under the FLSA. *Salinas*, 848 F.3d at 139–40. The first part of the test lays out six factors under which to assess whether a joint-employer relationship exists. Notably, the County concedes that "three of the six factors . . . weigh in favor of finding a joint employment

relationship."[9] (ECF No. 100, at 16.) Importantly, "a majority of factors are not necessary to support a finding that two or more entities are 'not completely disassociated' with respect to a worker's employment[.]" *Salinas*, 848 F.3d at 146. The Court reviews all six factors in the interest of creating a full record.

Regarding the first factor—supervision—the Sheriff "controls the day-to-day operations" of the deputies and "devises standard operating procedures for [the Sheriff's] Office." (ECF No. 104 ¶ 75; ECF No. 115 ¶ 75.) However, the Sheriff shares with the County the ability to direct the Sheriff's deputies. For example, upon being hired, the Sheriff's deputies complete new hire paperwork provided to them by the County's Human Resources Department and attend a County Human Resources orientation, during which they are informed about the County's policies, procedures, and benefits. (ECF No. 115 ¶ 65; ECF No. 104-22 ("Dickensheets Depo."), at 23:2–16; 45:3–18.) This factor thus supports a finding that the Sheriff and the County were "not completely disassociated" with respect to Plaintiffs' employment.

The second factor—authority over terms and conditions of employment—also supports a finding that Sheriff Hines and the County were "not completely disassociated" with respect to Plaintiffs' employment. Although Sheriff Hines was responsible for hiring and firing Plaintiffs, (ECF No. 104-19 ("Amanda Six Depo"), at 13:9–10), the Sheriff and County jointly created the Plan, which went into effect on April 16, 2021. (ECF No. 104-22; *see also* ECF No. 115 ¶ 78.) The Plan states that "[e]ffective April 16, 2021, a new pay plan will be used by the Hanover County Sheriff's Office . . . for sworn public safety employees only" and "will be used for both recruitment and retention purposes." (ECF No. 104-22, at 1.) It further states that "[o]n April

---

[9] Specifically, the County concedes that *Salinas* factors three, five, and six weigh in favor of a joint employment relationship.

16, 2021, current employees will be placed on the chart based on position/career level and creditable years of service", that it "considered the employee's 'target salary'", and that "[e]mployees whose current salary is below the target salary will receive a pay increase . . . to bring them to their target salary." (ECF No. 104-22, at 1.) Further, the County's Human Resources Department "manage[s] and maintain[s]" the Plan, and "is responsible for interpretation of the guidelines and policies regarding th[e] pay plan, in addition to providing future edits or updates."[10] (ECF No. 104-22, at 23.) Thus, the Sheriff and the County jointly exercised authority over the terms and conditions of Plaintiffs' employment.

Regarding the third factor—the degree of permanency and duration of the relationship between the putative joint employers—the Sheriff and the County have a long-standing relationship. (ECF No. 104, at 19 ("[T]he relationship between the County and the Sheriff extends over three hundred years, with the County established in 1720 and the Sheriff's office in 1721[.]") (citation omitted).) The County concedes this factor. (ECF No. 100, at 16.)

The fourth factor—whether one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer—also supports a finding that Sheriff Hines and the County were "not completely disassociated" with respect to Plaintiffs' employment. The County sets the Sheriff's budget. (ECF No. 104-10 "Hines Depo. 2", at

---

[10] The County maintains that "[t]he Sheriff determines promotions and, by statute, sets his deputies' pay." (ECF No. 115 ¶ 78 (citing Va. Code § 15.2-1609.2(D); ECF No. 100, at 13.) The County's admission "that the Sheriff **and County** created a Public Safety Pay Plan that went into effect [on] April 16, 2021", (ECF No. 115 ¶ 78 (emphasis added)), is not inconsistent with that statute, and shows that the Sheriff and County jointly exercise control over deputies' salaries.

17:20–21.) When the Sheriff's Office receives an invoice, the County is the ultimate payor. (Wright Depo., at 36:9–23.)

The fifth factor—whether Plaintiffs worked in a location controlled by one or more of the putative joint employers—weighs in favor of finding a joint relationship. The County owns the building from which the Sheriff's deputies work. (Hines Depo. 2, at 78:24–79:4.) The County concedes this factor. (ECF No. 100, at 16.)

The sixth factor—codetermination or allocation over functions ordinarily carried out by employers—also supports a finding that the Sheriff and the County were "not completely disassociated" with respect to Plaintiffs' employment. The County handles payroll for the Sheriff, including signing the deputies' paychecks and processing all W-2s for the deputies. (Amanda Six Depo, at 13:13–25; 57:21–58:7.) The County provides the equipment and materials necessary for the Sheriff's deputies to engage in their work—including police vehicles and computers. (ECF No. 104-6, at 5; Wright Depo., at 42:20–24.) Further, the Sheriff's deputies are eligible for coverage under numerous County insurance plans, including health, dental, vision, and life insurance. (ECF No. 104-6, at 3.) The County concedes this factor. (ECF No. 100, at 16.)

Although all six factors weigh in favor of a joint relationship, the County nevertheless asserts that "it is a legal impossibility for the County to be a joint employer of the Sheriff's deputies under Virginia law." (ECF No. 100, at 9.) However, the Virginia law cited by the County in support of this conclusion does not control because the definition of "employer" under the FLSA "encompass[es] a broader swath of workers than would constitute employees at common law." *Salinas*, 848 F.3d at 137. Indeed, for FLSA purposes, "an individual may be the

21

employee of more than one employer at a given time." *Jackson*, 2009 WL 2060073, at *3 (citing *Schultz*, 466 F.3d at 305).

