# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**CHRISTOPHER HATCHER,** *on behalf of*
*himself and all similarly situated persons, et al.,*

      **Plaintiffs,**

  **v.**                                        **Civil Action No. 3:23cv325**

**COUNTY OF HANOVER,**

      **Defendant.**

### <u>MEMORANDUM OPINION</u>

This matter comes before the court on Defendant the County of Hanover, Virginia's ("the County") Motion to Decertify. (ECF No. 101.)[1] Plaintiffs have responded, (ECF No. 116), and the County has replied, (ECF No. 119).

The matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process.

For the reasons articulated below, the Court will grant the Motion to Decertify. (ECF No. 101.) The Court will deny as moot Plaintiffs' Motion for Leave to File First Amended Complaint to Add a Second Class Representative. (ECF No. 93.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

# I. Factual and Procedural Background

## A.    Factual Background

### 1.    The Sheriff's Take Home Vehicle Policy

David R. Hines is the Sheriff of Hanover County.  (ECF No. 1 ¶ 9.)  The Sheriff's Office is divided into four divisions:  the administrative, patrol, investigative, and judicial divisions. (ECF No. 102-1 ("Hines Depo."), at 9:9–12.)  The patrol division of the Sheriff's Office has three shifts:  day shift, evening shift, and night shift.  (ECF No. 102-2 ("G. Six Depo."), at 8:14– 18.)

Deputies that live in Hanover County or "live in an adjoining jurisdiction within ten air miles" of the Hanover County boundary line receive "the benefit of being able to take [their] patrol vehicle . . . to [their] residence" pursuant to the Sheriff's Take Home Vehicle Policy (the "Policy").  (G. Six Depo., at 33:14–20; ECF No. 102-4.)  "Any officer eligible for an assigned vehicle may decline to accept it subject to the Sheriff's approval.  (ECF No. 102-4, at 1; *see also* G. Six Depo., at 34:24–25.)  Under the Policy, off-duty use of take-home vehicles is limited to certain enumerated activities, including "[v]ehicle maintenance and cleaning."  (ECF No. 102-4, at 2.)  Any "[c]osmetic changes, mechanical and/or electrical alterations to vehicles, and . . . addition and/or removal of equipment" authorized by the Sheriff "shall be made at a county maintenance facility or by a county contracted agency only."  (ECF No. 102-4, at 5.)

### 2.    "Marking On"

The Hanover County Public Safety Emergency Communications Center ("Dispatch") "receive[s] and dispatch[es] calls for service" and "maintain[s] effective radio communications to members of the Sheriff's Office", "ensur[ing] that proper information is relayed to those members through the use of local, state, and national computer information systems."

2

(ECF No. 102-5, at 1.)  Pursuant to a Communications Agreement between the Sheriff's Office and Dispatch, the Sheriff's Office "is dependent upon [dispatch] to not only receive and dispatch calls for service, but to also maintain effective radio communications to members of the Sheriff's Office[.]"  (ECF No. 102-5, at 1.)  Dispatch uses a Computer-Aided Dispatch software system ("CAD") "to process calls for service, incidents, and identify who to dispatch to calls for service[.]"  (ECF No. 102-7 ("Buchanan Depo."), at 11:15–24.)

"Marking on" is a term used to refer to the act of a patrol deputy communicating that they are on the radio.  (Hines Depo., at 34:9–19.)  Deputies may mark on using a variety of methods, including via radio or through the mobile data terminal in their vehicle by stating "10-41."  (Six Depo., at 29:5–10.)  The code "10-41" means "beginning duty."  (Buchanan Depo., at 50:12–14.)  When a deputy marks on by stating "10-41", he or she, identified by a unit number, appears as "available" in the CAD software system and Dispatch can view the deputy's location using their vehicle's mobile data terminal.  (Buchanan Depo., at 28:21–24, 29:10–25.)

### 3. The Plaintiffs

#### a. Christopher Hatcher

Christopher Hatcher was hired as a Hanover County Deputy Sheriff on January 2, 2002. (ECF No. 102-8 ("Hatcher Depo."), at 11:15–12:9.)  Deputy Hatcher was part of the Street Crimes unit[2] from October 2014 until he resigned from the Sheriff's Office in 2022.  (Hatcher

---

[2] Street Crimes is "an undercover unit" whose objective "is to locate fugitives who are elusive and [] difficult to apprehend."  (Hatcher Depo., at 51:4–15.)

Depo., at 24:14–17.) Deputy Hatcher's unit was under the investigative division of the Sheriff's Office. (Hatcher Depo., at 51:4–15.)

While on the Street Crimes unit, Deputy Hatcher testified that he could "never remember a time that I ever would have marked 10-41 on duty . . . on [the] police dispatch [channel]." (Hatcher Depo., at 68:10–15.) Instead, during that time, he communicated on a different channel called Street Crimes Unit 1 by saying "90 back."[3] (Hatcher Depo., at 68:16–69:19.) The Street Crimes Unit 1 (SCU1) channel was not monitored by Dispatch. (Hatcher Depo., at 71:21–25; *see also* ECF No. 100-8 ("Buchanan Depo 2."), at 61:13–23[4].)

Deputy Hatcher testified that from May 15, 2020, to May 31, 2022, he could not recall how many times he actually responded to a call while on the way to work. (Hatcher Depo., at 97:7–12.) He testified that in that time frame, if he responded to a call after having marked "90 back" but before he arrived at work, "it wouldn't have been a situation where I would have been dispatched to a call, it would have been more so me keying up that I was in the area or something that I observed." (Hatcher Depo., at 97:13–23.) However, he did not recall "any specifics or any particular call that resulted in [him] responding[.]" (Hatcher Depo., at 97:24–98:2.)

### b.    Jonathan McGill

Jonathan McGill started with the Sheriff's Office in November 2018 and worked there until October 2022. (ECF No. 102-18 ("McGill Depo."), at 9:23–24; 46:3–5.) Deputy McGill was a part of the patrol division of the Sheriff's Office. (*See* McGill Depo., at 54:2–5.) Deputy

---

[3] Deputy Hatcher testified that his "unit number the entire time [he] was in Street Crimes was 90." (Hatcher Depo., at 69:8–10.)

[4] ECF No. 100-8 is the deposition of Cheryl Flaherty Buchanan, an employee of the Hanover County Public Safety Emergency Communications Department ("Dispatch"), which was attached by the County in support of its Motion for Summary Judgment. (ECF No. 100-8, at 11:3–24.)

McGill was supervised by sergeants. (McGill Depo., at 19:13–18; 20:7–21.) Deputy McGill testified that he could not recall whether there was ever a time that Dispatch dispatched a call to him while he was on his way to roll call. (McGill Depo., at 38:11–14.) Deputy McGill described a situation in which he "ran across a[n] accident" and "stopped for the accident", but clarified that the call regarding the accident was not dispatched to him; rather, he "notified them that [he] was stopping." (McGill Depo., at 36:25–37:11.) Regarding his commute, he testified that it would take him between 10 and 15 minutes to drive from his home to headquarters. (McGill Depo., at 34:10–12.)

### c.    Timothy Sutton

Timothy Sutton started with the Sheriff's Office in July of 1993. (ECF No. 102-10 ("Sutton Depo."), at 8:2–5.) In 1999, he was promoted to sergeant on the evening shift in the patrol division of the Sheriff's Office. (Sutton Depo., at 12:5–22.) Sergeant Sutton remained a sergeant in the patrol division until January 8, 2023, when he left the Sheriff's Office. (Sutton Depo., at 13:9–11; 14:3–4.) As a sergeant, Sergeant Sutton would "supervise patrol deputies[] to ensure that they [were] keeping the county safe and responding to calls." (Sutton Depo., at 12:23–13:8; 16:19–23.)

While Sergeant Sutton would patrol, he would typically not receive calls to service from Dispatch. (Sutton Depo., at 17:3–6; 18:3–6; *see also* Sutton Depo., at 18:21–23 ("Q: But dispatch was not dispatching you to calls for service? A: No.").) He testified that from May 2020 until his retirement, he was never dispatched to a call for service on his way to headquarters. (Sutton Depo., at 34:12–15.) Regarding his commute, Sergeant Sutton testified

that it would take him between 15 and 20 minutes to get from the Hanover County line to headquarters. (Sutton Depo., at 33:15–17.)

### d.    Benjamin Waverly Carroll

Benjamin Waverly Carroll was a deputy with the Sheriff's Office from October 2007 until July 2022. (ECF No. 102-12 ("Carroll Depo."), at 10:5–7; 17:9–10.) Sometime in 2021, Deputy Carroll was assigned to Safe Streets, "a traffic interdiction unit" within "the Special Operations division", which is under the patrol division of the Sheriff's Office. (Carroll Depo., at 15:1–25.) Deputy Carroll was supervised by sergeants. (Carroll Depo., at 16:18–24.) Deputy Carroll also testified that over the course of his almost 15 years in patrol, he had been dispatched to a call for service during the time in which he traveled from his residence to roll call, although he could not recall when or how many times. (Carroll Depo., at 27:4–23.) He testified that he would mark 10-41 on his way to work once he crossed the Hanover County line. (Carroll Depo., at 24:1–5.) Regarding his commute, Deputy Carroll testified that it took him approximately 25 minutes to travel from the Hanover County line to headquarters. (Carroll Depo., at 21:3–6.)

### e.    Christopher Ryan Payne

Christopher Ryan Payne was a deputy with the Sheriff's Office from 2015 until December 2021. (ECF No. 102-14 ("Payne Depo."), at 25:21–23; 27:16–25.) From 2016 until December 2021, he was on the Safe Streets Unit. (Payne Depo., at 25:21; 27:16–25.) Deputy Payne testified that while members of the Safe Streets Unit "were normally exempt from getting . . . dispatched to a call", he would "sometimes" be dispatched to calls on his way to work "based on the proximity of where [his] vehicle was located." (Payne Depo., at 58:10–19.) He testified, "[i]f I was the closest unit, they would ask, normally via the radio or an MDT message, if we were able to go there and either handle the call or assist." (Payne Depo., at 58:19–22.)

Regarding his commute, Deputy Payne testified that it took him between 15 and 20 minutes to travel from his home to headquarters. (Payne Depo., at 25:3–17.)

    **f.**    **Lowell W. Lantz**

Lowell W. Lantz started with the Hanover Sheriff's Office in 1999. (ECF No. 102-16 ("Lantz Depo."), at 9:18–20.) In February 2020, he was "promoted to the rank of sergeant and assigned to day shift", a position in which he remained until August 2022. (Lantz Depo., at 18:11–16.) From August 2022 until May 2023, Sergeant Lantz was a sergeant in the youth services division. (Lantz Depo., at 18:17–21.) As a sergeant, he was in charge of all the deputies on shift, with a subset of deputies for whom he conducted evaluations. (Lantz Depo., at 35:23–36:13.)

When asked if he was ever dispatched to a call for service prior to the start of his shift between February 2020 and August 2022 as a sergeant in the patrol division, Sergeant Lantz stated, "I can't say that it happened on day shift, but I know it's happened in my career[.]" (Lantz Depo., at 39:11–21.) In those instances, Dispatch "didn't have a unit to send" but "knew [he] was there because . . . [he had] marked 10-41" and "called to dispatch [him.]" (Lantz Depo., at 39:15–21.) Regarding his commute, he testified it would take him "no more than 15 minutes" to travel from his home to headquarters. (Lantz Depo., at 30:5–7.)

    **B.**    **Procedural Background**

On May 15, 2023, Christopher Hatcher, individually and on behalf of all others similarly situated, filed a Class and Collective Action Complaint against the County and Hanover County

Sheriff David R. Hines (the "Sheriff"). (ECF No. 1.) The Complaint alleged four causes of action against both Defendants:

**Count I:**    Fair Labor Standards Act ("FLSA") Claim

**Count II:**   Virginia Wage Payment Act ("VWPA") Claim

**Count III:**  Virginia Gap Pay Act ("VGPA") Claim

**Count IV:**   Virginia Overtime Wage Act ("VOWA (2021)") Claim[5]

(ECF No. 1, at 15–21.)

On July 17, 2023, the Sheriff filed a Motion to Dismiss pursuant to Federal Rule 12(b)(1), (ECF No. 15), and the County filed a Motion to Dismiss pursuant to Federal Rule 12(b)(6), (ECF No. 20). On August 21, 2023, the Court granted the parties' Consent Motion to Dismiss Count II of Plaintiffs' Complaint. (ECF No. 31.) On March 18, 2024, the Court granted the Sheriff's 12(b)(1) Motion, (ECF No. 15), terminating him as a defendant, and denied the County's Rule 12(b)(6) Motion, (ECF No. 20). (ECF No. 55.) On March 29, 2024, the County filed an Answer. (ECF No. 56.)

On December 18, 2023, Plaintiffs filed a Motion for Class Certification Pursuant to Federal Rule 23 and FLSA Conditional Certification, (ECF No. 44), which the Court granted after holding a hearing, (ECF No. 67). The Court conditionally certified the collective action for Count I pursuant to 29 U.S.C. § 216(b) and certified Plaintiffs' proposed class action for Counts III and IV pursuant to Federal Rule of Civil Procedure 23. (ECF No. 67, at 1.) The Court

---

[5] Plaintiffs bring their claims under the 2021 version of the VOWA. (*See* ECF No. 1 ¶¶ 32, 61, 118.)

determined that the classes of employees for both the class action and the collection action would comprise:

> All current and former Hanover County Sheriff's Deputies employed by [the] Defendant[] at the rank of Lieutenant or below in patrol, investigations, or similar unit, who were issued take-home patrol cars and were required to "mark-on duty" prior to the start of their scheduled shift(s), during any time within the liability period since May 15, 2020.

(ECF No. 67, at 1.)

On October 22, 2024, the Court entered an Initial Pretrial Order, scheduling trial to commence on May 12, 2025.  (ECF No. 87, at 1.)  On February 18, 2025, Plaintiffs filed a Motion for Leave to File First Amended Complaint to Add a Second Class Representative, which the County opposed.  (ECF Nos. 93, 97.)

On March 13, 2025, the County filed a Motion for Summary Judgment, (ECF No. 99), and a Motion to Decertify, (ECF No. 101).  On the same day, Plaintiffs filed a Motion for Partial Summary Judgment.[6]  (ECF No. 103.)  On September 30, 2025, the Court granted in part and

---

[6] Plaintiffs moved for partial summary judgment "as to liability to establish that": (1) "the County is its employer, or at least one of their joint employers"; and (2) "that Class members were required to mark on duty, necessarily completing duties that form the principal activities for which they were employed to do but were not paid for the time between marking on duty and the beginning of their scheduled shift."  (ECF No. 104, at 1.)  The County moved for summary judgment on the same two issues, asking the Court to find that:  (1) "the County is not a joint employer of the Sheriff's deputies"; and (2) "the time spent commuting to work is not compensable."  (ECF No. 100, at 1.)

denied in part Plaintiffs' Motion for Partial Summary Judgment and denied Defendant's Motion

for Summary Judgment. (ECF No. 123.)

For the reasons articulated below, the Court will grant the County's Motion for

Decertification. (ECF No. 101.)

## II. Standard of Review

### A. Decertification of a Conditionally-Certified Collective Action Under the FLSA

"Pursuant to Section 216(b) of the FLSA, an action may be maintained against an

employer in federal court 'by any one or more employees for and on behalf of himself or

themselves and other employees similarly situated.'" *LaFleur v. Dollar Tree Stores, Inc.*, 30 F.

Supp. 3d 463, 467 (E.D. Va. 2014) (quoting 29 U.S.C. § 216(b)). "[C]ourts have observed that

the requirements for class certification of a collective action under FLSA are similar, but not

identical, to those that pertain to certification of a class under Fed. R. Civ. P. 23." *Houston v.*

*URS Corp.*, 591 F.Supp.2d 827, 832 (E.D. Va. 2008). In deciding whether to certify a collective

action under the FLSA, courts employ a two-step test:

> First, upon a minimal evidentiary showing that a plaintiff can meet the substantive
> requirements of 29 U.S.C. § 216(b), the plaintiff may proceed with a collective
> action on a provisional basis. Second, following discovery, the court engages in a
> more stringent inquiry to determine whether the plaintiff class is "similarly-
> situated" in accordance with the requirements of § 216, and renders a final decision
> regarding the propriety of proceeding as a collective action.

*Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D. Md. 2007) (internal

citation omitted). "The second phase of collective action certification under the FLSA is

often prompted by a defendant's filing of a motion to decertify, and the court undertakes

a more 'stringent' factual determination as to whether members of the collective class

are, in fact, similarly situated." *LaFleur*, 30 F. Supp. 3d at 467–68 (citing *Romero v. Mountaire Farms, Inc.*, 796 F. Supp. 2d 700, 705 (E.D.N.C. 2011)).

"As a general rule, FLSA class certification under Section 216(b) requires (1) that the plaintiffs are 'similarly situated,' and (2) that the plaintiffs included in the class 'opt-in' by filing with the court consents to join the suit." *Houston*, 591 F.Supp.2d at 831. "The FLSA does not define the term[] 'similarly situated' and the Fourth Circuit has not announced a test to determine whether individuals are 'similarly situated' for purposes of collective action membership." *O'Brien v. Smoothstack, Inc.*, No. 1:23cv491 (RDA), 2024 WL 1356674, at *7 (E.D. Va. Mar. 28, 2024); *see also Houston*, 591 F. Supp. 2d at 831. However, "[i]n considering a motion to decertify alleging dissimilarity of the conditionally certified class, district courts have typically applied three factors to aid in this determination: (1) the disparate factual and employment settings of the individual plaintiffs; (2) defenses which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *LaFleur*, 30 F. Supp. 3d at 468 (cleaned up).[7]

"Plaintiffs bear the burden of showing by a preponderance of the evidence that their claims are 'similarly situated.'" *Id.* "'[I]f the court determines that the plaintiffs are

---

[7] Some courts alternatively employ the United States Court of Appeals for the Second Circuit's "more lenient *Chipotle* test", under which "named plaintiffs and opt-in plaintiffs are similarly situated if they are alike with regard to some material aspect of their litigation." *Abe v. Va. Dep't of Env't Quality*, No. 3:20cv270 (JAG), 2021 WL 1845324, at *4 (E.D. Va. April 6, 2021) (internal quotation marks omitted) (citing *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 517 (2d Cir. 2020). Under this approach, "if named plaintiffs and party plaintiffs share legal or factual similarities material to the disposition of their claims, dissimilarities in other respects should not defeat collective treatment." *Scott*, 954 F.3d at 516 (internal quotation marks omitted). The *Chipotle* test "mirrors the standard applied" in *LaFleur*. *Abe*, 2021 WL 1845324, at *4 n.8. The Court applies the *Houston* test above but observes that the outcome would likely not differ under *Chipotle*. *See infra* Note 11.

in fact, not 'similarly situated[,]' the class is decertified and the original plaintiffs proceed on their individual claims." *Id.* (quoting *Houston*, 591 F. Supp. 2d at 832).

### B.   Decertification of a Class Action

Federal Rule of Civil Procedure 23(c)(1)(C) "explicitly authorizes a court to alter or amend a certification order at any time before final judgment." *Milbourne v. JRK Residential Am., LLC*, No. 3:12cv861 (REP), 2016 WL 1071571, at *3 (E.D. Va. Mar. 15, 2016) (citing Fed. R. Civ. P. 23(c)(1)(C)). "If it becomes apparent after the certification of the class that individualized issues predominate or class treatment 'render[s] the case unmanageable,' the court has a 'responsibility to decertify the class.'" *Id.* (quoting *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 433 (4th Cir. 2003)). "Importantly, however, 'if after the class has been certified and its claims heard and the representatives are found to be inadequate from some reason during the course of the class claims . . . the appropriate step is appointment of new representatives from the existing class, not decertification.'" *Milbourne*, 2016 WL 1071571, at *3 (quoting *Carpenter v. Stephen F. Austin State Univ.*, 706 F.2d 608, 617–18 (5th Cir. 1983) (internal citation omitted)).

The plaintiff bears the burden of proving all requirements of Rule 23. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001). First, the proposed class must satisfy the four requirements of Federal Rule of Civil Procedure 23(a).[8] Those requirements are that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the class representative's claims or defenses are typical of those of the class; and, (4) the class representative will fairly and adequately represent the interests of

---

[8] Rule 23(a) lists four requirements that a class representative must meet in order to sue on behalf of a class. Fed. R. Civ. P. 23(a).

the class. Fed. R. Civ. P. 23(a); *see Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998).

Second, the proposed class must align with at least one of the types of class actions delineated in Federal Rule of Civil Procedure 23(b)[9] and meet the corresponding prerequisites for certification. Here, Plaintiffs moved for certification under Rule 23(b)(3). (ECF No. 45, at 16.) A court may certify a class under Rule 23(b)(3) when the Court finds that: (1) questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and, (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

"In addition to the requirements of Rule 23(a), Rule 23(c) states that '[a]n order that certifies a class action must define the class and class claims, issues, or defenses.'" *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 196 (E.D. Va. 2015) (quoting Fed. R. Civ. P. 23(c)(1)(B)). Indeed, "the definition of the class is an essential prerequisite to maintaining a class action." *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir. 1976). The United States Court of Appeals for the Fourth Circuit "ha[s] repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (E.D. Va. 2014) (internal quotations omitted). To certify a class under Rule 23, the "court must be able to readily identify the class members in reference to objective criteria. Although the plaintiff need not be able to identify every class member at the time of certification, the plaintiff must demonstrate that class members will be

---

[9] Rule 23(b) outlines three types of class actions, including that proposed here: one involving "questions of law or fact common to class members [that] predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

identifiable without extensive and individualized fact-finding or mini-trials." *Souter*, 307

F.R.D. at 196 (internal quotation marks and citations omitted).

As the Fourth Circuit has explained, courts need not "accept plaintiffs' pleadings when

assessing whether a class should be certified." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356,

365 (4th Cir. 2004). Rather, "the district court must take a 'close look' at the facts relevant to the

certification question and, if necessary, make specific findings on the propriety of certification."

*Thorn*, 445 F.3d at 319 (quoting *Gariety*, 368 F.3d at 365). "Such findings can be necessary

even if the issues tend to overlap into the merits of the underlying case," but "[t]he likelihood of

the plaintiffs' success on the merits . . . is not relevant to the issue of whether certification is

proper." *Id.* (internal citations omitted).

The United States Supreme Court elaborated when describing a district court's ability to

make factual determinations at the class certification stage in *Wal-Mart Stores, Inc. v. Dukes*,

541 U.S. 338 (2011). In *Dukes*, the Supreme Court explained:

> Rule 23 does not set forth a mere pleading standard. A party seeking class
> certification must affirmatively demonstrate his [or her] compliance with the
> Rule—that is, he [or she] must be prepared to prove that there are in fact sufficiently
> numerous parties, common questions of law or fact, *etc.* We recognized in *Falcon*
> that "sometimes it may be necessary for the court to probe behind the pleadings
> before coming to rest on the certification question," and that certification is proper
> only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of
> Rule 23(a) have been satisfied."

541 U.S. at 350 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982)).

"Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's

underlying claim. That cannot be helped."[10] *Id.* at 351.

---

[10] After *Dukes*, in *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S.
455 (2013), and *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Supreme Court expounded
upon the extent to which a court may address merits issues at the class certification stage. In
*Amgen*, the Court explained that, "[a]lthough we have cautioned that a court's class-certification
analysis must be rigorous and may entail some overlap with the merits of the plaintiff's

## III. Analysis

### A.    The Court Will Decertify the Conditionally-Certified Collective Action

On July 10, 2024, the Court certified a collective action with the following class

definition:

> All current and former Hanover County Sheriff's Deputies employed by [the]
> Defendant[] at the rank of Lieutenant or below in patrol, investigations, or similar
> unit, who were issued take-home patrol cars and were required to "mark-on duty"
> prior to the start of their scheduled shift(s), during any time within the liability
> period since May 15, 2020.

(ECF No. 67, at 1.)  The County now asks this Court to decertify the collective action.  (ECF No.

101.)

The County contends that the collective action should be decertified because "Hatcher—

the lead plaintiff—is not similarly situated to the collective members and the collective members

are not similarly situated to each other."  (ECF No. 102, at 11.)  "In considering a motion to

decertify alleging dissimilarity of the conditionally certified class, district courts have typically

applied three factors to aid in this determination:  (1) the disparate factual and employment

settings of the individual plaintiffs; (2) defenses which appear to be individual to each plaintiff;

and (3) fairness and procedural considerations."  *LaFleur*, 30 F. Supp. 3d at 468.  "Plaintiffs bear

the burden of showing by a preponderance of the evidence that their claims are 'similarly

---

underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at
the certification stage."  568 U.S. at 466.  The *Amgen* Court continued:  "[m]erits questions may
be considered to the extent—but only to the extent—that they are relevant to determining
whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* (internal citations
omitted).  In *Comcast*, the Supreme Court added that the "rigorous analysis" required for class
certification also reaches damages and causation.  569 U.S. at 35–38.

situated.'" *Id.* Based on the first and third factors, the Court concludes that the members of the collective action are not similarly situated to each other.[11]

### 1. The Disparate Factual and Employment Settings of the Individual Plaintiffs Favor Decertification

"The first factor to be considered requires both an analysis of plaintiffs' job duties, geographic location, supervision, and salary as well as plaintiffs' evidence of [an employer's] policy that violates the FLSA." *LaFleur*, 30 F. Supp. 3d at 469. While "[i]nsubstantial differences in job duties . . . are not significant to the 'similarly situated' determination," *id.* at 468, "[t]here must be sufficient reason to believe that there are issues common to the proposed class that are central to the disposition of the FLSA claims and that such common issues can be substantially adjudicated without consideration of facts unique or particularized as to each class member."[12] *Houston*, 591 F. Supp. 2d at 832.

There are five members of the conditionally-certified collective action in addition to Christopher Hatcher: Jonathan McGill, Timothy Sutton, Christopher Ryan Payne, B. Waverly Carroll, and Lowell Lantz.[13] (ECF Nos. 5, 78, 79, 80, 82.) Significant differences exist in the

---

[11] The Court would reach the same conclusion under the *Chipotle* approach because, for the reasons articulated below, Plaintiffs do not "share legal or factual similarities material to the disposition of their claim." *Scott*, 954 F.3d at 516.

[12] The County first contends that "the County did not and does not maintain a 'common policy or plan' that violated the members' rights under the FLSA" because "the County was not Plaintiffs' employer." (ECF No. 102, at 11.) This argument is foreclosed by this Court's September 30, 2025 Memorandum Opinion granting Plaintiffs' Partial Motion Summary Judgment and concluding that the County is Plaintiffs' joint employer. (ECF No. 122, at 18–26; ECF No. 123.) Thus, the Court rejects this basis for the County's request that the collective action be decertified. (*See* ECF No. 102, at 11.)

[13] Matthew Dodge, Steve DiLoreto, and Jacob Richardson also originally opted in by filing their respective Notices of Filing Consent to Join. (ECF Nos. 40, 41, 81.) On January 10, 2025, Mr. Richardson withdrew his consent to opt-in. (ECF No. 89.) On January 29, 2025, Mr. DiLoreto withdrew his consent to opt-in. (ECF No. 90.) On February 4, 2025, Mr. Dodge

16

remaining plaintiffs' job duties and supervision that are central to the disposition of the FLSA claim and would require "consideration of facts unique or particularized as to each class member." *See Houston*, 591 F. Supp. 2d at 832.

Sergeants Sutton and Lantz were both sergeants in the patrol division of the Sheriff's Office who were responsible for supervising patrol deputies. (Sutton Depo., at 12:5–13:11; 16:19–23; Lantz Depo., at 18:11–21; 35:10–36:13.) As a sergeant, Sergeant Sutton would "supervise patrol deputies to ensure that they [were] keeping the county safe and responding to calls." (Sutton Depo., at 12:23–13:8; 16:19–23.) While on patrol, he "would typically not be dispatched to [calls for service]." (Sutton Depo., at 17:3–6; 18:3–6; *see also* Sutton Depo., at 18:21–23 ("Q: But dispatch was not dispatching you to calls for service? A: No.").) He testified that from May 2020 until his retirement, he was never dispatched to a call for service on his way to headquarters. (Sutton Depo., at 34:12–15.)

Like Sergeant Sutton, Sergeant Lantz was in the patrol division. (Lantz Depo., at 18:11–21; 35:10–15.) As a sergeant, he was in charge of all the deputies on shift, including a subset of deputies for whom he conducted evaluations. (Lantz Depo., at 35:23–36:13.) However, unlike Sergeant Sutton, when asked if he was ever dispatched to a call for service prior to the start of his shift between February 2020 and August 2022 as a sergeant in the patrol division, Sergeant Lantz stated, "I can't say that it happened on day shift, but I know it's happened in my career[.]" (Lantz Depo., at 39:11–21.) In those instances, Dispatch "didn't have a unit to send" but "knew

---

withdrew his consent to opt-in. (ECF No. 91.) At the County's request, the Court dismisses those parties without prejudice. (ECF No. 123.)

[he] was there because . . . [he had] marked 10-41" and "called to dispatch [him.]"  (Lantz Depo., at 39:15–21.)

Deputy McGill was a deputy in the patrol division.  Deputy McGill was supervised by sergeants.  (McGill Depo., at 19:13–18; 20:7–21.)  Deputy McGill testified that he could not recall whether there was ever a time that Dispatch dispatched a call to him while he was on his way to roll call.  (McGill Depo., at 38:11–14.)  Deputy McGill described a situation in which he "ran across a[n] accident" and "stopped for the accident", but clarified that the call regarding the accident was not dispatched to him; rather, he "notified them that [he] was stopping."  (McGill Depo., at 36:25–37:11.)

In contrast to Sergeants Sutton and Lantz and Deputy McGill, Deputy Carroll was a deputy "assigned to Safe Streets" in 2021, which is a unit under the patrol division.  (Carroll Depo., at 15:1–25.)  Deputy Carroll was supervised by sergeants.  (Carroll Depo., at 16:18–24.)  Deputy Carroll also testified that over the course of his almost 15 years in patrol, he had been dispatched to a call for service during the time in which he traveled from his residence to roll call, although he could not recall when or how many times.  (Carroll Depo., at 27:4–23.)  He testified that he would mark 10-41 on his way to work once he crossed the Hanover County line.  (Carroll Depo., at 24:1–5.)

Like Deputy Caroll, Deputy Payne was a deputy on the Safe Streets Unit from 2016 until 2021.  (Payne Depo., at 25:18–21; 27:16–25.)  Deputy Payne testified that while members of the Safe Streets Unit "were normally exempt from getting . . . dispatched to a call", he would "sometimes" be dispatched to calls on his way to work "based on the proximity of where [his] vehicle was located."  (Payne Depo., at 58:10–19.)  He testified, "[i]f [he] was the closest unit,

they would ask, normally via the radio or an MDT message, if [he] [was] able to go there and either handle the call or assist." (Payne Depo., at 58:19–22.)

Deputy Hatcher—the lead Plaintiff—was part of the Street Crimes unit from October 2014 until he resigned from the Sheriff's Office in 2022. (Hatcher Depo., at 24:14–17.) Unlike the other five collective action members, who were in the patrol division of the Sheriff's Office or its Safe Streets unit, Deputy Hatcher's unit was under the investigative division of the Sheriff's Office. (Hatcher Depo., at 51:4–15.) During his time on the Street Crimes unit, Deputy Hatcher testified that he could "never remember a time that [he] ever would have marked 10-41 on duty . . . on [the] police dispatch [channel]." (Hatcher Depo., at 68:10–15.) Instead, he communicated on a different channel called Street Crimes Unit 1 by saying "90 back." (Hatcher Depo., at 68:16–69:19.) The Street Crimes Unit 1 (SCU1) channel was not monitored by Dispatch. (Hatcher Depo., at 71:21–25; *see also* Buchanan Depo, at 61:13–23.)

Deputy Hatcher testified that from May 15, 2020, to May 31, 2022, he could not recall how many times he actually responded to a call while on the way to work. (Hatcher Depo., at 97:7–12.) He testified that in that time frame, if he responded to a call after having marked "90 back" but before he arrived at work, "it wouldn't have been a situation where [he] would have been dispatched to a call, it would have been more so [him] keying up that [he] was in the area or something that [he] observed." (Hatcher Depo., at 97:13–23.) However, he did not recall "any specifics or any particular call that resulted in [him] responding[.]" (Hatcher Depo., at 97:24–98:2.)

The Court concludes that common issues central to Plaintiffs' FLSA claim cannot be "substantially adjudicated without consideration of facts unique or particularized as to each class member." *Houston*, 591 F. Supp. 2d at 832. In conditionally certifying the collective action, the

Court found that Plaintiffs had made the "modest factual showing" by submitting declarations that "establish[ed] that deputies 'were required to mark on and be on duty prior to the start of their scheduled shift' as part of a 'regular, consistent, and established practice,' and that they did not receive overtime pay for that period of time." (ECF No. 66, at 11); *Hatcher v. Cnty. of Hanover*, No. 3:23cv325 (JAG), 2024 WL 3357839, at *6 (E.D. Va. July 10, 2024). However, Plaintiffs have failed to carry their burden at this stage, where a "stringent" factual showing applies. *LaFleur*, 30 F. Supp. 3d at 467–68.

As set out above, there are significant differences in the collective action members' job duties and whether they responded to calls while "marked on" but before the official start of their shifts. These differences have a direct bearing on Plaintiffs' FLSA claim. For example, as a sergeant, Sergeant Sutton was responsible for supervising patrol deputies and would typically not be dispatched for calls to service. (Sutton Depo., at 17:3–18:6.) But Deputies Payne, McGill and Carroll were all assigned to units in the patrol office and would be dispatched. (Payne Depo., at 25:18–21; 27:16–25; McGill Depo., at 19:13–20:21; Carroll Depo., at 15:1–25.) Furthermore, Deputy Hatcher was not part of the patrol division and was instead assigned to the Street Crimes Unit, which was part of the investigative division. (Hatcher Depo., at 24:14–17.) For his work, Deputy Hatcher communicated on a different channel than the other deputies, which was not monitored by Dispatch. (Hatcher Depo., at 71:21–25.) Plaintiffs worked across different divisions, with different titles, and different responsibilities.

There are also differences between Plaintiffs with respect to responding to calls made by Dispatch on the way to headquarters. Sergeant Sutton and Deputy McGill testified that they could not remember a time when Dispatch sent a call to them while they were on their way to headquarters. (Sutton Depo., at 34:12–15; McGill Depo., at 38:11–14.) By contrast, Sergeant

Lantz and Deputies Carroll and Hatcher testified that they had been dispatched for a call to service prior to the start of a shift, but they could not recall when. (Lantz Depo., at 39:11–21; Carroll Depo., at 27:4–23; Hatcher Depo., at 97:7–23.)

In opposing decertification, Plaintiffs contend that they "were all subject to the same requirement and practice that they mark on duty before their shift but were not paid until their shift started." (ECF No. 116, at 7.) However, in ruling on the parties' cross motions for summary judgment, the Court found that there exists a material dispute of fact regarding whether Plaintiffs "marked on" when they were driving to work, and whether they were *on duty* when they were "marked on." (ECF No. 122, at 28–38; ECF No. 123.) Because these facts are disputed, the Court cannot and does not rely on them in making its decision on decertification.

Based on the differences between the collective members outlined above, the disparate factual and employment settings of Plaintiffs favor decertification. *LaFleur*, 30 F. Supp. 3d at 476.

### 2. Individual Defenses Stemming from Different Factual and Employment Settings Favor Decertification

As to the second consideration when weighing decertification, the Court finds that the disparate factual and employment factors of each Plaintiff will likely give rise to defenses that will be "individual to each Plaintiff." *LaFleur*, 30 F. Supp. 3d at 463. This factor favors decertification as well.

### 3. Fairness and Procedural Concerns Favor Decertification

Under the third *LaFleur* decertification factor, the Court "must determine whether it can coherently manage the class in a manner that will not prejudice any party." *LaFleur*, 30 F.Supp.3d at 475. Here, the fairness and procedural considerations factor weighs in favor of decertification. The collective action is composed of only six members. As a result, the Court

21

concludes that limited prejudice would inure to Plaintiffs as a result of decertification.  Further,

decertification would not result in "hundreds of mini trials."  *Johnson v. Wave Comm GR LLC*, 4

F. Supp. 3d 453, 462 (N.D.N.Y. 2014).  However, proceeding as a collective action would

prejudice the County, which would be required to defend itself against multiple claims involving

disparate factual issues in one case.  Thus, fairness and procedural considerations favor

decertification.

### B.    The Court Will Decertify the Class Action

On July 10, 2024, the Court certified a class action with the following class definition:

> All current and former Hanover County Sheriff's Deputies employed by [the]
> Defendant[] at the rank of Lieutenant or below in patrol, investigations, or similar
> unit, who were issued take-home patrol cars and were required to "mark-on duty"
> prior to the start of their scheduled shift(s), during any time within the liability
> period since May 15, 2020.

(ECF No. 67, at 1.)[14]  The County now asks this Court to decertify the class action.  (ECF No.

101.)  The standard for certifying a class action under the Federal Rules of Civil Procedure is the

same as the standard for certification of a collection action under the FLSA.  *See Tysons Foods,*

*Inc., v. Bouaphakeo*, 577 U.S. 442, 452 (2016) ("For purposes of this case then, if certification of

respondents' class action under the Federal Rules was proper, certification of the collective

action was proper as well.")

The County advances at least two arguments in support of its Motion for Decertification.

First, the County contends that class certification was inappropriate because "[t]he procedure the

class members complain about is the Sheriff's, not the County's, and the County was not the

employer for any of the class members."  (ECF No. 102, at 16.)  This argument is foreclosed by

---

[14] This definition is identical to that conditionally certified by the Court as to Plaintiffs'
collective action.

this Court's September 30, 2025 Memorandum Opinion granting Plaintiffs' Partial Motion Summary Judgment and concluding that the County is Plaintiffs' joint employer. (ECF No. 122, at 18–26, 38, 41–42; ECF No. 123.)

Second, the County contends that the Court should decertify the class action because the class cannot satisfy the requirements of Rule 23(a) or Rule 23(b)(3). The County's argument prevails. The Court will address each prong of this argument in turn.

### 1.    The Class Meets the Ascertainability Requirement

The Fourth Circuit "ha[s] repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable." *EQT Prod. Co.*, 764 F.3d at 358 (internal quotations omitted). To certify a class under Rule 23, the "court must be able to readily identify the class members in reference to objective criteria. Although the plaintiff need not be able to identify every class member at the time of certification, the plaintiff must demonstrate that class members will be identifiable without extensive and individualized fact-finding or mini-trials." *Soutter*, 307 F.R.D. at 196 (internal quotation marks and citations omitted).

The County contends that the class is not ascertainable for three reasons. First, the County argues that it "was not the class members' employer", which "ends the Rule 23(a) inquiry." (ECF No. 102, at 17.) As discussed previously, this argument is foreclosed by this Court's September 30, 2025 Memorandum Opinion granting Plaintiffs' Partial Motion Summary Judgment and concluding that the County is Plaintiffs' joint employer. (ECF No. 122, at 18–26, 38, 41–42; ECF No. 123.) Second, the County states that "the practice at issue was the Sheriff's, not the County's[,] [s]o even if the County was the members' joint employer, the Sheriff's purported policy is not attributable to the County." (ECF No. 102, at 17.) The County cites

23

nothing in support of its bald assertion.  The Court reaches the opposite conclusion—as a joint employer of the Sheriff's Deputies, any requirement to "mark on" is attributable to the County. The Court rejects this argument.

Third, the County contends that there is no ascertainable class because "there is no common practice of marking 10-41 before the start of a shift."  (ECF No. 102, at 17.)  The County argues that "[t]his evidence, coupled with the Sheriff's lack of a policy as to when, or from where, a deputy must mark 10-41 . . . reflects that there is not a ready metric by which to assess claims of the class as a whole."  (ECF No. 102, at 17–18.)  While "the determination of a class certification motion may involve some consideration of the factual and legal issues that comprise the plaintiff's cause of action", "[t]he Court may not consider arguments directly on the merits."  *Chisolm*, 194 F.R.D. at 544 (quoting *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 489 (S.D. Ill. 1999)).  In its September 30, 2025 Memorandum Opinion, this Court concluded that there is a material dispute of fact regarding whether the County requires that Plaintiffs "mark on" before their shifts.  (ECF No. 122, at 29–30.)  Thus, the Court rejects the County's argument, which invites the Court to prematurely decide on the merits whether the Sheriff's deputies were required to "mark on" before their shift.

Because the class definition could allow identification of the class members by objective criteria, the Court concludes that the class meets the ascertainability requirement.

### 2.    Deputy Hatcher's Claims Are Not Typical of Those of the Class

Under Rule 23(a), the class representative's claims or defenses must be typical of those of the class.  Fed. R. Civ. P. 23(a)(3).  "Typicality requires that the claims of the named class representatives be typical of those of the class; 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'"  *Lienhart*, 255

F.3d at 146 (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982)). "'The typicality and commonality requirements of the Federal Rules ensure that only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class.'" *Broussard*, 155 F.3d at 340 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 341 (7th Cir. 1997)). Further, "[r]epresentativeness requires that the class representatives 'will fairly and adequately protect the interests of the class.'" *Lienhart*, 255 F.3d at 146–47 (quoting Fed. R. Civ. P. 23(a)(4)). "The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997).

The County argues that Deputy Hatcher—the sole class representative—"is at odds with the class certified by this Court." (ECF No. 102, at 19.) The County highlights the undisputed fact that "[Mr.] Hatcher did not mark 10-41 on the Police Dispatch Channel before the start of his shift." (ECF No. 102, at 18.) Rather, he testified that he "would mark back on" using a channel called Street Crimes Unit 1 ("SCU1") by saying "90 back." (Hatcher Depo., at 68:16–69:15.) Importantly, it is undisputed that by marking back on to SCU1 by saying "90 back", Deputy Hatcher was not communicating with Dispatch. (ECF No. 117 ¶ 23 ("While assigned to Street Crimes, Hatcher did not mark 10-41 on Police Dispatch Channel. He sometimes stated '90 back' on SCU1, a channel for the Street Crimes Unit that is not monitored by [Dispatch]."); *see also* Hatcher Depo., at 68:10–15 ("I can never remember a time that I ever would have

marked 10-41 on duty or in any way, shape, or form indicative that I was in my car or available did I ever during the time I was on Street Crimes mark on duty on police dispatch.").)[15]

In response, Plaintiffs attempt to minimize the import of the distinction between marking on duty using 10-41 and marking on to SCU by stating "90 back." Plaintiffs contend that Deputy Hatcher's role, which "required he mark on duty using a different code or channel than Deputies in Patrol units . . . makes no difference to the substance of the claim." (ECF No. 116, at 21.) Plaintiffs further contend that "[i]n a specialty unit, like Hatcher's, marking on duty via the radio indicates that a [d]eputy is on duty and can be contacted by unit colleagues regarding law enforcement duties." (ECF No. 116, at 7.) While Plaintiffs correctly point out that "[t]he code 10-41 does not appear in the class definition", (ECF No. 116, at 21), Deputy Hatcher, who did not communicate with Dispatch when marking on to SCU1, cannot "advance the same factual and legal arguments" as those deputies who, by marking on using 10-41, did communicate with Dispatch. *See Broussard*, 155 F.3d at 340.

The Hanover County Public Safety Emergency Communications Center ("Dispatch") "receive[s] and dispatch[es] calls for service" and "maintain[s] effective radio communications to members of the Sheriff's Office", "ensur[ing] that proper information is relayed to those members through the use of local, state, and national computer information systems." (ECF No. 102-5, at 1.) Pursuant to a Communications Agreement between the Sheriff's Office and Dispatch, the Sheriff's Office "is dependent upon [dispatch] to not only receive and dispatch calls for service, but to also maintain effective radio communications to members of the Sheriff's

---

[15] This is at odds with Deputy Hatcher's declaration, in which he averred that he "would mark on duty by handheld or mobile radio on Street Crimes Unit One 'SCU1' (the radio channel specific to street crimes investigators)" and that "[m]arking 'on duty' from our laptop or handheld or mobile radio was an activity that we were required to do to communicate with Hanover County's dispatch system." (ECF No. 45-1 ¶¶ 18, 21.)

Office[.]" (ECF No. 102-5, at 1.)  Contrary to Plaintiffs' assertion, whether a deputy marked on

such that they communicated with Dispatch makes a difference to the substance of Plaintiffs'

claim because it directly bears on whether "marking on" is an activity for which compensation is

required under the VGPA and VOWA.[16]

Because Deputy Hatcher did not communicate with Dispatch when he marked on to the

SCU1 channel by stating "90 back", he is unable to "advance the same factual and legal

arguments" as class members who marked on using 10-41 and thus communicated with

Dispatch. *See Broussard*, 155 F.3d at 340.  Thus, the Court concludes that Deputy Hatcher

cannot "fairly and adequately protect the interests of the class." *Lienhart*, 255 F.3d at 147

(quoting Fed. R. Civ. P. 23(a)(4)).

### 3.  Questions Common to the Class Do Not Predominate Over Other Questions

Under Rule 23(b)(3), the Court may certify a class when questions of law or fact common

to the members of the class predominate over any questions affecting only individual members.[17]

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  The

predominance requirement requires "courts to give careful scrutiny to the relation between

common and individual questions in a case." *Tyson Foods*, 577 U.S. at 453.  "An individual

---

[16] Plaintiffs seemingly acknowledge this elsewhere.  In their Memorandum in Support of their Motion for Partial Summary Judgment, Plaintiffs represent that "[t]his litigation turns on the significance of the Deputy's act of 'marking on duty,' and the fact that it places Deputies into an 'available' status on CAD which is a necessary step to being seen and dispatched by Dispatch." (ECF No. 104, at 24.)

[17] Where "a class action [is] brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over' other questions." *Lienhart*, 255 F.3d at 146 n.4.

question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* (internal quotation marks omitted) (brackets in original).

The significant differences outlined *supra* in Section III.A.1 regarding the collective action members' job duties, whether they "marked on" such that they were available to receive service calls from Dispatch, and whether they responded to calls while "marked on" but before the official start of their shifts, are applicable to the 265 class members and have direct bearing on Plaintiffs' FLSA claim. Thus, the Court concludes that the class fails the predominance requirement because it is insufficiently "cohesive to warrant adjudication by representation."[18] *Amchem*, 521 U.S. at 623.

### C.    Permitting Plaintiffs to Add Sergeant Sutton as a Class Representative Would Not Cure the Deficiencies Identified by the Court

In opposing decertification, Plaintiffs contend that "even if Mr. Hatcher were somehow to be disqualified from representing all [o]fficers (including Patrol and Investigations) and rather could only represent [o]fficers in the Investigations unit, the Amended Complaint would add Mr. Sutton as a class representative", who "was a Patrol Officer who marked on using 10-41." (ECF No. 116, at 21.) Plaintiffs add that "the Court could in its discretion create two subclasses, one for Patrol Officers and an additional subclass for Investigations Officers." (ECF No. 116, at 21.) In support of this argument, Plaintiffs cite case law stating that "Rule 23(c)(4) requires the Court

---

[18] Because the Court concludes that the class fails the predominance requirement, the Court concludes that a class action is not superior to other available methods for the fair and efficient adjudication of the controversy.

to consider employment [of subclasses] where an apparently unmanageable class action could be converted to a manageable one." (ECF No. 116, at 21 (quoting *Chisolm*, 194 F.R.D. at 557–58).

Adding Sergeant Sutton as a class representative would not salvage Plaintiffs' class. As a sergeant, Sergeant Sutton was not dispatched to service calls. (Sutton Depo., at 18:21–23 ("Q: But dispatch was not dispatching you to calls for service? A: No.").) He testified that from May 2020 until his retirement, he was never dispatched to a call for service on his way to headquarters. (Sutton Depo., at 34:12–15.) Thus, he would not adequately represent plaintiffs who marked on using 10-41 before their official shift started and were dispatched to calls for service. Further, even if Sergeant Sutton were added as a class representative, individual differences regarding Plaintiffs' job duties and whether they responded to calls while "marked on" but before the official start of their shifts would still predominate over questions common to the class.

### IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion to Decertify. (ECF No. 101.) The Court will deny as moot Plaintiffs' Motion for Leave to File First Amended Complaint to Add a Second Class Representative. (ECF No. 93.)

An appropriate Order shall issue.

Date: 09/30/25
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge