IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

CHRISTOPHER HATCHER,

    Plaintiff,

        v.                                  Civil Action No. 3:23cv325

THE COUNTY OF HANOVER, VIRGINIA,

    Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant the County of Hanover, Virginia's (the County") Second Motion for Summary Judgment (the "Motion" or "Motion for Summary Judgment"). (ECF No. 153.)[1] Plaintiff Christopher Hatcher ("Deputy Hatcher") responded in opposition, (ECF No. 163), and the County replied, (ECF No. 164).

The matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process. For the reasons articulated below, the Court will grant the Motion and dismiss the case.

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

## I. Factual and Procedural Background

### B.     Factual Background[2]

#### 1.     Deputy Hatcher's Employment with the Sheriff's Office

Deputy Hatcher was employed by the Hanover County Sheriff's Office (the "Sheriff's Office") in Hanover County, Virginia from January 2002 until his resignation on May 31, 2022. (ECF No. 154-4, at 3:7–15, 10:14–18.)  The Sheriff's Office contains four divisions:  the administrative, patrol, investigative, and judicial divisions. (ECF No. 100-1, at 4:9–12.)  Each division is composed of different "units" consisting of specialty teams. (ECF No. 100-1, at 4:13–15.)  Relevant here, the investigative division includes a Street Crimes Unit. (ECF No. 154-4, at 13:3–15.)  Street Crimes is an "undercover unit" designed to "locate fugitives who are elusive and are difficult to apprehend." (ECF No. 154-4, at 13:4–8.)  From 2014 until his resignation in May 2022, Deputy Hatcher served in the Street Crimes Unit. (ECF No. 154-4, at 10:14–18.)

As this Court previously explained, the Sheriff's Office had a "Take Home Vehicle Policy" that allowed deputies living in Hanover County or adjoining jurisdictions to drive their County-issued vehicles to and from work. (ECF No. 122, at 4 (citing 100-4, at 2 (the County's Take Home Vehicle Policy)).)  While working with the Street Crimes Unit, Deputy Hatcher had a County-issued "take-home car" that he drove to and from work. (*See* ECF No. 154-4, at 20:2–

---

[2] In recounting the factual history, the Court sets forth the undisputed facts as articulated in the parties' briefing in their past and present motions for summary judgment and the record submitted to the Court. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

With limited exceptions, the Court confines its recitation of the undisputed facts to those offered in support of the instant Motion for Summary Judgment.  Where necessary, and primarily for background, the Court relies on evidence offered with the parties' first motions for summary judgment.

9.) His "take home car" was unmarked and had regular Virginia license plates. (ECF No. 154-4, at 20:2–13.) The vehicle's lights and sirens were installed on the vehicle's grill and in its taillights and headlights, making them "covert." (ECF No. 154-4, at 20:14–19.) In a similarly covert fashion, Deputy Hatcher did not wear a uniform to work. (ECF No. 154-4, at 21:2–5.) "In a perfect world," Deputy Hatcher explained during a deposition, the general public would not know that he worked for law enforcement when driving his Sheriff's Office vehicle. (ECF No. 154-4, at 20:23–21:1.)

### 2.    "Marking On"

Deputies in the patrol divisions would inform Dispatch[3] that they were available to respond to incidents by "marking on duty" with Dispatch. (*See* ECF No. 154-5, at 2:1–3:23.) Deputies could "mark on duty" using a variety of methods, including via telephone or through a mobile data terminal in their vehicles, and by stating "10-41" over the radio. (ECF No. 154-5, at 3:4–4:7.) Dispatch uses a Computer-Aided Dispatch software system ("CAD") to "process calls for service, incidents, and identify who to dispatch to calls for service." (ECF No. 154-3, at 2:15–22.)[4]

Because Deputy Hatcher was a member of the Street Crimes Unit within the investigation

---

[3] The Hanover County Public Safety Emergency Communications Center ("Dispatch") is a department of the County that is "responsible for taking and dispatching . . . law enforcement related calls for service." (ECF No. 104-12, at 1.)

[4] As this Court previously explained, Dispatch is responsible for sending deputies to respond to calls for service. Once a deputy "marked on," he or she would appear as "available" in the CAD software system. (ECF No. 122, at 5.) "Dispatch can view the deputy's location using their vehicle's mobile data terminal." (ECF No. 122, at 5 (citing ECF No. 100-8, at 5:21–24, 6:10–25 *and* ECF No. 117 ¶ 15).) When Dispatch receives a call for service, the CAD system automatically generates a recommendation of who to dispatch 'based on zone and beat assignment and/or [automated vehicle location],' but Dispatch may override CAD's suggestion.'" (ECF No. 122, at 5 (citing ECF No. 104-8, at 33:8–15 *and* ECF No. 115 ¶ 33).)

division during the relevant time period, he did not "mark on" with Dispatch. Instead, Deputy Hatcher "marked on" to Street Crimes Unit 1 ("SCU1") by stating his unit number—90—paired with "back": "90 back." (ECF No. 154-4, at 16:16–17:19.) And although he "marked on" to SCU1, not Dispatch, he "monitor[ed]" the Dispatch frequency so he could "hear what's going on in the [C]ounty." (ECF No. 154-4, at 17:8–15.)

Deputy Hatcher could not recall a single instance when he responded to a call after marking "90 back." (ECF No. 154-4, at 23:7–25.) Nor did he recall a situation where he "key[ed] up" over Dispatch.[5] (ECF No. 154-4, at 24:3–13.) He also testified that if he took a call, it would not have been "a situation where [he] would have been dispatched to a call" but would rather involve him "keying up" that he was in the area or "something [he] observed." (ECF No. 154-4, at 23:19–23.)

## B.    Procedural Background

On May 15, 2023, Deputy Hatcher, individually and on behalf of all others similarly situated, filed a Class and Collective Action Complaint against the County and Hanover County Sheriff David R. Hines (the "Sheriff"). (ECF No. 1.) The Complaint asserted four causes of action against both Defendants, alleging violations of: (1) the Fair Labor Standards Act ("FLSA") (Count I); (2) the Virginia Wage Payment Act ("VWPA") (Count II); (3) the Virginia Gap Pay Act ("VGPA") (Count III); and the Virginia Overtime Wage Act of 2021 ("VOWA (2021)"). (ECF No. 1, at 15–21.)

On July 17, 2023, the Sheriff filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). (ECF No. 15.) On July 27, 2023, the County filed a Motion to Dismiss

---

[5] Deputy Hatcher explained in his deposition that he did not "key up" with Dispatch, but he did not define what "keying up" meant or entailed.

pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 20.) On July 31, 2023, the parties filed a consent Motion to Dismiss plaintiffs' claims under the VWPA in Count II, (ECF No. 22), which the Court granted on August 21, 2023, (ECF No. 31). On March 18, 2024, the Court granted the Sheriff's Rule 12(b)(1) Motion, terminating him as a Defendant. The Court also denied the County's Rule 12(b)(6) Motion. (ECF Nos. 54, 55.) Following the Court's decisions on the Motions to Dismiss, only the FLSA (Count I), VGPA (Count III), and VOWA (2021) (Count IV) claims remained, and each only as to the County. On March 29, 2024, the County filed an Answer. (ECF No. 56.)

On December 18, 2023, plaintiffs filed a Motion for Class Certification Pursuant to Federal Rule 23 and FLSA Conditional Certification, (ECF No. 44), which the Court granted after holding a hearing, (ECF No. 67). The Court conditionally certified the collective action under the FLSA in Count I pursuant to 29 U.S.C. § 216(b) and certified plaintiffs' proposed class action concerning the VOWA (2021) and the VPGA in Counts III and IV, respectively, pursuant to Federal Rule of Civil Procedure 23. (ECF No. 67, at 1.) The Court determined that the classes of employees for both the class action and the collective action would comprise:

> All current and former Hanover County Sheriff's Deputies employed by [the] Defendant[] at the rank of Lieutenant or below in patrol, investigations, or similar unit, who were issued take-home patrol cars and were required to "mark-on duty" prior to the start of their scheduled shift(s), during any time within the liability period since May 15, 2020.

(ECF No. 67, at 1.)

On October 22, 2024, the Court entered an Initial Pretrial Order, scheduling trial to commence on May 12, 2025. (ECF No. 87, at 1.) On February 18, 2025, plaintiffs filed a Motion for Leave to File First Amended Complaint to Add a Second Class Representative, which the County opposed. (ECF Nos. 93, 97.)

On March 13, 2025, the County filed a Motion for Summary Judgment, (ECF No. 99), and a Motion to Decertify, (ECF No. 101). Also on March 13, 2025, plaintiffs filed a Motion for Partial Summary Judgment. (ECF No. 103.) On September 30, 2025, the Court granted in part and denied in part plaintiffs' Motion for Partial Summary Judgment and denied in its entirety the County's Motion for Summary Judgment. (ECF Nos. 122, 123.) The same day, the Court granted the County's Motion to Decertify and decertified the collective and class actions. (ECF Nos. 125, 126.) As a result, Deputy Hatcher remains the only Plaintiff in this action. The Court additionally denied as moot plaintiffs' Motion for Leave to File First Amended Complaint. (ECF Nos. 125, 126.)

On December 9, 2025, Deputy Hatcher again filed a Motion for Leave to File Amended Complaint (the "Motion for Leave"), this time seeking to join as named plaintiffs the former plaintiffs who were members of the previously-certified class and collective actions, (ECF No. 136), which the County opposed, (ECF No. 140). On February 5, 2026, the Court denied the Motion for Leave, clarifying that, following decertification of the class and collective actions, Deputy Hatcher remains the sole Plaintiff in this action. (ECF No. 146.) The Court scheduled trial to begin on June 12, 2026. (ECF Nos. 148, 149.)

On March 25, 2026, Deputy Hatcher voluntarily dismissed his claim under VOWA (2021) (Count IV), which this Court approved. (ECF Nos. 151, 152.)

On April 16, 2026, the County filed the instant (and second) Motion for Summary Judgment. (ECF No. 153.) Deputy Hatcher responded in opposition, (ECF No. 163), and the County replied, (ECF No. 164). On April 27, 2026, Deputy Hatcher moved to continue the June 12, 2026 trial pending the Court's consideration of the Motion for Summary Judgment, (ECF No. 160), which the Court granted, (ECF No. 162). Trial in this case is scheduled to begin

August 19, 2026. (ECF No. 165.)

Two Counts remain before the Court on summary judgment, each brought by Deputy Hatcher in his individual capacity, against the County:

**Count I:**    Fair Labor Standards Act ("FLSA") Claim

**Count III:**    Virginia Gap Pay Act ("VGPA") Claim

(ECF No. 1 ¶¶ 84–93, 98–110.)

## II.  Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56[6] is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but instead must set forth specific facts, illustrating genuine issues for trial. *Celotex Corp.*, 477 U.S. at 322–24.  "A genuine issue of material fact exists only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021) (quotation omitted).  "'The mere

---

[6] Rule 56(a) provides:

(a) Motion for Summary Judgment or Partial Summary Judgment.  A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.'" *Id.* (quoting *Anderson*, 477 U.S. at 247–48) (emphasis in original).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of [its] evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). However, "'there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the *onus* of proof is imposed.'" *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)).

At this stage, the Court is tasked with assessing whether a plaintiff "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). "Because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [a court] must determine whether the evidence in [a] case presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal quotation marks and brackets omitted).

8

### III. Analysis

This case is in an unusual posture.  Over three years ago, Deputy Hatcher filed this case as a class and collective action under the FLSA and several Virginia state laws.  The Court conditionally certified the class and collective actions, and the case proceeded to discovery.  Following discovery, the County moved to decertify the class and collective actions.  The County also moved for summary judgment, and Deputy Hatcher moved for partial summary judgment.

In deciding the motion for decertification and the motions for summary judgment, the Court found that the evidence, *on a class-wide basis*, illustrated genuine disputes of material fact best suited for trial.  But the Court also found that Deputy Hatcher's *individual* claims were sufficiently factually distinct from those of the class and collective plaintiffs that decertification was necessary.  The Court therefore granted the County's motion for decertification, denied the County's motion for summary judgment, granted in part Deputy Hatcher's motion for summary judgment, and set the matter for trial.

The County now argues, for the first time, that Deputy Hatcher lacks standing under Article III of the United States Constitution to pursue his claims.  In so arguing, the County contends that this action is "premised entirely" on a purported policy requiring deputies to "mark on duty" with a particular channel—Dispatch—before their shifts began.  (ECF No. 154, at 9.) Because Deputy Hatcher did not mark on with *Dispatch*, but rather with SCU1, the County contends he was not "injured by any purported policy" of the County.  (ECF No. 154, at 8–10.) The County also argues that, in light of the decertification of the class and collective actions, no genuine disputes of material fact exist with respect to Deputy Hatcher's *individual* claims.  (ECF No. 154, at 15.)  Deputy Hatcher opposes both arguments, contending that he has standing to

pursue his claims and that genuine disputes of material fact preclude summary judgment for the County. (ECF No. 163, at 7–14.)

For the reasons articulated below, the Court finds that Deputy Hatcher has standing to pursue his claims under the FLSA and the VGPA. However, the Court concludes that no genuine material disputes of fact remain as to Deputy Hatcher's claims, and that the County is entitled to summary judgment as a matter of law. The Court will grant the Motion for Summary Judgment on this basis and dismiss Deputy Hatcher's claims against the County. (ECF No. 153.)

### A. Deputy Hatcher Has Established Genuine Disputes of Material Fact with Respect to his Article III Standing to Pursue his Claims Under the FLSA and the VGPA, Meaning he has Established his Standing to Sue at this Stage

The County first argues that it is entitled to summary judgment on Deputy Hatcher's claims because Deputy Hatcher was not injured by the relevant "marking on" policy. According to the County, Deputy Hatcher never "marked on duty" with *Dispatch* while he was employed with the Street Crimes Unit, meaning that he was not injured by the County's policy requiring deputies to "mark on" with *Dispatch* ahead of their shifts. (ECF No. 154, at 7–10.) Deputy Hatcher concedes that he did not "mark on duty" with *Dispatch*, but he contends that he "marked on duty" with *SCU1* before his shift began, and that because he was not compensated for the time he spent "marked on" with *SCU1* before his shift began, he has standing to pursue his claims. (ECF No. 163, at 7–9.) While the issue of standing presents a close call, the Court concludes that the County construes the alleged "marking on" policy too narrowly in arguing that Deputy Hatcher did not "mark on" because he marked on with SCU1 rather than Dispatch. Viewing the evidence and reasonable inferences therefrom favorably to Deputy Hatcher, the Court concludes that he has established a genuine issue of material fact regarding his standing to

10

pursue his claims under the FLSA and the VGPA such that he has established his standing to sue at the summary judgment stage.

### 1. Legal Standard:  The Three-Part Test Used to Evaluate Article III Standing

Article III, Section 2, clause 1 of the Constitution limits federal court jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1.  As the United States Supreme Court has explained, an "essential and unchanging part of the case-or-controversy requirement" is that a plaintiff must establish Article III standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To establish standing, a plaintiff must show that he or she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant; and[,] (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan*, 504 U.S. at 560–61; *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180–81 (2000)).  "[M]onetary loss is a quintessential injury in fact." *Poppleton Now Cmty. Ass'n, Inc. v. La Cite Dev., LLC*, 175 F.4th 455, 462 (4th Cir. 2026) (quotation omitted).  Indeed, "'monetary harm' constitutes a 'traditional tangible harm' that 'readily qualif[ies]' as a concrete injury under Article III." *Id.* (quoting *TransUnion*, 594 U.S. at 425).

"A plaintiff must demonstrate standing 'with the manner and degree of evidence' required at the relevant 'stage of the litigation.'" *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 295 (4th Cir. 2024) (quoting *Lujan*, 504 U.S. at 561) (internal alterations omitted).  Thus, at the summary judgment stage, a plaintiff "cannot rest on mere allegations but must set forth evidence which, viewed in his [or her] favor, would establish the elements of Article III standing." *Id.*  To survive a summary judgment motion challenging standing, a plaintiff must point to evidence creating a genuine issue of material fact with respect to standing. *Brasko v. First Nat'l Bank of*

11

*Penn.*, 700 F. Supp. 3d 354, 370 (D. Md. 2023) ("Thus, to survive Defendant's motion for summary judgment, Plaintiffs must point to competent evidence creating a genuine issue of material fact about whether they personally were [injured by the Defendant's actions].").

> ### 2.     Deputy Hatcher Has Established a Concrete Injury in Fact, Causation, and Redressability
>
> #### a.     The County Erroneously Construes Deputy Hatcher's Claim as Limited to "Marking On" with Dispatch

The County argues that Deputy Hatcher lacks Article III standing for two reasons: (1) because Deputy Hatcher marked on with SCU1, he was not injured by the County's "purported policy requiring that deputies 'mark on' . . . with *Dispatch*," (ECF No. 154, at 8–10 (emphasis added)), and (2) Deputy Hatcher was not dispatched to respond to an accident or emergency while "marked on" before his shift began, (ECF No. 154, at 9–10). In support, the County identifies several allegations in the Complaint, as well as argument in Deputy Hatcher's briefing on the parties' earlier motions for summary judgment, that define "marking on" as calling or logging in *with Dispatch*. (ECF No. 154, at 8 (citing ECF No. 1 ¶ 26); *see* ECF No. 104, at 24 (Deputy Hatcher's brief in support of partial summary judgment providing that "[t]his litigation turns on the significance of the Deputy's act of 'marking on duty,' and the fact that it places Deputies into an 'available' status on CAD which is a necessary step to being seen and dispatched by Dispatch").)

These citations notwithstanding, the County too narrowly construes Deputy Hatcher's claims. The Complaint includes one allegation that defines "marking on" as "call[ing] in, or log[ging] in from a laptop in the car, to the Sheriff's *dispatch system* to announce him/herself as being on duty." (ECF No. 1 ¶ 26 (emphasis added).) But other allegations in the Complaint describe "marking on" more generally—using language not confined to *Dispatch*—including

12

those specifically discussing the responsibilities of deputies in the investigative division, like Deputy Hatcher. (*See* ECF No. 1 ¶¶ 25 ("Plaintiff and those similarly situated were required by Defendants to 'mark on duty' upon leaving their homes in their Sheriff-issued patrol vehicles prior to the beginning of their shifts."), 27 ("Each Deputy assigned to patrol *or investigations units* are required by the Sheriff to 'mark on duty' from the moment s/he turns on his/her Sheriff-issued patrol car and commences the drive between his/her home and starting location of the Deputy's scheduled work shift.") (emphasis added), 47 ("In the case of investigator Deputies, they must 'mark on duty' from the time they leave their home, even though they do not start to receive compensation until the time they arrive at their 'target location' and their shift begins.").) Indeed, nowhere in the Complaint does Deputy Hatcher *expressly* tie the challenged policy to marking on with *Dispatch*.

Thus, in considering whether Deputy Hatcher has Article III standing to pursue his claims under the FLSA and the VGPA, the Court considers whether Deputy Hatcher has established a dispute of fact with respect to whether he had to mark on *generally*—not whether the County required Deputy Hatcher to mark on with *Dispatch*.

> **b.      Construing Deputy Hatcher's Claims Properly, the Court Concludes that Deputy Hatcher's Alleged Monetary Harm is a Quintessential, Concrete Injury in Fact Supporting his Standing to Sue**

Applying its mistaken construction of Deputy Hatcher's claims, the County asserts that Deputy Hatcher was not injured by the County's policy requiring him to "mark on duty" because he was not required to "mark on" duty *with Dispatch*. (ECF No. 154, at 8–10.) Because that construction of Deputy Hatcher's allegations in the Complaint too narrowly frames the challenged policy, the Court considers whether Deputy Hatcher can show the County required him to mark on *at all*. Viewing the evidence and reasonable inferences therefrom favorably to

Deputy Hatcher, Deputy Hatcher has established a genuine dispute of material fact as to whether the County required him to do so.

Deputy Hatcher testified in a deposition that the Sheriff trained him to "mark on" with SCU1 when he got in his vehicle to drive to work before his shift began. (ECF No. 154-4, at 16:16–17:15.) He indicated the same in sworn interrogatories. (ECF No. 163-1 ¶ 3 ("[Deputy Hatcher] avers that pre-shift work generally occurred each day when he engaged in his first principal work activity of marking on as required."); ECF No. 163-2 ¶ 6 ("Marking on duty from your patrol car, before leaving your home, has been the practice dating back to my employment from 2002 through the end of my employment. It was also the practice of the Street Crimes Unit to mark on when leaving your residence.").)

But as this Court observed in considering the parties' cross motions for summary judgment, other evidence suggests that the County did not have a policy governing when and how deputies were to "mark on." (ECF No. 122, at 29–31.) For instance, Sheriff Hines testified during a deposition he "didn't care" when his deputies marked on, "whether it's on [their] way to work or as [they're] walking in the back door." (ECF No. 100-1, at 16:3:16.) And Deputy Gregory Six explained in a deposition that the Sheriff's Office "require[s] people to mark on the radio for the shift that they are coming to work" but that there are no "specific requirements or policy" that govern how soon before a shift a deputy must "mark on." (ECF No. 100-3, at 3:21–4:2.) While he contended that there is no "policy that [deputies] have to mark on the radio . . . before [their] shift," Deputy Six further testified that it "is a practice that officers mark on the radio prior to their shift." (ECF No. 100-3, at 4:19–22.) "[T]he time period with which that is done varies amongst everyone." (ECF No. 100-3, at 4:23–24.)

This conflicting evidence was sufficient to establish a genuine dispute of material fact as

to whether the County required Deputy Hatcher to "mark on duty" before his shifts in the parties' prior briefing, and it remains sufficient to establish the same here. Deputy Hatcher has thus established through *evidence* (and reasonable inferences therefrom), as he must at this stage, that a dispute of fact exists as to whether he was required to "mark on duty" before the start of his shift. The County does not dispute that Deputy Hatcher was not compensated for the time he spent "marked on" but before his shift began. Accordingly, Deputy Hatcher adequately demonstrates that he spent time "marked on" without compensation—time for which he contends he was owed compensation. That he was not compensated for that time sufficiently establishes the "quintessential" Article III injury: monetary harm.

The County further argues that Deputy Hatcher lacks standing because he was not dispatched to respond to an accident or emergency while "marked on" before his shift began. (ECF No. 154, at 10.) But whether Deputy Hatcher was required to respond to calls while "marked on" is a question on the *merits*, not a question of *standing*. That is, to prevail on his FLSA and VGPA claims, Deputy Hatcher must show that he engaged in compensable activities—such as responding to an accident or emergency—while "marked on" before his shift began. Deputy Hatcher need not show that he was dispatched to a call in order to show that he was *injured* by the County's policy requiring him to mark on before his shift began. While "a merits inquiry into the existence of a right and the standing inquiry into the allegation of an injury-in-fact are often difficult to separate, . . . a plaintiff need not prove the merits of [his or her] case in order to demonstrate that [he or she] has Article III standing." *Pagliara v. Fed. Home Loan Mortgage Corp.*, 203 F. Supp. 3d 678, 684 (E.D. Va. 2016) (quotation omitted); *Partington v. Am. Int'l Specialty Lines Ins. Co.*, 443 F.3d 334, 339 n.4 (4th Cir. 2006) ("A plaintiff does not lack Article III standing simply because he [or she] has failed to state a

15

claim.").[7] Here, requiring Deputy Hatcher to demonstrate that he responded to calls while marked on would require Deputy Hatcher to prove his claim. The Article III standing inquiry does not require that of him.

Despite the County's arguments to the contrary, the evidence and reasonable inferences therefrom demonstrate that Deputy Hatcher has established genuine disputes of material fact as to whether he was injured by the County's "mark on" policy.

### c.    The Remaining Standing Elements Are Satisfied

In addition, and although the County does not argue otherwise, the Court finds that the remaining standing elements are satisfied. With respect to causation, Deputy Hatcher challenges

---

[7] The County also cites *Fernandez v. RentGrow, Inc.* in support of its argument that Deputy Hatcher lacks Article III standing, explaining that only plaintiffs who have been "*concretely harmed* by a defendant's statutory violation may sue" for such a violation in federal court. (ECF No. 154, at 8 (quoting *Fernandez*, 116 F.4th 288, 294–95 (4th Cir. 2024) (quotation omitted).) But *Fernandez* is inapposite because it evaluated whether the plaintiff's claim of reputational harm was sufficiently concrete under Article III. Here, Deputy Hatcher alleges *monetary* harm—an unquestionable concrete injury—not reputational harm.

In *Fernandez*, the plaintiff brought a class action suit under the Fair Credit Reporting Act against RentGrow, a company he alleged produced and sent an erroneous tenant screening report to a landlord from whom he had applied to lease a residence. *Id.* at 292. On summary judgment, RentGrow argued that the plaintiff lacked Article III standing to pursue his claim because the evidence demonstrated that the landlord did not read, and therefore did not rely on, the erroneous information in the screening report in making its leasing decision. Because of that, RentGrow argued, the plaintiff did not suffer a "concrete" injury. *Id.* at 299–300. The Fourth Circuit agreed with RentGrow: because the plaintiff alleged only reputational harm, and because he "failed to demonstrate that the misleading . . . information in his screening report was read and understood, or otherwise considered" by any third party, the plaintiff suffered no "concrete injury in fact flowing from" the alleged statutory violation of the Fair Credit Reporting Act. *Id.* at 300.

Thus, the focus in *Fernandez* was whether the plaintiff asserted a "concrete" injury that passed Article III muster. In contrast, Deputy Hatcher, unlike the plaintiff in *Fernandez*, asserts the "quintessential" Article III injury: monetary harm. *See Fernandez*, 116 F.4th at 295 (explaining that "[t]raditional tangible injuries, like physical harm and monetary harm, are the most obvious" concrete injuries).

a purported *County* policy requiring him to "mark on" without compensation before his shift began. And the Court can redress Deputy Hatcher's injury through an award of damages.

In sum, disputes of fact exist sufficient to demonstrate Deputy Hatcher's Article III standing to pursue his claims. The Court proceeds to consider the merits of the Motion.

> **B.    The Court Will Grant Summary Judgment in Favor of the County Because No Genuine Disputes of Material Fact Exist and the County is Entitled to Judgment as a Matter of Law**

The County argues that it is entitled to summary judgment because Deputy Hatcher "cannot show that he engaged in compensable activity for which he did not receive pay." (ECF No. 154, at 10–15.) Deputy Hatcher counters that the "declarations and discovery on the record make clear that [he] has *fairly alleged or implied* . . . that he performed compensable work without compensation." (ECF No. 163, at 11 (emphasis added).) Because the record is bereft of *evidence* that Deputy Hatcher engaged in compensable work without compensation while "marked on," the Court will grant the County's Motion.

> **1.    Count I:  The FLSA**

>> **a.    Legal Standard:  Compensable Time Under the FLSA and the Portal-to-Portal Act**

The FLSA "requires employers to compensate employees for all hours worked." *Truslow v. Spotsylvania Cnty. Sheriff*, 783 F. Supp. 274, 277 (E.D. Va. 1992), *aff'd* 993 F.2d 1539 (4th Cir. 1993); *see* 29 U.S.C. § 207(a)(1)("[N]o employer shall employ any of his [or her] employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."); *id.* § 207(k)(setting forth exceptions to § 207(a)(1)'s overtime requirements for public agencies employing employes in "fire protection activities" or "law enforcement activities").

17

But not all work-related activities are compensable under the FLSA. For example, the Portal-to-Portal Act excludes from compensability certain activities that are ancillary to the employee's "principal" activities. *See generally* 29 U.S.C. § 254. Specifically, the Portal-to-Portal Act provides that an employer is not required under the FLSA to compensate employees for

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

> (2) activities which are preliminary to or postliminary to said principal activity or activities[.]

*Id.* § 254(a)(1)–(2). The Portal-to-Portal Act further clarifies that

> the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

*Id.* § 254(a).

The Portal-to-Portal Act thus creates a distinction between "principal activities," which are compensable, and activities that are "preliminary or postliminary" to principal activities, which are not compensable. *Id.* § 254(a)(1)–(2). "An employee's 'principal activity' is the activity or activities which the employee is employed to perform."[8] *Chagoya v. City of Chicago*, 992 F.3d 607, 618 (7th Cir. 2021) (citing *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 36 (2014)); *see also* 29 C.F.R. § 790.8(a) (Department of Labor interpretative statement discussing "principal activities"). The United States Supreme Court explained that activities that are an "integral and indispensable part of . . . principal activities" are themselves principal

---

[8] Neither party offers a definition of what the "principal activity" would be in this case.

18

activities. *Steinger v. Mitchell*, 350 U.S. 247, 256 (1956).[9]

"By contrast, a 'preliminary activity' is an 'activity engaged in by an employee before the commencement of his [or her] 'principal' activity or activities.'" *Chagoya*, 992 F.3d at 619 (quoting 29 C.F.R. § 790.7(b)). "[A] 'postliminary activity' is 'an activity engaged in by an employee after the completion of his [or her] 'principal' activity or activities.'" *Id.* (quoting 29 C.F.R. § 790.7(h)).

To summarize, employees "must receive compensation [under the FLSA] for any activity that 'is an intrinsic element of those activities [that the employee is employed to perform] and one with which the employee cannot dispense if he is to perform his principal activities.'" *Hatcher v. Hines*, No. 3:23-cv-325 (JAG), 2024 WL 1158365, at *4 (E.D. Va. Mar. 18, 2024) (quoting *Integrity Staffing Sols.*, 547 U.S. at 33).

### b.    The Court Will Grant Summary Judgment as to Deputy Hatcher's FLSA Claim in Count I

In considering the parties' earlier cross motions for summary judgment, the Court explained that summary judgment "hinge[d] on whether 'marking on' is a principal activity for which compensation is required under the FLSA, or whether 'marking on' is preliminary to principal activity such that compensation is not required." (ECF No. 122, at 28.)  In the Motion, the County insists that Deputy Hatcher did not mark on with *Dispatch*, meaning he did not mark

---

[9] Also relevant here, the United States Department of Labor's regulations interpreting the FLSA provide:

> A police officer, who has completed his or her tour of duty and who is given a patrol car to drive home and use on personal business, is not working during the travel time even where the radio must be left on so that the officer can respond to emergency calls.  Of course, the time spent in responding to such calls is compensable.

29 C.F.R. § 5553.221(f).

on *at all*, so he necessarily did not engage in any principal activity compensable under the FLSA such that the County is entitled to summary judgment on the FLSA claim. (ECF No. 154, at 10–11.) In response, Deputy Hatcher objects to the County's distinction between marking on *with Dispatch* and marking on with *SCU1*. (ECF No. 163, at 9–10.) He additionally argues that the three disputes of fact this Court identified as precluding summary judgment on the parties' cross motions still preclude the Court from doing so.[10] (ECF No. 163, at 13–14.)

As the Court already explained *supra*, that Deputy Hatcher did not mark on *with Dispatch* does not mean that he did not *mark on*. The Court therefore first proceeds by considering whether the three original material factual disputes this Court identified still preclude summary judgment for the County. After determining that they do not, the Court explains that the County is entitled to judgment as a matter of law because the record lacks evidence that Deputy Hatcher engaged in compensable activity under the FLSA.

> **i.     Previous Factual Dispute 1:  A Dispute of Fact Remains Concerning Whether the County Required Deputy Hatcher to "Mark On" Before His Shift**

This Court previously concluded that a genuine dispute of material fact existed as to whether the County had a policy governing when and how deputies were to "mark on." (ECF No. 122, at 29–31.) In making that finding, the Court relied on evidence provided by the County—and recited above—showing that the County did not have a policy governing when and how deputies were to "mark on." (*See* ECF No. 122, at 29–31; *supra* Section III.A.2.b.) But the

---

[10] In considering the parties' earlier cross motions for summary judgment, the Court concluded that "at least three material factual disputes regarding 'marking on' preclude[d] the Court from granting summary judgment to either party":  (1) whether the County required the plaintiffs to "mark on" before their shifts; (2) whether the plaintiffs were on duty when they were "marked on"; and, (3) whether the plaintiffs were dispatched when they were marked on but before their shifts started. (ECF No. 122, at 28–29.)

record at bar supports Deputy Hatcher's claim that he was required to "mark on" to SCU1 when he got into his vehicle to drive to work before his shift began. (ECF No. 154-4, at 16:21–18:3 (deposition testimony); ECF Nos. 163-1, 163-2 (interrogatory responses); *see infra* Section III.A.2.b.)

As before, the record presents a dispute of fact concerning whether Deputy Hatcher was required to "mark on" before the start of his shift.

> ii. **Previous Factual Dispute 2: Because There is No Evidence that Deputy Hatcher Was "On Duty" When He Marked On With SCU1, No Factual Dispute Remains**

The Court also previously found that genuine disputes of material fact existed as to whether the plaintiffs were "on duty" when they marked on before their scheduled shift. (ECF No. 122, at 31–33.)[11] That is no longer the case. All of the evidence offered in support of Deputy Hatcher's argument that being "marked on" amounts to being "on duty" was specific to *patrol* deputies in marked cars, then a part of the litigation through the now-decertified class and collective actions, who marked on with *Dispatch*. (ECF No. 122, at 31.)

For instance, the Court explained that the code used by patrol deputies to "mark on"—10-41—is defined as "beginning duty" in the Hanover Public Safety Emergency Communications Policy. (ECF No. 122, at 31 (citing ECF No. 104-9, at 3).) The Court also cited deposition testimony of Cheryl Buchanan, the director of dispatch and emergency communications for the County, who affirmed that "10-41" means "begin duty." (ECF No. 122, at 31 (citing ECF No. 104-8, at 4:26–24).) This evidence is specific to marking on with *Dispatch*—an activity Deputy Hatcher concedes he did not do. (*See* ECF No. 163, at 5 (responding "undisputed" to the

---

[11] Intrinsic to this dispute of fact is what it means to be "on duty." Neither party has defined the term.

21

County's statement that Deputy Hatcher "did not mark 10-41 on the Police Dispatch Channel while he was assigned to Street Crimes").)  Crucially, Deputy Hatcher now offers no evidence to indicate that "marking on" with SCU1 likewise means being "on duty."  (Perhaps it does.)  But without *any* evidence on this point, the Court cannot find that a dispute of fact remains as to whether "marking on" with SCU1 is akin to being "on duty."

|  | iii. | **Previous Factual Dispute 3:  Because There is No Evidence that Deputy Hatcher was Dispatched to Calls For Service After Marking on but Before His Shift Began, No Factual Dispute Remains** |
|--|------|------|

Third, and most pivotal here, the Court denied summary judgment because genuine disputes of material fact existed concerning whether the Plaintiffs were dispatched for calls to service after marking on but before their shifts began.  (ECF No. 122, at 33–35.)  Importantly, in reaching this conclusion, the Court relied on Deputy Hatcher's deposition testimony as evidence supporting the finding that the plaintiffs were *not* required to respond to calls while "marked on."  The Court explained:

> Deputy Hatcher testified that from May 15, 2020, to May 31, 2022, he could not recall how many times he actually responded to a call while on the way to work. ([ECF No. 100-9, at 15]:7–12.)  He testified that in that time frame, if he responded to a call after having marked "90 back" but before he arrived at work, "it wouldn't have been a situation where [he] would have been dispatched to a call, it would have been more so [him] keying up that [he] was in the area or something that [he] observed."  ([ECF No. 100-9, at 15]:13–23.)  However, he did not recall "any specifics or any particular call that resulted in [him] responding[.]"  ([ECF No. 100-9, at 15]:24–98:2.)

(ECF No. 122, at 33–34.)  In response to the County's instant Motion for Summary Judgment, Deputy Hatcher offers no new evidence that he was dispatched to calls or otherwise required to respond to emergencies or accidents while "marked on."  To the contrary, Deputy Hatcher *concedes* as much.  (ECF No. 163, at 14 (explaining that Deputy Hatcher "was an investigator and marked on SCU1, a channel not observed by [D]ispatch and his Unit did not respond to

22

emergency calls").)  And given his plainclothes dress, unmarked car, and covert status, a reasonable inference could be made that Deputy Hatcher would not respond to any call for aid.

In an effort to salvage his claim, Deputy Hatcher argues that although the "third material dispute of fact" does not apply to him because he never "marked on" with Dispatch, the "principles guiding th[is] factual question remain[]." (ECF No. 163, at 14.)  He maintains that although he was not dispatched to respond to emergencies on his drive to and from work, he was required to "mark on" and report to his target location thirty minutes before his shift began, and that he performed compensable work after he arrived at the target location but before his shift started. (ECF No. 163, at 13–14.)

Unfortunately, Deputy Hatcher offers no *evidence* that he performed compensable work prior to his shift beginning.  Indeed, Deputy Hatcher asks this Court to "*infer[]*" that that once he arrived at his "target location," he engaged in principal activities that he was employed to perform:  investigating crimes, interviewing witnesses, surveilling suspects, and intercepting perpetrators. (ECF No. 163, at 12 (emphasis added).)  The Court is required to draw all reasonable factual inferences in Deputy Hatcher's favor.  But it cannot assume, as Deputy Hatcher now asks it to, the existence of evidence not in the record.  *Robinson v. Priority Auto. Huntersville, Inc.,* 70 F.4th 776, 780 (4th Cir. 2023) ("[P]laintiffs need to present more than their own unsupported speculation and conclusory allegations to survive [summary judgment]."); *OLA Montgomery v. MPR Assocs., Inc.,* No. Civ. A. 04-1508 (CMH), 2005 WL 2009286, at *2 (E.D. Va. Aug. 16, 2005) ("Unsupported speculation by the non-moving party 'cannot create a genuine issue of material fact.'") (quoting *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1986)).  The Court cannot credit Deputy Hatcher's conclusory allegation that he performed compensable activities

23

while at the target location. As such, that assertion does not create a genuine dispute of material fact precluding summary judgment.

>            iv.    **No Genuine Disputes of *Material* Fact Remain That Preclude Summary Judgment for the County on the FLSA Claim**

In sum, none of the disputes of fact this Court previously identified as precluding summary judgment for the County prevent the Court from doing so at this juncture. Although a dispute of fact exists as to whether the County required Deputy Hatcher to "mark on" before leaving his house, this dispute is no longer *material*: while the Court previously found that it would be *necessary* for Deputy Hatcher to establish that the County required him to "mark on" before his shift began in order for him to establish a claim under the FLSA, it is not *sufficient* to do so. To prevail, he must also show that after "marking on" he was considered "on duty" *and* was dispatched to calls. The record does not support either finding.

>            v.    **The County is Entitled to Judgment as Matter of Law Because Deputy Hatcher Did Not Engage in Principal Activities Compensable Under the FLSA**

Based on the present record, Deputy Hatcher did not engage in compensable activity under the FLSA. Even *assuming* that Deputy Hatcher "marked on" with SCU1, marking on, *on these facts*, is a preliminary activity under the Portal-to-Portal Act and therefore not compensable under the FLSA. *See* 29 U.S.C. § 254(a). The record before the Court is clear: beyond the rote physical act of "marking on" with SCU1, no *evidence* exists that Deputy Hatcher engaged in *any* activities[12] *at all* from the time he left his residence to the time he arrived at his "target location,"

---

[12] Deputy Hatcher testified in deposition that he "monitor[ed]" the Dispatch frequency so he could "hear what's going on in the [C]ounty." (ECF No. 154-4, at 17:8–15.) Although he does not argue that this activity is integral to his principal activities such that it would be compensable, even if he had, this would not change the outcome here. For instance, many courts

24

let alone activities that could be construed to be compensable "principal activities." Acknowledging as much, Deputy Hatcher asks the Court to *infer* that he engaged in compensable activity. (ECF No. 163, at 12.)  But the Court has already found that no genuine disputes of material fact exist as to whether Deputy Hatcher was on duty or dispatched to calls for service while marked on.

Given this dearth of evidence, to determine that Deputy Hatcher's "marking on" with SCU1 was a principal activity would run afoul of the dictates of the Portal-to-Portal Act, which clearly provides that "[t]he time that the deputies spent commuting in marked patrol vehicles is excluded from compensable work time by the Portal-to-Portal Act." *Llorca*, 893 F.3d at 1326–28; 29 U.S.C. § 254(a); *see also Chagoya*, 992 F.3d at 622 (dismissing FLSA claims by police officers for "time spent . . . in their [] vehicles driving to and from their duty station for their regular work shifts"); *Adams v. United States*, 471 F.3d 1321, 1323–27 (Fed. Cir. 2006) (dismissing FLSA claims by police officers for commute time in government-owned vehicles even if required to "monitor their vehicles' communication equipment" during their commute).

This Court's previous reliance on *Hertz v. Woodbury County, Iowa*, No. 06-cv-4083, 2008 WL 2095553 (N.D. Iowa May 16, 2008), does not compel a different outcome because the

---

have persuasively ruled in a manner dispositive to Deputy Hatcher's claims here when deciding that time spent commuting to the office is not compensable even where the officer monitors his or her radio. *See Llorca*, 893 F.3d at 1326–28 (finding that the "time that the deputies spent commuting in marked patrol vehicles is excluded from compensable work time by the Portal–to–Portal Act," even where the deputies were required to "monitor their radios" and "monitor the roads for traffic violations" during their commutes); *Adams v. United States*, 471 F.3d 1321, 1323–27 (Fed. Cir. 2006) (dismissing FLSA claims by police officers for commute time in government-owned vehicles even if required to "monitor their vehicles' communication equipment" during their commute); 29 C.F.R. § 5553.221(f) (Department of Labor regulation expressly providing that "[a] police officer, who has completed his or her tour of duty and who is given a patrol car to drive home and use on personal business, *is not working during the travel time even where the radio must be left on so that the officer can respond to emergency calls*") (emphasis added)).

Court now finds otherwise.  (ECF No. 122, at 36–37.)  As this Court previously explained, the plaintiffs in *Hertz* were "employed by the Woodbury County Sheriff's Department."  (ECF No. 122, at 36 (citing *Hertz*, 2008 WL 2095553, at *1).)  The undisputed evidence in *Hertz* showed that two plaintiffs commuted to and from work in marked cars, which Woodbury County had the officers drive for "three reasons:  to increase police presence; to reduce response time; and to engage in law and traffic enforcement while commuting to and from the office."  *Hertz*, 2008 WL 2095553, at *1.  Both plaintiffs "report[ed] (via radio) '10-41,'" which "mean[t] the officers [were] 'on-duty,'" when they "enter[ed] their patrol cars for the morning commute to the office."  That information was "communicated to the Woodbury County Communications Center."  *Id.*

The officers in *Hertz* claimed that Woodbury County failed to compensate for "on duty" time under the FLSA because they were "required to report '10-41' ('on-duty') when they enter[ed] the[ir] vehicle each morning . . . and that [they were] available to respond to calls while commuting to and from the office."  *Id.* at *4.  They also argued that the county benefited from their driving to work in marked cars because doing so "increased police presence [and] reduced response time," and because they were "engaged in law and traffic enforcement" on the way.  *Id.* However, the *Hertz* court noted that one plaintiff "points to only one instance where he removed debris from the roadway during his commute to work."  *Id.*  In response, Woodbury County argued that the plaintiffs did not perform any compensable work because the plaintiffs were "only commuting and did not demonstrate that they are performing any work."  *Id.*  In support of this argument, Woodbury County claimed "that neither officer pulled over any vehicles for traffic violations, investigated any suspicious vehicles, or responded to any other calls during the entire time."  *Id.*

The *Hertz* court denied summary judgment for Woodbury County, finding that a "factual

issue [existed] with regard to the amount of time spent by plaintiffs performing 'work' during their commutes to and from work," and that "[t]he actual amounts of time spent by plaintiffs on such activities, and whether that time is substantial or negligible such as to be deemed de minimis," required resolution by a factfinder. *Id.* at *7.

*Hertz* is now distinguishable for at least three reasons. First, unlike Deputy Hatcher, the officers in *Hertz* marked on duty with *Dispatch* by stating "10-41." Deputy Hatcher did not mark on with Dispatch, nor did he use the code "10-41." Second, the phrase the officers used to "mark on"—"10-41"—meant "on duty," suggesting that the officers were "on duty" when they were "marked on." Although this Court previously credited similar evidence as indicative that the class-wide plaintiffs were "on duty" when they marked on "10-41," Deputy Hatcher did not "mark on" using the phrase "10-41," and he drove an unmarked car and wore plain clothes, meaning that his covert status would constrain the likelihood of responding to an event.[13] And third, the court in *Hertz* observed that although the officers did not pull vehicles over, investigate suspicious vehicles, or respond to other calls, one plaintiff pointed to an instance where he removed debris from the roadway during his commute. Even that minimal evidence does not exist on the present record.

---

[13] Another fact identified above—although not one relied upon by the plaintiffs or cited by the Court in its earlier opinion on summary judgment—distinguishes *Hertz* from the instant case: that Deputy Hatcher drove an unmarked car. (ECF No. 154, at 14.) The *Hertz* court explained that the officers drove their *marked* cars to and from the office to "increase police presence," and their doing so benefited the county. 2008 WL 2095553, at *1, *4. In contrast, as a member of the Street Crimes Unit, Deputy Hatcher did not wear a uniform and drove an unmarked car. (ECF No. 154-4, at 20:11–13, 21:2–5.) By his own admission, his covert car and plainclothes dress was to prevent the general public from knowing that he was law enforcement. (ECF No. 154-4, at 20:23–21:1.) Thus, Deputy Hatcher's intentional disguise did not provide the same benefit to the County during his commute as that described in *Hertz*, and therefore could not be construed to amount to a principal activity requiring compensation.

27

At bottom, no *material* disputes of fact exist and the County is entitled to summary judgment as a matter of law on Deputy Hatcher's FLSA claim in Count I.  Accordingly, the Court will dismiss Deputy Hatcher's claim under the FLSA in Count I.  The Court next considers Deputy Hatcher's VGPA claim.

### 2.    Count III:  The VGPA

#### a.    Legal Standard:  Compensable Time Under the VGPA

The VGPA provides that "[e]mployers shall pay fire protection or law-enforcement employees overtime compensation or leave, as under the [FLSA], 29 U.S.C. § 207(o), at a rate of not less than one and one-half times the employee's regular rate of pay for all hours of work between the statutory maximum permitted under 29 U.S.C. § 207(k) and the hours for which an employee receives his salary[.]" Va. Code § 9.1-701(A).  "For purposes of computing . . . law-enforcement employees' entitlement to overtime compensation, all hours that an employee works or is in a paid status during his regularly scheduled work hours shall be counted as hours of work." Va. Code § 9.1-703.

The Virginia General Assembly intended for the VGPA to "operate in conjunction with the FLSA." *Bailey v. Loudoun Cnty. Sheriff's Office*, 762 S.E.2d 763, 768 (Va. 2014). Accordingly, whether a plaintiff prevails under the VGPA "necessarily requires" a plaintiff to "first prevail on [his or her] FLSA claim." *Emmons v. City of Chesapeake*, No. 2:18-cv-402 (LRL), 2019 WL 8888192, at *1 n.2 (E.D. Va. June 18, 2019), *aff'd*, 982 F.3d 245 (4th Cir. 2020) (finding that "a determination of whether plaintiffs may prevail under the Virginia Gap Pay Act necessarily requires plaintiffs first prevail on their FLSA claim").

28

      **b.**      **The Court Will Grant Summary Judgment on the VGPA Claim in Count III**

Deputy Hatcher's claim under the VGPA rises and falls with his claim under the FLSA. *See Emmons*, 2019 WL 8888192, at \*1 n.2. Because the County is entitled to summary judgment on Deputy Hatcher's FLSA claim, the County is likewise entitled to summary judgment on Deputy Hatcher's VGPA claim. Accordingly, the Court will dismiss Deputy Hatcher's claim under the VPGA in Count III.

### IV. Conclusion

For the reasons articulated above, the Court will deny the Motion for Summary Judgment, (ECF No. 153), with respect to the County's argument that Deputy Hatcher lacks standing. However, the Court will grant the Motion for Summary Judgment and dismiss Deputy Hatcher's claims as a matter of law.

An appropriate Order shall issue.

Date: 6/26/26
Richmond, Virginia

/s/
M. Hannah Lauck
Chief United States District Judge

29