The County also relies on *Roop v. Whitt*, in which the Virginia Supreme Court held that "a sheriff's deputy, who is an employee of the sheriff, is not a local employee for the purposes of [Va.] Code § 15.2-1512.4." 768 S.E. 2d 692, 696 (Va. 2015). That statute governs the right of local employees to contact elected officials and is not at issue here. *See Salinas*, 848 F.3d at 143 ("[A]n entity may constitute an employer for purposes of the FLSA even if it is not an employer under other statutes.")

The County additionally cites *Shannon v. City of Richmond Virginia Sheriff's Off.*, in which this Court dismissed a plaintiff's case against the City of Richmond Sheriff's Office because the Sheriff's Office was "not a cognizable legal entity." No. 3:22cv460 (MHL), 2023 WL 2720806, at *6 (E.D. Va. Mar. 30, 2023). In so finding, this Court noted that the "'Sheriff's Office is not a properly named party defendant because the . . . Sheriff is an independent constitutional officer; not a legally recognized entity separate from the Sheriff himself and the county government.'" *Shannon*, 2023 WL 2720806, at *6 (E.D. Va. Mar. 30, 2023) (quoting *Clark v. Beasley*, 3:03cv1074 (HEH), 2004 WL 3222732, at *4 (E.D. Va. July 8, 2004)). However, the Sheriff's status as an independent constitutional officer does not preclude the Sheriff and the County from constituting joint employers of the deputies under the FLSA.

The County compares the case at bar to cases such as *Krage v. Macon-Bibb County, Ga.* There, the Court analyzed whether the County was a joint employer of Sheriff's deputies under the FLSA using the Eleventh Circuit's *Villarreal* framework, rather than the Fourth Circuit's

*Salinas* framework.  No. 5:19cv321, 2021 WL 5814274, at \*6 (M.D. Ga. Dec. 7, 2021).  *Krage* is distinguishable from the case at bar for two reasons.

First, unlike the six-step *Salinas* framework, the *Villarreal* framework includes four steps, which were applied in *Krage* as follows:  (1) whether the County had the power to hire and fire the deputies, (2) whether the County supervised and controlled the work schedules or conditions of employment of the deputies; (3) whether the County determined the rate and method of payment of the deputies, and (4) whether the County maintained employment records of the deputies.  *Id.* at \*6–\*7.  These factors do not map neatly onto the *Salinas* factors under which this Court analyzes whether the County is a joint employer under the FLSA.  *Salinas*, 848 F.3d at 141–42 (analyzing, *inter alia*, "[t]he degree of permanency and duration of the relationship between the putative joint employers", "[w]hether . . . one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer", and "[w]hether the work is performed on a premises owned or controlled by one or more of the putative joint employers").

Second, of the four *Villarreal* factors, the *Krage* Court found that only one factor— whether the County maintained employment records of the deputies—"weigh[ed] in favor of finding that the County is the [p]laintiffs' employer."  2021 WL 5814274, at \*7.  In contrast, as discussed below, in the case at bar, the County concedes that "three of the six [*Salinas*] factors . . . weigh in favor of finding a joint employment relationship."  (ECF No. 100, at 16.)

And the Court concludes that the remaining three weigh toward a finding of a joint relationship.

That distinction alone creates a material distinction between this case and *Krage*.

Nevertheless, the County asserts that "[t]he relationship between Sheriff Hines and the

County is identical to that of the county and sheriff in *Krage*." (ECF No. 100, at 16.) This Court

concludes otherwise. In *Krage*, the court stated:

> To the extent that the County issued paychecks to sheriff's deputies, maintained
> employment records of sheriff's deputies, and undertook other responsibilities that
> employers commonly perform, these functions are best characterized as
> administrative functions that Sheriff Davis delegated to the County to avoid the
> duplication of resources. Most importantly, there is nothing in the record to suggest
> Sheriff Davis could not perform these functions himself if he so chose or that in the
> performance of these functions the County exercised any actual control over the
> deputies.

2021 WL 5814274, at *7. Significantly, in *Krage*, the sheriff could elect "to subject [the

deputies] to some or all of the terms of the [County's policies]." *Id.* at *1. But "those policies

were only applicable [to the deputies] to the extent Sheriff Davis chose to adopt them." *Id.* at *7.

Here, the record is bereft of any suggestion that Sheriff Hines may exercise discretion to opt his

deputies out of compliance with the County policies to which they are subjected.

Finally, the County cites cases in which a court held that a county was not a joint

employer for the purposes of non-FLSA claims. *See, e.g., Kellum v. Isle of Wight Cnty., Va.*, No.

2:18cv543 (LRL), 2020 WL 3164962, at *10 (E.D. Va. Feb. 13, 2020), report and

recommendation adopted, 2020 WL 1304083 (E.D. Va. Mar. 19, 2020) (finding that the

Commissioner of Revenue and the County were not joint employers under the ADA); *Butler v.*

*Spotsylvania Cnty. Gov.*, No. 3:19cv950 (DJN), 2020 WL 2572801, at *4 (E.D. Va. May 21,

2020) (finding that "the County does not constitute Plaintiff's 'employer' under either the ADA

or Title VII"). These cases are inapposite. *Butler v. Drive Auto. Indus. of Am.*, 793 F.3d 404,

412 n.10 (4th Cir. 2015) ("[T]he FLSA uses a different definition of 'employee' such that the

statute is not directly analogous to Title VII" and "FLSA cases . . . are not particularly transferable to Title VII cases); *Salinas*, 848 F.3d at 133 ("[T]he striking breadth of these definitions brings within the FLSA's ambit workers who might not qualify as employees under a strict application of traditional agency law principles or under other federal statutes[.]") (internal citations and brackets omitted).

In the end, all six of the factors evaluated in the first step of the *Salinas* analysis support a finding that the County and the Sheriff Hines are "not completely disassociated" and instead have a "joint relationship" such that they are Plaintiffs' joint employers. The cases the County cites to argue the opposite do not control this analysis. The Court therefore proceeds to the second step of the *Salinas* analysis: whether the Plaintiffs are employees of the County. *Salinas*, 848 F.3d at 141.

ii.    **<u>*Salinas* Step 2</u>: Plaintiffs are Joint Employees of Sheriff Hines and the County**

Because Sheriff Hines and the County are "not completely disassociated," the Court proceeds to step two of *Salinas* to assess whether the worker is an employee. *Salinas*, 848 F.3d at 140. To do so, the Court reviews whether the "worker is economically dependent on . . . his [or her] putative joint employers." *Id.* at 150. Six additional factors guide that analysis:

> (1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his [or her] managerial skill; (3) the worker's investment in equipment or material, or his [or her] employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business.

*Id.* at 160 (quoting *Schultz*, 466 F.3d at 304–05).

Here, no dispute of material fact exists that Plaintiffs are employees—not independent contractors—of the joint employers. Indeed, the County does not contend otherwise. Together,

the County and Sheriff Hines govern the manner in which the deputies perform their work. (*See* ECF No. 104-22 (evincing that the Sheriff and County jointly created a Public Safety Plan that outline target salaries and allows for "pay increase[s] . . . to bring [deputies] to their target salary").) The deputies "economically depend[]" on the County and the Sheriff, demonstrating that the deputies are employees rather than independent contractors. (*See* Hines Depo. 2, at 20:4–7 (affirming that "[one] hundred percent of th[e] money flows through the [C]ounty before it goes to pay [the Sheriff's] personnel"); *see also* Hines Depo. 2, at 17:20–21 (affirming that "the [County] board of supervisors decides the [Sheriff's] budget").)

Because Sheriff Hines and the County are "not completely disassociated" with respect to the Plaintiffs' employment and because Plaintiffs constitute employees rather than independent contractors, Sheriff Hines and the County constitute joint employers under the FLSA. *Accord Hatcher v. Hines*, 3:23cv325 (JAG), 2024 WL 1158365, at *6 (Mar. 18, 2024).

The Court next considers whether the time the Plaintiffs were "marked on" is compensable under the FLSA.

### 3.    Legal Standard:  Compensable Time under the FLSA

The Fair Labor Standards Act, passed in 1938, Pub. L. No. 75-718, 52 Stat. 1060 (1938), requires employers to pay employees time-and-a-half wages for hours worked over forty hours per week.  29 U.S.C. §§ 207(a)(1), (k).  The Portal-to-Portal Act 1947, Pub. L. No. 80-49, 61

Stat. 1060 (1947), amended the FLSA to exclude certain activities as non-compensable. 29

U.S.C. § 254. Under the Portal-to-Portal Act, compensable activity does not include:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

> (2) activities which are preliminary to or postliminary to said principal activity or activities.

29 U.S.C. § 254(a). The Portal-to-Portal Act also clarified that "the use of an employer's vehicle

for travel by an employee and activities performed by an employee which are incidental to the

use of such vehicle for commuting shall not be considered part of the employee's principal

activities if the use of such vehicle for travel is within the normal commuting area for the

employer's business or establishment and the use of the employer's vehicle is subject to an

agreement on the part of the employer and the employee or representative of such employee."

29 U.S.C. § 254(a)(2).

Thus, the Portal-to-Portal Act created a distinction between "principal activities", which

are compensable, and activities that are "preliminary or postliminary" to principal activities,

which are not compensable. 29 U.S.C. § 254. However, activities that are an "integral and

indiscernible part of the principal activities" *are* compensable, *Steinger v. Mitchell*, 350 U.S.

247, 256 (1956), meaning that employees "must receive compensation for any activity that 'is an

intrinsic element of those activities [that an employee is employed to perform] and one with

which the employee cannot dispense if he is to perform his principal activities.'" *Hatcher v.*

*Hines*, 2024 WL 1158365, at *4 (quoting *Integrity Staffing Sols., Inc. v. Busk*, 547 U.S. 27, 33 (2014)).[11]

### 4. Disputes of Material Fact Exist Regarding "Marking On" under the FLSA

Both parties seek summary judgment on the issue of whether Plaintiffs' time driving to work while "marked on", but before the start of their shift, is compensable under the FLSA. Plaintiffs assert that summary judgment in their favor on this issue is appropriate because they "were required to mark on duty, necessarily completing duties that form the principal activities for which they were employed to do but were not paid for the time between marking on duty and the beginning of their scheduled shift." (ECF No. 104, at 1.) Defendant asserts otherwise. Defendant posits that judgment should be granted to them because Plaintiffs' act of marking on "is preliminary to the principal activity for patrol deputies, and thus, falls squarely within the exclusion of the Portal-to-Portal Act." (ECF No. 100, at 27.)

Resolution of the cross motions therefore hinges on whether "marking on" is a principal activity for which compensation is required under the FLSA, or preliminary to a principal activity and thus excluded as non-compensable by the Portal-to-Portal Act. As set out below, at least three material factual disputes regarding "marking on" preclude the Court from granting summary judgment to either party on this issue: first, whether the County required that Plaintiffs

---

[11] Also relevant here, the Department of Labor's regulations interpreting the FLSA provide:

> A police officer, who has completed his or her tour of duty and who is given a patrol car to drive home and use on personal business, is not working during the travel time even where the radio must be left on so that the officer can respond to emergency calls. Of course, the time spent in responding to such calls is compensable.

29 C.F.R. § 5553.221(f).

"mark on" before their shifts; second, whether Plaintiffs were on duty when they were "marked on"; third and finally, whether Plaintiffs were dispatched when they were marked on but before their shifts started.

### i.      A Material Dispute of Fact Regarding Whether the County Requires that Plaintiffs "Mark On" Before Their Shifts Exists

First, the parties materially disagree as to whether Plaintiffs were required to "mark on" before the start of their scheduled shift.  According to the County, "[d]iscovery has made clear that . . . there is no requirement, policy, or uniform practice as to when deputies 'mark on.'" (ECF No. 100, at 23.)  According to Plaintiffs, "[d]eputies are required to, and did in fact, mark on duty (10-41) prior to the beginning of their shift."  (ECF No. 104, at 27–28.)  This is a material factual dispute that precludes the Court from granting summary judgment.[12]

In support of its assertion that "there is no requirement, policy, or uniform practice as to when deputies 'mark on'", (ECF No. 100, at 23), the County cites Sheriff Hines's deposition, in which Sheriff Hines stated that deputies in the patrol division are required to be marked 10-41 "when their shift starts."[13]  (Hines Depo., at 7:20–35:8.)  Sheriff Hines explained that "once [a deputy's] shift starts, [they] have to be [marked] 10-41", but that he did not "care when [a deputy] mark[s] on[.]"  (Hines Depo., at 148:12–16.)  According to Sheriff Hines, deputies mark

---

[12] Indeed, Plaintiffs acknowledge that "had the County not required class members to mark 'on duty' prior to their scheduled shift, this case would be markedly different, or perhaps, not a case at all."  (ECF No. 104, at 27.)

[13] Unlike deputies in the patrol division, deputies in the investigative division, including narcotics officers and street crime officers, are not required to mark 10-41.  (Hines Depo., at 8:10–14; Gregory Six Depo., at 42:18–25.)

10-41 "when they walk into roll call"[14], "when they leave their house", and "on their way to work," functionally telling communications, "I'm on my way." (Hines Depo., at 108:12–15.)

      The County produced similar evidence in the form of Deputy Six's deposition, in which he stated that the Sheriff's Office "require[s] people to mark on the radio for the shift that they are coming to work" but that there are no "specific requirements or policy" that govern how soon before a shift a deputy must "mark on". (ECF No. 100-3 ("Gregory Six Depo."), at 14:21–15:2.) While there is no "policy that [deputies] have to mark on the radio . . . before [their] shift", "[i]t is a practice that officers mark on the radio prior to their shift." (Gregory Six Depo, at 15:19– 22.) "[T]he time period with which that is done varies amongst everyone." (Gregory Six Depo., at 15:23–24.) The "sheriff make[s] known to its deputies what the practice is" "during field training", and during this training, the deputies are trained on how to "mark on". (Gregory Six Depo., at 24:20–22; 27:16–19.)

      In support of Plaintiffs' contrary assertion that "[d]eputies are required to, and did in fact, mark on duty (10-41) *prior* to the beginning of their shift", (ECF No. 104, at 27–28 (emphasis added)), Jonathan McGill testified in his deposition that he received training to "mark 10-41 before the shift started" but "no time specifically [was] given." (McGill Depo., at 32:9–15.) Christopher Ryan Payne also affirmed that he was "supposed to mark on [his] radio before the shift started." (Payne Depo., at 58:5–7.) Further, former Deputy Sheriff J. Kirk Shaffier represented in a sworn declaration that he "was employed by the Hanover County Sheriff's Office from June 1998 to July 2006, and October 2006 to August 2022", and that during that time, "the required practice for all deputies was to mark on duty (10-41) from the moment they

---

[14] "[T]he first 30 minutes of every shift is supposed to be a roll call." (Gregory Six Depo., at 68:3–5.) Roll call occurs every shift change unless it is cancelled. (Hines Depo. 2, at 44:5–7.)

either left their driveway (if they lived in Hanover County) or entered Hanover County in their patrol car on their way to roll call." (ECF No. 107-7 ("Shaffier Decl."), at 1–2.)

The Court makes no credibility finding here. This record clearly presents a material dispute of fact regarding whether Plaintiffs were required to "mark on" before the start of their shifts. This bears on whether "marking on" is a principal activity for which compensation is required under the FLSA, or merely preliminary to a principal activity and thus excluded as non-compensable by the Portal-to-Portal Act.

ii.    **A Material Dispute of Fact Regarding Whether Plaintiffs Were On Duty When They Were "Marked On" Exists**

Second, the parties also disagree as to whether Plaintiffs were on duty when they were marked 10-41 before their scheduled shift start time. On one hand, Plaintiffs assert that "[t]here is no genuine dispute over whether the time at issue in this case can be characterized as 'on duty.'" (ECF No. 104, at 23.) Plaintiffs further contend that "[t]he Class does not request to be paid for commute time here, rather they are entitled to be compensated for the time they are required to be 'on duty.'" (ECF No. 104, at 26.) On the other hand, the County denies that marking on 10-41 means that a deputy is on duty. (ECF No. 115 ¶ 14.)

In support of their position that "marking on" means a deputy is on duty, Plaintiffs point to the deposition testimony of Cheryl Buchanan, the director of dispatch and emergency communications for the County, who affirmed that 10-41 means "begin duty." (ECF No. 104-8, at 17:16–24.) Plaintiffs also produced a Hanover Public Safety Emergency Communications policy governing communication between Dispatch and the Sheriff's Office. (ECF No. 104-9.) The policy contains a list of "ten codes", and states that the code "10-41" means "beginning duty." (ECF No. 104-9, at 3.) Further, in Sergeant Sutton's deposition, he stated that when deputies were marked 10-41 and "driving to headquarters", they "would be expected to deal with

anything that presented itself as a law enforcement issue while en route to headquarters." (ECF No. 104-15 ("Sutton Depo. 2"), at 26:3–8.) He further testified that "at times, [he] heard dispatch . . . ask [deputies] to respond" to calls when they were driving from their residence to headquarters and marked 10-41. (Sutton Depo. 2, at 26:9–16.)

The County presented opposing sworn testimony. Sheriff Hines testified in his deposition that a deputy who marks 10-41 before the start of his shift "is not on duty . . . [h]e's on his way to duty." (Hines Depo., at 163:2–12.) Sheriff Hines explained, "there's no expectation and no responsibility until [deputies are] on shift to answer that radio" and that the deputies are only expected "to be listening to the radio" "once their shift starts." (Hines Depo., at 108:20–109:3.) Further, Deputy Six testified that "[m]arking on" the radio is "not interchangeable with being on duty." (Gregory Six Depo. 2, at 3:10–11.) He explained that deputies can "mark on" before their shift, or in cases where they forget, "they do it after their shift has started." (Gregory Six Depo. 2, at 2:12–14.) "Marking on" is not used to track shift time for which deputies are compensated; that happens using a "completely separate system[]" called Kronos. (Gregory Six Depo. 2, at 3:16–18; 10:10–11:1.) Deputies have "preloaded schedules" in Kronos and are paid a portion of their yearly salary each pay period "[a]s long as [their] end punch and [their] out punch match [their] preloaded schedule[.]"[15] (Gregory Six Depo. 2, at 11:10–14.) Deputy Six further testified that the purpose of marking on is so that dispatch "will know that [a deputy] is coming . . . to a particular shift for an assignment" and "knows who is available for calls when the shift begins." (Gregory Six Depo., at 24:1–8; 44:16–

---

[15] The parties do not define what it means to "punch."

25.) He testified that while deputies are driving to work, they do not have any duties or obligations. (Gregory Six Depo., at 81:6–13.)

Resolving this conflicting testimony is a job for a jury. Whether Plaintiffs were on duty when they were "marked on" while driving to work before the start of their shift cannot be resolved on this written record. Whether "marking on" is a principal activity for which compensation is required under the FLSA, or merely preliminary to a principal activity and thus excluded as non-compensable by the Portal-to-Portal Act, is a second material dispute that must be resolved at trial.

### iii. A Material Dispute of Fact Exists Regarding Whether Plaintiffs Were Dispatched to Calls for Services When They Were Marked On But Before Their Shifts Started

Third and finally, the parties disagree as to whether Plaintiffs could be dispatched to service calls—and whether they did in fact respond to calls—when they were marked 10-41 before their scheduled shift start time. The County asserts that "[d]iscovery has made clear that . . . deputies were not dispatched to calls for service until they were marked clear from roll call." (ECF No. 100, at 23.) In direct contrast, Plaintiffs contend that "testimony has revealed that [d]eputies were dispatched to report to calls prior to the start of their shifts when they were marked 'on duty.'" (ECF No. 104, at 24.)

In support of the County's position, Deputy Hatcher testified that from May 15, 2020, to May 31, 2022, he could not recall how many times he actually responded to a call while on the way to work. (Hatcher Depo., at 97:7–12.) He testified that in that time frame, if he responded to a call after having marked "90 back"[16] but before he arrived at work, "it wouldn't have been a

---

[16] During his time on the Street Crimes unit beginning in 2014, Deputy Hatcher testified that he could "never remember a time that [he] ever would have marked 10-41 on duty . . . on [the] police dispatch [channel]." (Hatcher Depo., at 68:10–15.) Instead, he communicated on

situation where [he] would have been dispatched to a call, it would have been more so [him] keying up that [he] was in the area or something that [he] observed." (Hatcher Depo., at 97:13–23.) However, he did not recall "any specifics or any particular call that resulted in [him] responding[.]" (Hatcher Depo., at 97:24–98:2.) Sergeant Sutton also testified that from May 2020 until his retirement, he was never dispatched to a call for service on his way to headquarters. (Sutton Depo., at 34:12–15.) He did not recall if he ever stopped for an incident on his way to headquarters during that time period. (Sutton Depo., at 34:16–19.) Deputy McGill testified that he could not recall whether there was ever a time in which Dispatch dispatched a call to him while he was on his way to roll call. (McGill Depo., at 38:11–14.) Deputy McGill described a situation in which he "ran across a[n] accident" and "stopped for the accident", but clarified that the call regarding the accident was not dispatched to him; rather, he "notified them that [he] was stopping." (McGill Depo., at 36:25–37:11.)

But some witnesses testified otherwise. In support of Plaintiffs' position, Deputy Payne testified that while members of the Safe Streets Unit "were normally exempt from getting . . . dispatched to a call", he would "sometimes" be dispatched to calls on his way to work "based on the proximity of where my vehicle was located." (Payne Depo., at 58:10–19.) He testified, "[i]f I was the closest unit, they would ask, normally via the radio or an MDT message, if we were able to go there and either handle the call or assist." (Payne Depo., at 58:19–22.) However, he could not recall a specific instance when that occurred. (Payne Depo., at 58:23–25.) Deputy Carroll also testified that during his nearly 15 years in patrol, he had been dispatched to a call for

_____

different channel called Street Crimes Unit 1 by saying "90 back." (Hatcher Depo., at 68:16–69:19.) The Street Crimes Unit 1 (SCU1) channel was not monitored by Dispatch. (Buchanan Depo., at 61:13–23.)

service during the time in which he traveled from his residence to roll call, but could not remember when or how many times. (ECF No. 104-14 ("Carroll Depo. 2"), at 27:4–23.)

When asked if he was ever dispatched to a call for service prior to the start of his shift between February 2020 to August 2022, Sergeant Lantz stated, "I can't say that it happened on day shift, but I know it's happened in my career[.]" (Lantz Depo., at 39:11–21.) In those instances, dispatch "didn't have a unit to send" but "knew [he] was there because . . . [he had] marked 10-41" and "called to dispatch [him.]" (Lantz Depo., at 39:15–21.) However, he could not recall a specific date, time, or year. (Lantz Depo., at 39:22–25.) Deputy Shaffier averred in his declaration that "[i]t was [his] observation that deputies who were marked on duty (10-41) were called by Dispatch for any emergency calls even if the deputy had not yet arrived at roll call," but "[i]t was the practice for Dispatch to avoid calling deputies for non-emergency calls prior to their roll call." (Shaffier Decl., at 3.)

This third material dispute of fact—whether Plaintiffs were dispatched to calls when they were marked on while driving to work before the start of their shift—cannot be resolved here. This bears on whether "marking on" is a principal activity for which compensation is required under the FLSA, or merely preliminary to a principal activity and thus excluded as non-compensable by the Portal-to-Portal Act. A jury must decide this.

### iv.    Case Law Supports this Court's Conclusion

The County identifies several cases that support the proposition that the FLSA does not require employers to compensate employees for time spent commuting to and from work. *See, e.g., Truslow v. Spotsylvania Cnty. Sheriff*, 783 F. Supp. 274, 277 n.5 (E.D. Va. 1992) (holding that "as a matter of law" "defendants were not required [under the FLSA] to compensate [deputy sheriff plaintiff] for the time he and the [police] dogs spent commuting to or

from work"); *Llorca v. Sheriff, Collier Cnty.*, 893 F.3d 1319, 1326 (11th Cir. 2018) ("The time

that the deputies spent commuting in marked patrol vehicles is excluded from compensable work

time by the Portal-to-Portal Act."). But that is not the issue before the Court. Plaintiffs concede

that their time merely driving to work is not compensable under the FLSA. (ECF No. 117, at 24

("Of course, the Portal-to-Portal Act exempts time merely commuting.").) Plaintiffs' claim "is

not that the Deputies were merely commuting to work," but that "the Deputies were marked on

duty and actively completing law enforcement duties on their drive to work." (ECF No. 117, at

29.)

The case at bar is more analogous to *Hertz v. Woodbury County, Iowa*, in which a court

denied the plaintiffs' motion for summary judgment. 2008 WL 2095553 (N.D. Iowa May 16,

2008). There, the plaintiffs were officers "employed by the Woodbury County Sheriff's

Department." *Id.* at *1. The undisputed facts showed that, like here, two plaintiffs—a lieutenant

and a sergeant of the sheriff's department—"commute[]d to and from work in 'marked'

Woodbury County Sheriff's Department patrol cars." *Id.* "Woodbury County ha[d] these

officers drive these patrol cars for three reasons: to increase police presence; to reduce response

time; and to engage in law and traffic enforcement while commuting to and from the office." *Id.*

The plaintiffs "both report (via radio) '10-41' when they enter their patrol cars for the morning

commute to the office." *Id.* "'10-41' means the officers are 'on-duty.'" *Id.* That information

was "communicated to the Woodbury County Communications Center." *Id.*

In *Hertz*, the officers claimed "that Woodbury County failed to compensate [the

plaintiffs] for 'on-duty' time as required by FLSA." *Id.* at *3. The officers asserted that they

were "required to report '10-41' ('on-duty') when they enter the vehicle each morning . . . and

that [they were] available to respond to calls while commuting to and from the office." *Id.* at *4.

They contended that the county "receive[d] a benefit because of the officers [sic] increased police presence, reduced response time, and their being engaged in law and traffic enforcement." *Id.* However, the *Hertz* court noted that one plaintiff "points to only one instance where he removed debris from the roadway during his commute to work." *Id.* But "Woodbury County dispute[d] that plaintiffs were performing any work that is an integral and indispensable part of their employment because plaintiffs are only commuting and did not demonstrate that they are performing any work." *Id.* Woodbury County claimed "that neither office pulled over any vehicles for traffic violations, investigated any suspicious vehicles, or responded to any other calls during the entire time." *Id.*

The *Hertz* court concluded that the Woodbury County's "challenge to the motion for summary judgment raised a factual issue with regard to the amount of time spent by plaintiffs performing 'work' during their commutes to and from work" and that "[t]he actual amounts of time spent by plaintiffs on such activities, and whether that time is substantial or negligible such as to be deemed de minimis, is a factual issue for resolution at trial." *Id.* at *7. As a result, that court denied the motion for summary judgment.

Similarly, at least three disputes of material fact present themselves: (1) whether plaintiffs were required to "mark on" before the start of their shifts, (2) whether they were on duty when they marked on before the start of their shifts, and (3) whether they were dispatched to calls while marked on but before the start of their shifts. These disputes preclude the Court from granting summary judgment on the issue of whether Plaintiffs' time driving to work while "marked on", but before the start of their shift, is compensable under the relevant law and therefore must be resolved at trial. *Llorca*, 893 F.3d at 1324 ("[I]t is for the court to determine if

a set of facts gives rise to liability [under the FLSA]; it is for the jury to determine if those facts exist.") (internal quotation marks omitted).

### B.   The VOWA (2021) Claim (Count IV)[17]

#### 1.   Legal Standard:  Joint Employer Under the VOWA (2021)

The 2021 version of the VOWA contains nearly identical definitions as the FLSA. *See* Va. Code § 40.1-29.2 (2021) (defining "employee" as "any individual employed by an employer"; defining "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee"; defining "employ" as "to permit or suffer work"). Thus, the analysis of whether the County is a joint employer of the Plaintiffs is the same under VOWA (2021) as it is under the FLSA.

#### 2.   The County is Plaintiffs' Joint Employer Under the VOWA (2021)

Both parties correctly agree that the analysis of whether the County is Plaintiffs' joint employer is the same under the FLSA and the VOWA (2021).  (ECF No. 100, at 10 n.2; ECF No. 104, at 20.)  *See Hatcher*, 2024 1158365, at *6 (finding the County was Plaintiffs' joint employer under the VGPA because Plaintiffs stated a claim that the County was Plaintiffs' joint employer under the FLSA).  As articulated *infra*, the County is Plaintiffs' joint employer under the FLSA.  Accordingly, for those same reasons, the County is also Plaintiffs' joint employer under the VOWA (2021).

#### 3.   Legal Standard:  Compensable Time Under the VOWA (2021)

In relevant part, the 2021 version of the VOWA provided that for "law enforcement employees of any public sector employer for whom [the FLSA,] 29 U.S.C. § 207(k)[,] applies,

---

[17] As explained in Note 5, *supra*, Plaintiffs limit their claims under VOWA to the period between July 1, 2021 and June 30, 2022, prior to VOWA's 2022 enactment.

such employer shall pay an overtime premium as set forth in this section for (i) all hours worked in excess of the threshold set forth in [the FLSA,] 20[18] U.S.C. § 207(k)[,] and (ii) any additional hours such employee worked or received as paid leave as set forth in subsection A of [the VGPA,] § 9.1-701." Va. Code § 40-1-29.2(C) (2021).

### 4.    Disputes of Material Fact Exist Regarding "Marking On" under the VOWA (2021)

Plaintiffs argue that the 2021 VOWA did not incorporate the Portal-to-Portal Act. (ECF No. 104, 28–30.)[19]  Thus, they maintain, even if the Court determines under the FLSA that "marking on" is a preliminary activity and therefore not compensable, the County would still be liable under the VOWA (2021). (ECF No. 104, at 28–30.)  In response, the County contends that VOWA (2021) incorporated the Portal-to-Portal Act, and that, as under the FLSA, Plaintiffs have not shown that "marking on" is compensable. (ECF No. 115, at 29–31.)  At this stage, the Court cannot and does not decide whether VOWA (2021) incorporates the Portal-to-Portal Act because disputes of material fact preclude summary judgment in favor of either party.

The Court pauses to note that the parties' rather cursory briefing on the applicability of VOWA (2021) also precludes any reasoned decision at this stage.  First, the parties only summarily address whether VOWA (2021) incorporates the Portal-to-Portal Act.  For instance, in arguing their positions, both parties cite to opinions from this district analyzing whether the treble damage provision in the VGPA that applied in VOWA (2021), but which was eliminated under VOWA (2022) when the VGPA was amended, applies retroactively. (ECF No. 115, at 29

---

[18] This is an error, as 20 U.S.C. 207(k) does not exist.  The statute should read 29 U.S.C. § 207(k).

[19] Plaintiffs concede that the present (2022) version of VOWA incorporates the Portal-to-Portal Act. (ECF No. 104, at 28–30.) *See* Va. Code § 40.1-29.2 (2022).

(citing *Meharg v. York Operations, LLC*, No. 4:22cv51 (RAJ), 2022 WL 16636943, at \*4 (E.D. Va. Nov. 2, 2022)); ECF No. 121, at 17 (citing *Hatcher v. Hines*, 3:23cv325 (JAG), 2024 WL 1158365, at \*8-9 (E.D. Va. Mar. 18, 2024)). Neither of these opinions help this Court decide the issue it must. The Court need not decide the retroactivity of the treble damages provision in VOWA (2021). This Court must also find whether the *Portal to Portal Act* incorporated into VOWA (2022) applies retroactively to VOWA (2021)—the statute explicitly invoked in the Complaint before the Court. And, more consequentially, neither party provides any guidance as to how the Court would analyze Plaintiff's VOWA (2021) claim in the event that it did not incorporate the Portal-to-Portal Act.

Regardless, disputes of material fact prevent a finding as to the VOWA (2021) under any reading of that statute. First, assuming VOWA (2021) *does* incorporate the Portal-to-Portal Act, the Court's analysis of whether "marking on" is compensable under the VOWA (2021) would mirror the analysis under the FLSA. As explained above, at least three disputes of material fact preclude the Court from determining whether "marking on" is compensable under the FLSA and would also preclude a determination as to whether "marking on" is compensable under the VOWA (2021).

Assuming the opposite—that the VOWA (2021) *does not* incorporate the Portal-to-Portal Act—creates disputes of material fact that likewise would preclude summary judgment. This is true because VOWA (2021) incorporates the FLSA's definition of "work". Va. Code § 40-1-29.2(C) (2021) (explaining that employers under the 2021 VOWA are to pay overtime premiums for the hours worked in excess of the threshold set forth in the FLSA, 29 U.S.C. § 207(k)). And even prior to the Portal-to-Portal Act, the "general rule . . . [was] and always has been that the FLSA does not treat ordinary home-to-job-site travel as compensable." *Keubel v. Black &*

40

*Decker Inc.*, 643 F.3d 352, 360 (2d Cir. 2011) (explaining that the Portal-to-Portal Act did "not

purport to change earlier definitions of compensable work"); *see also* 29 C.F.R. § 785.25 ("An

employee who travels from home before his [or her] regular workday and returns to his [or her]

home at the end of the workday is engaged in ordinary home to work travel which is a normal

incident of employment. . . . Normal travel from home to work is not worktime."). So, the Court

cannot make any determination about how either VOWA (2021) or VOWA (2022) would decide

this case because that would flow from outcome of the same three disputes of fact described

above.

That factual disputes exist as to how VOWA (2021) affects the outcome here does not,

however, prevent the Court from deciding which law applies. That simply requires additional

briefing. For the reasons articulated in the accompanying Order, this Court will order the parties

to file additional briefing on the issue of whether the VOWA (2021) incorporates the Portal-to-

Portal Act and whether and why "marking on" is, or is not, compensable under the VOWA

(2021)'s definition of "work". (ECF No. 124.)

### C. **The VGPA Claim (Count III)**

#### 1. **Legal Standard: Employer Under the VGPA**

Under the Virginia Gap Pay Act ("VGPA"), "[e]mployers shall pay . . . law-enforcement

employees[20] overtime compensation or leave, as under the [FLSA] at a rate of not less than one

and one-half times the employee's regular rate of pay for all hours of work between the statutory

---

[20] The VGPA defines "law-enforcement employee" as "any person who is responsible for
the prevention and detection of crime and the enforcement of the penal, traffic or highway laws
of the Commonwealth, other than an employee who is exempt from the overtime provisions of
the [FLSA], and who is a full-time employee of either (i) a police department or (ii) a sheriff's
office that is part of or administered by the Commonwealth or any political subdivision thereof."
Va. Code § 9:1-700.

41

maximum permitted under [the FLSA] and the hours for which an employee receives his salary[.]" Va. Code § 9.1-701(A). "It is clear that the [Virginia] General Assembly intended the [VGPA] to operate in conjunction with the FLSA." *Bailey v. Loudoun Cnty. Sheriff's Office*, 762 S.E.2d 763, 768 (Va. 2014).

The VGPA defines "employer" as "any political subdivision of the Commonwealth, including any *county*, city, town, authority, or special district that employs fire protection employees[.]"[21] Va. Code § 9:1-700 (emphasis added). Whether an entity is an employer under the VGPA rises or falls with whether the County is an employer under the FLSA. *See Emmons v. City of Chesapeake*, No. 2:18cv402 (LRL), 2019 WL 8888192, at *1 n.2 (E.D. Va. June 18, 2019), *aff'd*, 982 F.3d 245 (4th Cir. 2020) (finding that "a determination of whether Plaintiffs may prevail under the Virginia Gap Pay Act necessarily requires Plaintiffs first prevail on their FLSA claim"); *see also Bailey*, 762 S.E.2d at 768 ("It is clear that the [Virginia] General Assembly intended the [VGPA] to operate in conjunction with the FLSA.").

## 2. The County is Plaintiffs' Employer Under the VGPA

On this expanded record, this Court again finds that the County is Plaintiffs' employer for purposes of the VGPA. *See Hatcher*, 2024 WL 1158365, at *6. Plaintiffs constitute "law-enforcement employees" under the VGPA because they are "full-time employee[s]" of "a sheriff's office." *See* Va. Code § 9.1-700. The County is a "political subdivision" of the Commonwealth of Virginia. *See id.* VGPA's mandate that "[e]mployers shall pay . . . law-enforcement employees overtime compensation or leave, as under the [FLSA] at a rate of not less

---

[21] Prior to 2005, the statute only applied to fire protection employees. In 2005, the statute was amended to apply to law enforcement employees. Va. Code § 9.01-704 (2005); *see also Bailey*, 762 S.E.2d at 768. However, the Virginia legislature did not change the definition of employer.

than one and one-half times the employee's regular rate of pay", Va. Code § 9.1-701(A), applies

to the County, the entity that controls the Sheriff's budget and handles payroll. As discussed,

"the [Virginia] General Assembly intended the [VGPA] to operate in conjunction with the

FLSA." *Bailey*, 762 S.E.2d at 768. Therefore, there is no genuine dispute of material fact that

the County is Plaintiffs' employer under the VGPA.

### 3.    Legal Standard:  Compensable Time Under the VGPA

The VGPA requires that "[e]mployers shall pay fire protection or law-enforcement

employees overtime compensation or leave, as under the Fair Labor Standards Act, 29 U.S.C.

§ 207(o), at a rate of not less than one and one-half times the employee's regular rate of pay for

all hours of work between the statutory maximum permitted under 29 U.S.C. § 207(k) and the

hours for which an employee receives his salary[.]" Va. Code § 9.1-701(A). "For purposes of

computing . . . law-enforcement employees' entitlement to overtime compensation, all hours that

an employee works or is in a paid status during his regularly scheduled work hours shall be

counted as hours of work." Va. Code § 9.1-703. As discussed *supra*, "[i]t is clear that the

[Virginia] General Assembly intended the [VGPA] to operate in conjunction with the FLSA."

*Bailey*, 762 S.E.2d at 768. "As such, a determination of whether Plaintiffs may prevail under the

Virginia Gap Pay Act necessarily requires Plaintiffs first prevail on their FLSA claim."

*Emmons*, 2019 WL 8888192, at *1 n.2.

### 4.    Disputes of Material Fact Exist Regarding "Marking On" under the VGPA

The Court reiterates its earlier determination that disputes of material fact preclude the

Court from granting summary judgment under the FLSA with respect to whether Plaintiffs were

required to "mark on" prior to their shift and whether such time is compensable. Because the

VGPA operates in conjunction with the FLSA, and a determination of whether Plaintiffs can

prevail under the VGPA requires Plaintiffs to first prevail on their FLSA claim, *Emmons*, 2019 WL 8888192, at *1 n.2, the same disputes of material fact likewise preclude the Court from granting summary judgment for either party under the VGPA.

## IV.  Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Plaintiffs' Motion for Partial Summary Judgment, (ECF No. 103), and deny Defendant's Motion for Summary Judgment, (ECF No. 99).  Specifically, the Court finds that the County is Plaintiffs' joint employer under the FLSA and the VOWA, and Plaintiffs' employer under the VGPA.  The Court therefore will grant Plaintiffs' Motion for Partial Summary Judgment and will deny Defendants' Motion for Summary Judgment on this issue.

However, disputes of material fact exist with respect to whether Plaintiffs were required to "mark on" prior to the beginning of their scheduled shift and whether such time was compensable.  The Court therefore will deny both parties' Motions for Summary Judgment on the "marking on" issue.  Counts I, III, and IV will against the County will proceed, but each only on the issue of whether any time that Plaintiffs were "marked on" prior to the start of their shift is compensable under the FLSA, the VGPA, or the VOWA.

An appropriate Order shall issue.

Date: **09/30/25**
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge